McNUTT LAW GROUP LLP
SCOTT H. McNUTT (CSBN 104696)
SHANE J. MOSES (CSBN 250533)
MARIANNE M. DICKSON (CSBN 249737)
188 The Embarcadero, Suite 800
San Francisco, California 94105
Telephone: (415) 995-8475
Facsimile: (415) 995-8487

MICHAEL ST. JAMES (CSBN) 95653
ST. JAMES LAW, P.C.
155 Montgomery Street, Suite 1004
San Francisco, California 94104
(415) 391-7566 Telephone
(415) 391-7568 Facsimile

Proposed Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>Round Table Pizza Inc.,<br><br>Debtor.<br><br>In re<br><br>Round Table Development Co.,<br><br>Debtor.<br><br>In re<br><br>The Round Table Franchise Corp.,<br><br>Debtor.<br><br>In re<br><br>Round Table Pizza Nevada, LLC,<br><br>Debtor. | Case Nos. 11-41431 RLE<br>11-41432 RLE<br>11-41433 RLE<br>11-41434 RLE<br><br>Chapter 11<br><br>**MOTION FOR ORDER AUTHORIZING USE OF CASH COLLATERAL**<br><br>Judge: Hon. Roger Efremsky<br>Date: February 11, 2011<br>Time: 10:30 a.m.<br>Place: United States Bankruptcy Court<br>1300 Clay Street<br>Oakland, California. |

205877.1

| | |
|---|---|
| Respondents: | General Electric Credit Corporation |
| | The Prudential Insurance Company of America |

## I. INTRODUCTION

Round Table Pizza, Inc., Round Table Franchise Corporation, Round Table Development Company, and Round Table Pizza of Nevada, LLC, the joint debtors and debtors in possession in the above captioned Chapter 11 reorganization cases (collectively "Round Table" or "Debtor"), hereby jointly move the Court for an order authorizing the Debtors to use cash collateral in the ordinary course of their business (the "Cash Collateral Motion"), and generally consistent with the 13 week cash budget attached hereto (the "Budget"). On an emergency interim basis pending final relief, the Debtors seek emergency interim relief to disburse approximately $1.2 million in the week ending February 13, 2011, approximately $2.4 million in the week ending February 20, 2011, and approximately $2 million in the week ending February 27, 2011; during that three week period, the Debtors project that their net cash will increase by approximately $1 million.

Respondents General Electric Credit Corporation and The Prudential Insurance Company of America (collectively, "GECC / Prudential" or "Lenders") assert that they hold duly perfected security interests in substantially all of Round Table's assets, including its cash, to secure an obligation of approximately $30 million.

This Cash Collateral Motion is based on the Memorandum of Points and Authorities set forth herein, the NOTICE OF HEARING ON FIRST DAY MOTIONS (the "Omnibus Notice"), the DECLARATION OF ROB MCCOURT IN SUPPORT OF FIRST DAY MOTIONS (the "Omnibus Declaration") filed concurrently herewith and incorporated herein by reference, the pleadings and papers on file herein, and upon such oral and documentary evidence as may be presented at the hearing on the Cash Collateral Motion. By a separate application, Debtors have requested an order shortening time for notice and setting a hearing on this matter and other "first day" motions on an expedited basis.

## II. JURISDICTION

On February 7, 2011 (the "Petition Date"), the Debtors filed their voluntary petitions for relief under Chapter 11 of Title 11 of the United Stated Code in the United States Bankruptcy

Court for the Northern District of California.

The Court has jurisdiction over this case and this Motion Pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409(a).

The statutory bases for the relief requested herein are §§ 105(a) and 363of the Bankruptcy Code.

### III. FACTS

**A. Background**

Round Table's first restaurant opened in Menlo Park, California in 1959. Over the past 50 years, Round Table has grown to dominate the Northern California market for pizza, to become a major West Coast chain, with nearly 500 stores in seven States, and to engage in international franchise development.

During the same period, Round Table diversified from acting exclusively as a franchisor to also operating company owned stores, ultimately acquiring and developing 140 company-owned stores and swelling its employee base from 70 to a peak of over 3,000 employees.

During the decade prior to the Great Recession, Round Table enjoyed tremendous growth. Between 1997 and 2006, revenues grew from $15 million to $120 million per year, and operating profits grew from $4.3 million to $10.5 million. In February of 2007, Round Table obtained a new credit facility. Although Round Table restructured its business to adjust to the Great Recession, the terms of the credit facility could not be met by that restructured business. Efforts to renegotiate the terms of the credit facility were unsuccessful.

A fuller presentation of Round Table's background, the circumstances which led to the instant Chapter 11 filing, and Round Table's expectations regarding its reorganization is set forth in the Declaration of Rob McCourt in Support of First Day Motions.

## B. The GECC / Prudential Credit Facility

The February 2007 GECC / Prudential credit facility provided for borrowings of up to $65 million dollars. $21 million was drawn down at the outset to retire existing secured debt. An additional $7.r million was drawn to pay for company stores which were developed and committed to just prior to the Great Recession. Finally, $1.5 million was drawn down in June of 2010 to provide Round Table with liquidity. Currently, the aggregate outstanding indebtedness on the credit facility is approximately $30 million dollars.

The credit facility applies a floating interest rate, originally set at 3.75% over LIBOR. At inception, the lenders insisted that Round Table hedge its potential exposure to an increase in the LIBOR rate by obtaining an interest rate hedge contract from Rabo Capital. The LIBOR rate dropped substantially during the intervening period (from more than 5% to less than 1%), rendering the Rabo Capital hedge contract pointless. For the last quarter of 2010, the obligation to Rabo Capital on the interest rate hedge contract was $260,000.

The credit facility contemplated a high and escalating level of principal repayment: nearly $1.6 million in 2010, twice that in 2011 and treble that in 2012. At the time the schedule was negotiated, Round Table had been enjoying a decade of substantial and uninterrupted growth, was expecting imminently to acquire 35 company stores and to build an additional 65 company stores, and projected 2010 revenue in excess of $210 million. Projecting the future on the basis of past experience and then-current plans for growth, the negotiated rates of principal repayment seemed reasonable.

Unfortunately, the Great Recession followed shortly after the inception of the credit facility, plans for growth were shelved, and actual 2010 revenue was only $112 million. As a consequence, the contract rates of principal repayment were not achievable. Round Table sought to negotiate modifications of its obligations under the credit facility that would permit ongoing

performance in this changed economic environment, but was entirely unsuccessful.

Instead, through an August 31, 2010 Amendment, GECC / Prudential increased the interest rate, and thereafter required a shift in the base rate from LIBOR to prime. Interest on the facility now accrues at 6.5% over prime, or currently 10.05%. (By contrast, interest at the rate originally contemplated by the credit facility, 3.25% over LIBOR, would amount to less than 4%.) Including the charge on the Rabo Capital hedge contract, the aggregate effective interest rate imposed on Round Table by the credit facility is now 13.59%. A current market interest rate would amount to 6.5% to 7%.

In connection with its ESOP, an independent appraiser valued Round Table at $45 million as of December 31, 2009. Round Table engaged in marketing efforts immediately prior to the Petition Date, which confirmed an enterprise value in that range. GECC / Prudential is owed $30 million, and thus has an equity cushion of more than $10 million.

**C.  Intended Reorganization**

There are two core aspects to Round Table's business: a franchisor to independent third party owner-operators, and operating company-owned stores.

There are currently 355 franchised stores owned by 148 franchisees. The franchise base is highly diversified: 91% of the franchisees own 5 stores or less, and only two franchisees own 20 to 25 stores. Management believes that the franchise segment of Round Table's business is sound, produces stable profits and does not require material reorganization.

Round Table operates 128 company-owned stores. Although most of them are profitable, a number of the stores have been unable to operate profitably in the current economic environment, generating significant losses. Over the first 4 to 6 months of its Chapter 11 case, Round Table intends to close unprofitable stores and to renegotiate leases with respect to its marginal stores. Within 4 to 6 months, Round Table expects that its remaining base of company-owned stores will be stable and profitable.

Round Table expects to have maximized the value of the chain, through store closings and lease renegotiations, by the conclusion of the initial phase of its reorganization, after which it intends to complete its reorganization by embarking on one of two paths.

If it appears that an appropriate value can be realized for the benefit of all of its constituencies through a sale, Round Table is amenable to engaging in that process.

On the other hand, if problems in the economy and the credit industry make it impossible to realize an appropriate value for the company this year, Round Table will propose a Plan of Reorganization which restructures its debt so that it can operate successfully for a period of perhaps five years, by the conclusion of which it would expect to sell the business or refinance the debt.

For either reorganization to succeed, the Round Table must remain a going concern, requiring it to pay its operating expenses in the ordinary course of business.

### D. Proposed Use of Cash

The attached 13 week cash budget identifies Round Table's current expectations for the use of cash through the week ending May 8, 2011. The Budget reflects no material net change in cash during the Budget period.

The Budget may be changed from time to time based on business developments and in response to any concerns raised by parties in interest.

### IV. RELIEF REQUESTED

### A. Interim Relief

As contemplated by Rule 4001(b), Round Table seeks emergency use of cash collateral on an interim basis until a final hearing on this Motion can be held. The final hearing can be held no earlier than 14 days after service of this Motion. Round Table assumes that the final hearing will be scheduled for the week of February 21-25, 2011.

Pending the final hearing, Round Table seeks permission to use cash to sustain business

operations consistent with the Budget. Specifically, Round Table seeks to disburse approximately $1.2 million in the week ending February 13, 2011, approximately $2.4 million in the week ending February 20, 2011, and approximately $2 million in the week ending February 27, 2011. During that three week period, Round Table projects that its net cash will increase by approximately $1 million.

**B.    Final Relief**

Round Table requests that it be authorized freely to expend cash in the ordinary course of its business and consistent with the Budget, as revised and extended from time to time.

**C.    Adequate Protection**

Substantially all of Round Table's value is associated with its status as a going concern. Were Round Table to liquidate (absent a liquidation sale which preserved at least its franchise operations as a going concern), Round Table would have limited realizable value. Thus, the most significant adequate protection to be afforded to GECC / Prudential is Round Table's continuation in business as a going concern, a status which can be maintained only if Round Table continues to pay its operating expenses in the ordinary course of business.

The second most valuable adequate protection Round Table can provide GECC / Prudential is to implement the initial phase of its business reorganization. "Adequate protection" protects against a diminution in the creditor's collateral base, but the Budget contemplates no diminution in cash, and by eliminating unprofitable company stores and restructuring marginal stores,GECC / Prudential will be left with a collateral base consisting exclusively of a profitable franchise business and a profitable company store business.

Third, GECC / Prudential enjoys a substantial equity cushion – more than $10 million – which provides adequate protection for its interests.

Since there is no anticipated diminution in the collateral base, and in fact the collateral

basewill be enhanced, Round Table believes that the foregoing adequately protects GECC / Prudential's interests.

Nonetheless, as a fourth form of adequate protection, Round Table is willing to secure any diminution in GECC / Prudential's collateral base with a replacement lien against its post-petition assets (other than rights arising under Chapter 5) with the same nature, extent, validity and enforceability as its pre-petition lien.

Round Table submits that the foregoing adequately protects GECC / Prudential's interests, such that Round Table should be permitted freely to use cash in the ordinary course of its business, including cash collateral, and to implement such Orders as the Court may hereafter enter.

## V. AUTHORITY FOR RELIEF REQUESTED

### A. Extent of Cash Collateral

Although Round Table has not conducted a thorough review or completed its analysis, it appears that GECC / Prudential holds a duly perfected and enforceable security interest in substantially all of Round Table's assets and enjoys "cash collateral" rights with respect to much of Round Table's revenues. For the purposes of this Cash Collateral Motion only, Round Table concedes Section 363(p)(2).

Round Table believes that its estate is solvent and that GECC / Prudential holds more than 75% of the debt. As a consequence, Round Table believes that there is no present purpose to be served at this early stage in its reorganization by searching for holes in GECC / Prudential's security interest or collateral rights.

Conversely, it would be inappropriate in the current circumstances for Round Table to attempt to bind its estate to resolutions of those issues. Any relief granted to Round Table or GECC / Prudential now should be without prejudice to reconsideration, recharacterization or re-allocation in the future.

**B.     Use of Cash Collateral**

Section 363 (c)(2) provides, in pertinent part, as follows:

> The trustee [or debtor in possession] may not use, sell or lease cash collateral ... unless:
>
> (A)   each entity that has an interest in such cash collateral consents; or
>
> (B)   the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

Thus, a court may authorize a debtor's use of a creditor's cash collateral in the absence of creditor consent. Section 363(e) of the Bankruptcy Code provides, however, that the court may prohibit or condition such use "as is necessary to provide adequate protection" for the interest of the secured creditor. The burden of proof respecting the existence of adequate protection is on the moving party. § 363(p)(1).

Thus, this Court may authorize Round Table's use of any cash collateral of GECC / Prudential if it determines that the interests of GECC / Prudential are being adequately protected. *In re McCombs Properties VI, Ltd.,* 88 B.R. 261 (Bankr. C.D. Cal. 1988).

**C.     Right to Adequate Protection**

The law on this subject was established by the Supreme Court more than 20 years ago in *United Savings v. Timbers of Inwood Forest,* 484 U.S. 365, 108 S.Ct. 626 (1988).

The Supreme Court held that the "interest in property" which is to be the subject of adequate protection is limited to the "value of the collateral." *Timbers,* 108 S.Ct. at 630. The adequate protection provisions of the Bankruptcy Code protect a secured creditor only from a potential diminution in the value of that creditor's collateral during the post-petition period. Id.

In this case, there is no basis to believe that the value of GECC / Prudential's collateral will diminish. The Budget reflects no net diminution in cash, either in the interim period or for the 13 week Budget period as a whole. Viewed more broadly, GECC /

Prudential's collateral will be enhanced, as unprofitable stores are closed and marginal stores are restructured to profitability.

The courts have consistently held that where there is no diminution in the value of the collateral, there is no need for adequate protection or "adequate protection payments."

> [T]he Court finds that the property is not depreciating in value. In consequence, the Court finds that Lomas [Secured Creditor] is adequately protected by the value of its collateral . . . The right to receive payments is a simple contract right, that supports only a claim in the bankruptcy case. There is no other adequate protection to which Lomas is entitled under the Bankruptcy Code.

*In re Elmore,* 94 B.R. 670, 677 (Bankr. C.D. Cal. 1988). And see, e.g., *In re Johnson,* 90 B.R. 973, 978 (Bankr. D. Minn. 1988) (secured creditor is not impaired and is not entitled to receive adequate protection payments where value of collateral does not decline); *In re Century Inv. Fund, VII Ltd. Partnership,* 96 B.R. 884, 887 (Bankr. E.D. Wis. 1989) (where value of collateral appears to be stable, secured creditor is not entitled to adequate protection payments); *In re Anderson,* 86 B.R. 877, 889 (Bankr. N.D. Ind. 1988) (secured creditor was required to show a necessity for adequate protection by demonstrating a decline in asset value from the petition date); *In re Kessler,* 86 B.R. 134, 136 (Bankr. C.D. Ill. 1988) (under *Timbers,* movants are not entitled to adequate protection payments, as there was no showing that property was depreciating in value).

**D.     Provision of Adequate Protection**

To the extent that there is an obligation to provide adequate protection, Round Table proposes to do so in two ways.

First, an equity cushion is routinely considered a form of adequate protection. Here, GECC / Prudential enjoys an equity cushion of at least $10 million beyond its debt of $30 million.

Second, Round Table is prepared to offer GECC / Prudential a replacement lien

encumbering post-petition assets (other than rights and causes of action arising under Chapter 5 of the Bankruptcy Code), with the same nature, extent, scope and validity as its existing lien to secure any diminution in its collateral value.

Round Table submits that, in the unlikely event that GECC / Prudential is entitled to adequate protection, these proposals adequately provide it.

**E.  Conclusion**

Use of cash, including cash collateral, is essential to the preservation of Round Table's business and going concern value.  The Court can authorize the use of cash notwithstanding the absence of consent by GECC / Prudential.

The Court may condition the use of cash on the provision of adequate protection to GECC / Prudential so as to protect it from a diminution in the value of its collateral base. Here, no net loss of cash is contemplated, and the balance of GECC / Prudential's collateral base will be enhanced by Round Table's reorganization efforts.

GECC / Prudential's interests will be adequately protected by preservation of Round Table's going concern value, implementation of Round Table's reorganization and, in the unlikely event of a diminution in value, replacement liens on post-petition assets to secure that diminution.

## VI.  PRAYER

WHEREFORE, Round Table respectfully requests that the Court enter an Order:

1. Granting the Cash Collateral Motion;

2. Setting a final hearing on the Cash Collateral Motion;

3. Authorizing Round Table, on an interim and emergency basis, to use cash collateral pending the final hearing generally consistent with the Budget;

4. Authorizing Round Table, following the final hearing, freely to use cash collateral in the ordinary course of its operations, generally as contemplated by the Budget as it is from time to time amended, and as otherwise contemplated by such Orders as the Court may hereafter enter;

5. Affording GECC / Prudential replacement liens against Round Table's post-petition assets (other than rights and causes of action arising under Chapter 5 of the Bankruptcy Code) with the same nature, extent, validity and enforceability as their pre-petition liens, but solely to secure any diminution in the value of its collateral; and.

6. Granting such further relief the Court deems just and proper.

DATED: February 9, 2011  Respectfully submitted,

McNUTT LAW GROUP LLP

By: /s/ *Scott H. McNutt*
Scott H. McNutt
Proposed Attorneys for Debtor