MCNUTT LAW GROUP LLP
SCOTT H. McNUTT (CSBN 104696)
SHANE J. MOSES (CSBN 250533)
MARIANNE M. DICKSON (CSBN 249737)
188 The Embarcadero, Suite 800
San Francisco, California 94105
Telephone: (415) 995-8475
Facsimile: (415) 995-8487

MICHAEL ST. JAMES (CSBN) 95653
ST. JAMES LAW, P.C.
155 Montgomery Street, Ste. 1004
San Francisco CA 94104
Telephone: (415) 391-7566
Facsimile: (415) 391-7568

Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>Round Table Pizza Inc.,<br><br>Debtor. | Case Nos. 11-41431 RLE<br>11-41432 RLE<br>11-41433 RLE<br>11-41434 RLE<br><br>Chapter 11 |
| In re<br><br>Round Table Development Co.,<br><br>Debtor. | **DECLARATION OF J. ROBERT McCOURT IN SUPPORT OF FIRST DAY MOTIONS**<br><br>Judge: Hon. Roger Efremsky<br>Date: February 11, 2011<br>Time: 10:30 a.m.<br>Place: United States Bankruptcy Court<br>1300 Clay Street<br>Oakland, California |
| In re<br><br>The Round Table Franchise Corp.,<br><br>Debtor. | |
| In re<br><br>Round Table Pizza Nevada, LLC,<br><br>Debtor. | |

I, J. Robert McCourt, declare as follows:

1. I am the President and Chief Executive Officer of Round Table Pizza, Inc., Round Table Franchise Corporation, Round Table Development Company, and Round Table Pizza of Nevada, LLC, (collectively, "Round Table"). As discussed below, all of these entities have been operated as a single unitary business.

2. I have been a member of Round Table's management team since 1996. I make this Declaration of my personal knowledge and based on my review of Round Table's books and records and inquiries of Round Table's management and employees. I could and would competently testify as follows:

## I. BACKGROUND

3. Round Table's first restaurant opened in Menlo Park, California in 1959. Over the past 50 years, Round Table has grown to dominate the Northern California market for pizza, to become a major West Coast chain, with nearly 500 stores in seven States, and to engage in international development.

4. During the same period, Round Table diversified from acting exclusively as a franchisor to also operating company owned stores, ultimately acquiring and developing 140 company-owned stores and swelling its employee base from 70 to a peak of over 3,000 employees.

5. During the decade prior to the Great Recession, Round Table enjoyed tremendous growth. Between 1997 and 2006, revenues grew from $16 million to $120 million per year, and operating profits grew from $4.3 million to $10.5 million.

6. Having enjoyed consistent profitable expansion over the preceding decade, Round Table sought a new credit facility that would support further expansion, including a planned acquisition of more than 35 stores. In February of 2007, Round Table closed a $65 million credit facility jointly provided by General Electric Capital Corporation and The Prudential Insurance Company of America (collectively, "GECC / Prudential"), providing it with the ability to fund further expansion.

## II. THE GREAT RECESSION

7.  Round Table's management was sensitive to the economic environment, especially regarding employment, since there is an extremely close relationship between employment levels and Round Table's unit sales. *See* Exhibit A. Round Table's management responded promptly to increases in unemployment in mid-2007 and the onset of the Great Recession. In late 2007, management halted the growth which had driven the company for the preceding decade, shelving the plans to acquire more than 35 stores and ultimately terminating all efforts to acquire or develop new company stores.

8.  As the Great Recession continued, the company focused on reducing expenses. General administrative and overhead expenses were reduced from $12.2 million dollars in 2006 to $6 million dollars in 2009, while Round Table increased market share by 4% during the same period. Round Table's management addressed the profitability and performance of the company stores by closing under-performing stores as leases expired, seeking concessions from landlords and selling some of the stores to franchisees. Round Table's management also reduced costs above the company store level, ultimately engaging in 5 rounds of lay-offs and severing a total of 54 employees.

9.  Management led the cost reductions. Corporate employees and senior management received no merit increases in 2007, 2009 and 2010, and only a 2.6% increase in 2008. Historically, corporate employees had received low salaries counterbalanced by high bonuses, but only a nominal bonus ($125,000 among 85 employees) was paid in 2007, and no bonuses were earned or paid in 2008, 2009 and 2010. Management also forfeited more than $500,000 in earned compensation and vacation pay to improve the company's performance.

10. In addition, in response to the Great Recession, senior management deferred almost $2 million dollars in compensation, compensation which had been earned by exceeding performance targets in 2005 and 2006 but was first payable in 2008. Although ample funding was available to pay that compensation at the time, management deferred the compensation because it recognized that the cash would be useful to the company in weathering the approaching storm.

## III. OWNERSHIP AND VALUE

11. Round Table has been largely owned by an Employee Stock Ownership Plan (the "ESOP") for much of its history, and solely owned by the ESOP for more than a decade. The ESOP is designed and intended to provide a source of retirement income to Round Table's loyal, long-term employees. There are currently 3,190 participants in the ESOP. Round Table's management is committed to maximizing the recovery to its employees through the ESOP.

12. Round Table is required to provide the ESOP with liquidity with which it can make distributions, based on the company's share price, as determined by an independent appraiser, based on market data and market comparisons. As of December 31, 2009, Round Table was valued by the independent appraiser at $45 million. I believe that value to be fair and reasonable, and consistent with the market, including my recent experience in attempting to sell the company, discussed below.

13. Although Round Table has supported and promoted the ESOP, in certain respects, ESOP ownership has exacerbated Round Table's financial stress. The ESOP and applicable law establishes specified monetary contributions that the company must make to the ESOP each year; additionally, Round Table committed to set levels of voluntary contributions which were only reduced in response to the pressures of the Great Recession.

14. Round Table's contributions to the ESOP since 2004 have exceeded $11 million.

15. In addition, the company's obligation to provide the ESOP with liquidity to make distributions to participants based on the company's value exacerbates demands on Round Table's cash.

16. Ordinarily, much of the annual contribution is payable at the end of the succeeding year. Round Table failed timely to pay, at the urging of its Lenders, contributions due December 31, 2010, aggregating $826,000. Including 2010 obligations, which are due in 2011, Round Table currently owes about $1.44 million to the ESOP.

## IV. EXTRANEOUS EVENTS

17. In the midst of the Great Recession, Round Table was required to address and resolve two wage and hour class action lawsuits. Aggregate costs associated with this litigation exceeded $4.3 million, imposing additional strains on the company's liquidity. Unpaid obligations under the class action settlements currently aggregate about $380,000.

18. In 2010, the pizza market became extremely price competitive as a result of the Great Recession. Round Table could not materially reduce the cost of its ingredients, since it had established its reputation as "the last honest pizza." The lower margins during this period put additional stress on Round Table's profitability.

## V. THE GECC / PRUDENTIAL CREDIT FACILITY

19. The credit facility provided for borrowings of up to $65 million dollars. $21 million was drawn down at the outset to retire existing secured debt. Additional funds were drawn to pay for company stores to which Round Table had committed before the onset of the Great Recession time. Finally, $1.5 million was drawn down in June of 2010 to provide Round Table with liquidity.

20. Since inception in March of 2007, Round Table has repaid more than $9.7 million in principal, and has paid interest and fees aggregating more than $8.2 million. Currently, the aggregate outstanding indebtedness on the credit facility is approximately $30 million dollars.

21. The credit facility imposes a floating interest rate, originally set at 3.25% over LIBOR. At inception, the Lenders insisted that Round Table hedge its potential exposure to an increase in the LIBOR rate by obtaining an interest rate hedge contract from Rabo Capital. The LIBOR rate dropped substantially during the intervening period (from more than 5% to less than 0.3%), rendering the Rabo Capital hedge contract pointless. For the last quarter of 2010, the obligation to Rabo Capital on the interest rate hedge contract was $260,000; since inception, Round Table has paid Rabo Capital more than $2.55 million on account of the interest rate hedge contract.

22. The credit facility contemplated a high and escalating level of principal repayment: nearly $1.6 million in 2010, twice that in 2011 and treble that in 2012. At the time the schedule was negotiated, Round Table had been enjoying a decade of substantial and uninterrupted growth and was expecting imminently to acquire 35 company stores and to build an additional 65 company stores, and projected 2010 revenue in excess of $210 million. Projecting the future on the basis of past experience and then-current plans for growth, the negotiated rates of principal repayment seemed reasonable.

23. Unfortunately, the Great Recession followed shortly after the inception of the credit facility, plans for growth were shelved, and actual 2010 revenue was only $112 million. As a consequence, the contract rates of principal repayment were not achievable. Round Table sought to negotiate modifications of its obligations under the credit facility that would permit ongoing performance in this changed economic environment, but was entirely unsuccessful.

24. Instead, through an August 31, 2010 Amendment, GECC / Prudential increased the interest rate, and thereafter required a shift in the base rate from LIBOR to prime. Interest on the facility now accrues at 6.8% over prime, or currently 10.05%. (By contrast, interest at the rate originally contemplated by the credit facility, 3.25% over LIBOR, would amount to 3.51%.) Including the charge on the Rabo Capital hedge contract, the aggregate effective interest rate imposed on Round Table by the credit facility is now 13.59%. I believe a market interest rate would amount to 6.5% to 7%.

## VI. EFFORTS TO SELL THE COMPANY

25. Recognizing that the operations of the chain following the Great Recession could not support the principal repayment schedule in the GECC / Prudential credit facility, Round Table's management concluded that the chain should be sold in order to retire the debt.

26. In June of 2010, Round Table retained North Point Advisors as its investment banker, and began efforts to sell the company. Through North Point, 117 potential buyers were contacted, of which 54 executed non-disclosure agreements and received due diligence materials.

The company received 17 proposals (written and verbal) and proceeded to serious negotiations with the most favorable.

27. Round Table engaged in serious negotiations with two potential acquirers at values which would permit it to pay all creditors and fund a return to the ESOP which owns all of its equity. GECC / Prudential were actively involved in the sales process, requiring regular reports and follow up information, and engaging in direct discussions and negotiations with those potential acquirers. Ultimately, GECC / Prudential refused to provide financing for any portion of the purchase price, resulting in the potential acquirers withdrawing.

28. Recently, Round Table received a contingent opportunistic offer which, if ultimately consummated, might have yielded at most partial payment to unsecured creditors. Believing that its value was materially in excess of its debts, consistent with the recent ESOP appraised value of $45 million, Round Table concluded that the interests of creditors and the ESOP were better served by a Chapter 11 reorganization.

## VII. INTENDED BUSINESS REORGANIZATION

29. There are two core aspects to Round Table's business: a franchisor to independent third party owner-operators, and operating company-owned stores.

30. There are currently 355 franchised stores, with 148 franchisees. The franchise base is highly diversified: 91% of the franchisees own 5 stores or less, and only two franchisees own 20 to 25 stores. Management believes that the franchise segment of Round Table's business is sound, produces stable profits and does not require material reorganization.

31. Round Table operates 128 company-owned stores. Although most of them are profitable, a number of the stores have been unable to operate profitably in the current economic environment, generating significant losses. Over the first 4 to 6 months of its Chapter 11 case, Round Table intends to close unprofitable stores and to renegotiate leases with respect to its marginal stores. Within 4 to 6 months, Round Table expects that its remaining base of company-owned stores will be stable and profitable.

32. Round Table expects to have maximized the value of the chain, through store closings and lease renegotiations, by the conclusion of the initial phase of its reorganization.

## VII. FINANCIAL REORGANIZATION

33. After the initial phase of its reorganization has concluded, Round Table intends to complete its reorganization by embarking on one of two paths.

34. If it appears that an appropriate value can be realized for the benefit of all of its constituencies through a sale, Round Table is amenable to engaging in that process.

35. On the other hand, if problems in the economy and the credit industry make it impossible to realize an appropriate value for the company this year, Round Table will propose a Plan of Reorganization which restructures its debt so that it can operate successfully for a period of perhaps five years, by the conclusion of which it would expect to sell the business or refinance the debt.

## VIII. MOTION FOR JOINT ADMINISTRATION

36. Formally, Round Table consists of 4 separate entities: Round Table Pizza, Inc., the parent corporation, and two subsidiaries, Round Table Franchise Corporation, which operates the franchise business, and Round Table Development Company, which operates the company-owned stores; and Round Table Pizza of Nevada, LLC, which is wholly owned by Round Table Development Company.

37. As a practical matter, Round Table has always operated and presented itself as a single, unitary business.

   a. Creditors have consistently been provided only consolidated financial statements.

   b. The Lenders receive monthly financial reports, prepared only on a consolidated basis.

   c. All internal financial statements are prepared on a consolidated basis.

d. All cash is swept to a single account held by the parent corporation, and all disbursements are made from the parent's accounts.

e. All three corporations file tax returns as a consolidated group. As a single-member LLC, Round Table Pizza of Nevada, LLC is not treated as a separate taxable entity for federal tax purposes.

f. Separate financial statements are not prepared for Round Table Development Company or Round Table Pizza of Nevada, LLC.

g. As a result of FTC requirements, the company is obligated to prepare and submit to the FTC annual financial statements for Round Table Franchise Corporation, but those financial statements are not otherwise provided to creditors. Those statements are not provided to creditors, however, and include the following Note:

> Transactions with Parent and Affiliates
> Substantially all of the Company's cash receipts and disbursements are managed by the Parent. Under this arrangement, all cash receipts for the franchise fees are transferred to the Parent and all Company expenses are funded by the Parent.

38. Although Round Table maintains bookkeeping information so that separate financial statements can be prepared for each entity, Round Table itself only prepares financial statements on a consolidated basis. Round Table's accountants perform an annual audit and prepare separate financial statements for the FTC for Round Table Franchise Corporation. Separate financial statements for Round Table Development Corporation and Round Table Pizza of Nevada, LLC ordinarily are not prepared at all.

39. It would be extremely burdensome and expensive for Round Table to attempt to prepare financial statements internally on a current, non-consolidated basis for the first time post-bankruptcy. Round Table therefore requests that it be permitted to continue to prepare all periodic reports, including Monthly Operating Reports, on a consolidated basis pending further Order of the Court.

## VIX. CASH COLLATERAL AND ADEQUATE PROTECTION

40. The GECC / Prudential credit facility is secured by liens encumbering substantially all of the assets of each of the entities. Round Table is not presently aware of any meritorious basis on which the nature, extent, perfection or validity of the liens could be challenged. Round Table believes that most of its net revenues constitute "cash collateral.

41. Round Table requests authority to use cash in the ordinary course of its business to fund operations, generally consistent with the weekly cash flow budget attached hereto as Exhibit B. Round Table believes that substantially all of its value is associated with its ongoing business operations, and that value can be preserved only if it continues timely to fund its expenses of operation. Continuing operations consistent with its intended reorganization described above provides "adequate protection" to GECC / Prudential."

42. As additional adequate protection, Round Table proposes to provide GECC / Prudential with replacement liens on its post-petition assets to protect it against any post-petition diminution in its collateral base, such replacement liens to enjoy the same nature, extent, validity and perfection as its liens on Round Table's pre-petition assets.

43. Round Table requests that its use of cash in the ordinary course of its operations and the foregoing "adequate protection" for GECC / Prudential continue indefinitely, until modified by further Order of the Court.

## X. REJECTION OF THE RABO CAPITAL HEDGE CONTRACT

44. The Rabo Capital Hedge Contract was designed to protect Round Table from increases in the LIBOR interest rate above the rate in effect in March of 2007 (5.2%). The LIBOR rate is currently below 0.3%, leaving the Rabo Capital Hedge Contract of no practical utility to Round Table. As previously noted, the cost of the Rabo Capital Hedge Contract is currently running about $260,000 per quarter; as noted, it has cost Round Table more than $2.55 million since inception.

45. In addition, the Rabo Capital Hedge Contract provides that the filing of a bankruptcy petition by Round Table constitutes an event giving rise to Early Termination of the Rabo Capital Hedge Contract.

46. I believe that it would be in the best interests of Round Table's creditors and its estate to reject the Rabo Capital Hedge Contract, effect as of the Petition Date.

## XI. PRE-PETITION WAGES AND BENEFITS

47. Round Table's employees (the "Employees") fall into three broad categories.

    a. First and most numerous are the 2,581 employees who work in the 128 company-owned stores ("Store Employees"). This group consists exclusively of hourly rate employees. Consistent with industry practice, these employees are paid bi-weekly, with a 5 day lag. Their last pre-petition payroll was disbursed on February 4, 2011, covering wages earned through January 30, 2011.

    b. Second, Round Table has 21 employees engaged in the management of multiple company stores as district managers and regional managers ("Field Managers"). Consistent with industry practice, these employees are paid bi-weekly, with a 5 day lag. Their last pre-petition payroll was disbursed on February 4, 2011, covering wages earned through January 30, 2011.

    c. Finally, Round Table employs 43 individuals at its headquarters in Concord, California as staff and managers ("Corporate Staff"). All Corporate Staff are paid bi-monthly. Their last pre-petition payroll was disbursed on January 31, 2011, covering wages earned through January 31, 2011.

48. In addition, Round Table has a bonus program for exceptional performance by Store and Field Employees. The bonus for performance in the fourth quarter of 2010 is currently due, in the aggregate amount of $41,081 for approximately 60 employees. Since the bonus relates to services performed in the final quarter of 2010, we have viewed it as pre-petition wages.

49. The next payroll for Store Employees and Field Managers will be distributed on February 18, 2011 and will cover wages earned during the period from January 31, 2011 through February 13, 2011 and will therefore include approximately 9 days of pre-petition wages. The next payroll for Corporate Staff will be distributed on February 15, 2011 and will cover wages earned during the first 15 days of February and will therefore include approximately 8 days of pre-petition wages.

50. The Store Employees, Field Managers and Corporate Staff are essential to Round Table's operations and prospects for success. If any significant numbers of the Employees become disaffected, it could seriously jeopardize Round Table's prospects for a successful reorganization.

51. All of these Employees live very close to their paychecks, and all would find any disruption or delay in payment an extreme hardship. I think it critical that the Employee's receive their pay on time and in full, notwithstanding the bankruptcy filing. Round Table therefore seeks to honor the employment contracts post-petition and intends to assume them under any Plan of Reorganization, except with respect to store closings discussed below.

52. I have caused the pay, bonus, sick leave and vacation leave entitlements of the Employees to be compared to the $11,725 priority claim amount. In the case of only 34 Employees does the combination of accrued but unpaid wages as of the Petition Date and earned sick leave and vacation leave exceed that $11,725 amount (the "Over Priority Employees").

53. As noted, the company was recently valued at $45 million by independent appraisers, reflecting a value of $15 million in excess of secured debts and a value substantially in excess of the amount of all creditor claims. Under any set of circumstances, I think it is clear that all priority claims will inevitably be paid in full.

54. I think it important that Round Table timely fund the full amount of its current payroll, including bonuses to the Store and Field Employees for fourth quarter 2010 performance. Among the Over Priority Employees, none will have accrued but unpaid wages as of the Petition Date in excess of $11,725. I therefore believe that Round Table should be authorized to fund the

full amount of its ordinary February 18, 2011 payroll to Store Employees and Field Employees and its February 15, 2011 payroll to Corporate Staff.

55. Second, I think it important that Round Table honor its employee benefit obligations to the fullest extent permissible. If Round Table is permitted to honor benefit obligations up to an aggregate of $11,725 (less the amount of any paid pre-petition wages), that will allow all Under Priority Employees, aggregating 2,611 persons, to enjoy full benefits and will allow the Over Priority Employees to enjoy the bulk of their benefits. I believe that this will be a significant factor in sustaining employee morale and loyalty in the face of this bankruptcy filing.

56. I also believe it important that the Employees, other than the Over Priority Employees, be excluded from the master mailing list and Schedule E. These are individuals of limited means who are entirely dependent upon receiving their pay on a regular and predictable basis. Receiving periodic notices about developments in their employer's bankruptcy case may unnecessarily frighten the Employees and lead them to consider changing jobs, to the substantial detriment of Round Table.

57. On the other hand, no purpose would be served by providing the Employees with notice of developments in the bankruptcy case, if Round Table is authorized to perform on their employment agreements on a current basis post-petition, and if those agreements are ultimately reinstated under a Plan of Reorganization. If the case proceeds as anticipated, the employees will be unimpaired by the bankruptcy process and have no need to participate in it.

58. Finally, there is substantial burden and expense associated with giving periodic notices to more than 2,500 persons. If those persons will be entirely unaffected by the bankruptcy process, that burden and expense should be avoided.

59. I also think that Round Table should be authorized to pay any pre-petition payroll checks that are presented post-petition. Bouncing payroll checks would have a devastating effect on morale. In addition, with only a few exceptions among the Over Priority Employees, honoring a pre-petition payroll check and accrued but unpaid wages as of the Petition Date would not exceed the $11,725 priority amount. I have caused those Over Priority Employees' pay to be

analyzed, and they do not have uncashed payroll checks.  Of course, if any Employee did not cash a payroll check pre-petition and cashes it post-petition, that may require restrictions on the enjoyment of benefits so as to ensure that the Employee does not receive more than the priority amount.  I have caused Round Table to put procedures in place to ensure that benefits are reviewed with respect to any Employee who cashes a payroll check post-petition.

60. Of course, it is important that the employees are made aware of the bankruptcy filing, and Round Table has developed a communication plan to inform all employees.  In the event that the Wage and Benefits Motion is approved, Round Table intends immediately to distribute to all affected employees the communication attached as Exhibit C, which also explains the potential limitation on the use of benefits.

61. As noted, Round Table intends to close unprofitable company-owned stores and the marginal stores which cannot be restructured so as to be profitable.  Upon setting a date for any store closing, Round Table proposes to give the employees at that store additional notice of the bankruptcy filing and the availability of the bankruptcy claim process, and requests that any claim filed by an employee within 100 days following the store closing be deemed timely.  That said, even in the event of store closings, I expect to seek permission to pay all employees in full prior to their discharge.

## XII.  UTILITIES

62. Attached as Exhibit D is a schedule identifying the amounts of all utility billings over the past 12 months. (This schedule is an internal company document and does not represent an attempt to determine who is a "utility" for bankruptcy purposes – some of the entities on the schedule may not be "utilities" for bankruptcy purposes.

63. Round Table believes that the respective utilities – if they are utilities entitled to deposits  – will be adequately protected by receiving a post-petition deposit equal to the average utility billing in the preceding 12 months, as specified in the Exhibit.

## XIII. PRE-PETITION TAXES

64. As a matter of policy and practice, Round Table always timely pays the various state and federal taxes it incurs in the ordinary course of business. Round Table does not ordinarily pay taxes in advance, however. Attached hereto as Exhibit E is a schedule of taxes that accrued prior to the Petition Date but are payable after the Petition Date. I believe it would be appropriate to pay these taxes as they come due.

## XIV. INSURANCE

65. Round Table maintains a variety of insurance coverage, identified in Exhibit F. Round Table's insurance policies are carefully selected to represent the most appropriate and cost effective insurance for its needs. Round Table does not believe that it would be beneficial to revisit the selection of its insurance post-petition, and seeks instead to retain its insurance coverage as intact.

66. In most cases, Round Table pre-pays for insurance coverage, and contemplates continuing to honor billings on its insurance policies in the ordinary course of its business.

67. In some cases, those policies are financed. Ordinarily, the financier enjoys the right to cancel the policy and retain the refund for non-payment. Round Table proposed to continue to honor the insurance finance contracts.

## XV. CASH MANAGEMENT SYSTEM

68. In the ordinary course of business, Round Table maintains more than 100 accounts and sub-accounts into which deposits are made (the "Store Accounts"). The vast majority of the Store Accounts are used by the Company store to deposit daily revenue. The Store Accounts are "zero balance accounts:" the balance in each account is regularly swept to the master Concentration Account.

69. Round Table makes disbursements from the Concentration Account and payroll accounts. Ordinarily funds are transferred from the Concentration Account into the payroll account to cover checks as they are presented.

70. Round Table requests authority to maintain the Store Accounts unchanged. Since no money is held in the Store Accounts from day to day, the Debtor submits that there is no need for those accounts to be converted into "Debtor in Possession" accounts or otherwise modified.

71. As discussed above, I think it critical that Wells Fargo be authorized to maintain the Payroll Accounts intact and to authorize it to honor all checks drawn on those accounts, without regard to whether they were issued pre-petition or post-petition. Similarly, it is critical that a mechanism be established to permit Round Table promptly to effect disbursements on post-petition accounts payable.

## XVI. LIMITING NOTICE

72. From time to time, Round Table engages in sales of its company-owned stores, when it can do so on favorable terms. As of the commencement of the bankruptcy case, there were three such sales in process. These sales represent a comparatively small portion of Round Table's assets, currently amounting to less than 5% of the company-owned stores.

73. Assuming that these sales are outside of the ordinary course of business, it would be unduly burdensome to give notice to all creditors of these sales. I think it would be appropriate to limit notice of such sales to the persons more directly and immediately involved with them.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed February 9, 2011, at San Francisco, California.

*/s/ J. Robert McCourt*
J. Robert McCourt