MCNUTT LAW GROUP LLP
SCOTT H. MCNUTT (CSBN 104696)
SHANE J. MOSES (CSBN 250533)
MARIANNE M. DICKSON (CSBN 249737)
188 The Embarcadero, Suite 800
San Francisco, California 94105
Telephone: (415) 995-8475
Facsimile: (415) 995-8487

MICHAEL ST. JAMES (CSBN 95653)
ST. JAMES LAW, P.C.
155 Montgomery Street, Ste. 1004
San Francisco CA 94104
Telephone: (415) 391-7566
Facsimile: (415) 391-7568

Proposed Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>Round Table Pizza, Inc.,<br><br>Debtor. | Case No. 11-41431 RLE<br><br>(Jointly Administered with Case Nos. 11-41432 RLE, 11-41433 RLE, and 11-41434 RLE)<br><br>Chapter 11<br><br>**OMNIBUS DECLARATION OF J. ROBERT McCOURT**<br><br>Judge: Hon. Roger Efremsky<br>Date: March 11, 2011<br>Time: 10:30 a.m.<br>Place: 1300 Clay Street, 2nd Floor<br>Oakland, California |

I, J. Robert McCourt, declare as follows:

1. I am the President and Chief Executive Officer of Round Table Pizza, Inc., Round Table Franchise Corporation, Round Table Development Company, and Round Table Pizza of

Nevada, LLC, (collectively, "Round Table"). As discussed below, all of these entities have been operated as a single unitary business.

2. I have been a member of Round Table's management team since 1996. I make this Declaration of my personal knowledge and based on my review of Round Table's books and records and inquiries of Round Table's management and employees. I could and would competently testify as follows:

## I. STORE CLOSINGS

3. In the process of marketing the company for sale, Round Table was required to acknowledge that there were a number of unprofitable or underperforming stores whose closure would benefit the company. Attached hereto is a page from the company's September, 2010 marketing materials, suggesting "store optimization" through a program of closing 28 stores in 2010 through 2015 to achieve an aggregate improvement in EBITDA (by the final year) of $2.6 million. Attempting to quickly close 28 stores outside of bankruptcy would yield substantial damage claims and litigation, so the store optimization proposal contemplated closing stores at or near the end of their leases.

4. After Round Table concluded that a Chapter 11 filing would be necessary, management undertook to evaluate the prospect for store closings at the outset of the case.

5. A number of favorable alternatives were available to the company as a result of its bankruptcy filing. Most obviously, it could reject leases and close stores prior to lease expiration. Less obviously, it could negotiate with its landlords against the threat of lease rejection to render stores viable, and where two or more stores serviced an area, to determine the store that would close based on restructuring proposals from all of the local landlords. Round Table retained real estate consultants to assist it in aggressively attempting to negotiate the best available lease restructures following the bankruptcy filing.

6. Round Table's Board of Directors was sensitive to the burdens the bankruptcy filing would impose on Senior Management and determined to establish a performance-based bonus system to address the efforts that would be required of Senior Management in the first six weeks of the case.

7. With respect to the Board's performance based bonus system, there were explicit and implicit provisions. The implicit provisions were based on the Board's understanding of the character of the members of senior management and their integrity. Thus, the Board expected that no bonuses would be paid if the transition to Chapter 11 was ineffective or harmful; if say, vendor concern led to widespread store-level COD demands, defeating Round Table's cash controls, or if employee concern led to an exodus from the stores.

8. The Board was sensitive to the fact that a successful transition would require extensive efforts on the part of Senior Management; for example, the Chief Financial Officer has gone from working about 47 hours a week (9 – 10 hours a day, five days a week) to about 78 hours a week post-petition (14 hours a day, five days a week, and 8 to 11 on weekends) or a 166% increase. Increases in hours on the order of 125% to 135% have been expended by Ted Storey, General Counsel, and I since the bankruptcy filing.

9. The Board's explicit metric for the March bonuses was that the initial set of "Stores closed by 3/31, [at no more than] $2.6mm cost."

10. Initially, management intended to close approximately 30 stores over three consecutive weeks. The stores which might be restructured with landlord concessions were placed in the last week, and many of the landlords have engaged in constructive discussions regarding lease modifications designed to render the stores viable. As a consequence, I decided to conclude the initial set of Store Closings at 21, with further store closings to occur only after negotiations with the various landlords had concluded and it was possible to evaluate the operations of each store in the context of all nearby stores and all of the landlords "last and best" offers.

11. Respecting the initial set of Store Closings, 20 stores closed by February 27, 2011; the last is expected to close by mid-March. Aggregate maximum lease rejection damages for the 20 stores closed to date are $1.65 million. Under any set of circumstances, Round Table believes that aggregate maximum lease rejection damages for the 21 stores will be less than $1.9 million. The revised cash collateral budget estimates cash costs of Store Closures for 30 stores at $240,000. Thus, the initial set of store closures will certainly satisfy the "less than $2.6 million" metric.

12. Round Table's invariable practice is to avoid giving any advance notice of a store closing to the restaurant employees (the "Crew"). Round Table operates a cash business, on average there is almost 100% turnover each year among Crew employees. As a consequence, there is an extremely high risk that revenues will be dissipated and inventory pilfered after employees become aware that their store will close and their jobs will be lost. To counteract those predictable developments, Round Table avoids notifying the Crew of the closing of their store until just before the Closing. That approach was taken with the store closings Round Table has effected to date.

13. Information filed with the Court is accessible over the internet and otherwise, so Round Table concluded that providing notice of intended lease rejections in advance of the Store Closings might result in the information being communicated to the Crew in advance of the closing, which would be potentially harmful to the estate. Round Table has therefore filed Rejection Motions only after closing the affected stores.

14. In the week ending February 20, 2011, Round Table closed 9 stores. In the week ending February 27, 2011, Round Table closed an additional 11 stores. I personally and directly supervised the Store Closings.

15. Following each Store Closing, Round Table causes furniture and equipment, foodstuffs, supplies and paper goods to be removed from the store. Unless there is furniture or equipment which is so damaged or deteriorated that it is not worth the cost of removal, all of Round Table's property is removed from the premises. Signage is removed, telephone numbers are transferred to nearby Round Table stores, and posters or flyers are put out to advise customers of the nearest Round Table location. After everything has been removed, the premises are surrendered to the landlord "broom clean." Upon surrendering the premises, Round Table transmits a Surrender Notice to the Landlord by overnight mail. From and after the delivery of the Surrender Notice, Round Table makes no use of and enjoys no benefit from the subject premises.

16. Ordinarily, nothing is left behind that is the subject of any lien or security interest. Three things are often left behind because they are not owned by Round Table: the Pepsi dispenser (owned by Pepsi), any air gas tanks associated with the soda dispenser (owned by Air Gas), its

game and vending machines (managed by Bayside Amusements), and the Muzak equipment (owned by Muzak). Currently, our Surrender Notices include contact information for those entities.

17. The primary objective of the store closings was to eliminate stores whose unprofitability dragged down the performance of the company. Financial information regarding the 20 closed stores is presented in the tables below.

Week Ended February 20, 2011

| | Number | Store | Annual EBITDA Improvement | Rejection Claim |
|---|---|---|---|---|
| 1 | 967 | Pico Rivera | $ (131,932) | 184,137 |
| 2 | 293 | Solana Beach | $ (106,805) | 158,592 |
| 3 | 84 | Antioch | $ (81,461) | 119,310 |
| 4 | 672 | Perris | $ (73,615) | 69,755 |
| 5 | 934 | Dayton | $ (57,474) | 72,902 |
| 6 | 494 | Mira Loma | $ (38,416) | 55,941 |
| 7 | 648 | Arcata | $ (33,070) | 70,595 |
| 8 | 747 | Oceanside | $ (29,411) | 40,670 |
| 9 | 755 | Fremont | $ (30,277) | 20,973 |
| **Total** | | | $ (582,461) | 792,875 |

///

///

///

Week Ended February 28, 2011

| Number | | Store | Annual EBITDA Improvement | Rejection Claim |
|---|---|---|---|---|
| 1 | 572 | Elko | $ (92,442) | 87,993 |
| 2 | 278 | Cornell | $ (111,730) | 102,197 |
| 3 | 288 | Beaverton | $ (30,659) | 109,272 |
| 4 | 345 | Tigard | $ (92,405) | 73,233 |
| 5 | 960 | Happy Valley | $ (105,483) | 130,015 |
| 6 | 153 | Martinez | $ (99,185) | 67,312 |
| 7 | 801 | Danville | $ (60,628) | 35,265 |
| 8 | 652 | Clovis | $ (101,323) | 96,378 |
| 9 | 901 | Herndon | $ (50,841) | 38,797 |
| 10 | 702 | First and Nees | $ (95,667) | 61,127 |
| 11 | 101 | Albany | $ (33,960) | 56,376 |
| **Total** | | | $ (874,323) | 857,965 |
| ***20*** | | | $ (1,456,784) | 1,650,840 |

Based on the foregoing, it is reasonable to expect a minimum of $1.4 million in improved EBITDA as a result of the foregoing Store Closings. In addition, in some cases I expect a nearby store to capture some of the customers and revenues associated with the closed store, further improving Round Table's overall performance.

18. The Store Closings have provided a substantial benefit to Round Table. Round Table intends to close additional stores, however, many of the landlords are working with Round Table to provide significant concessions in order to render stores viable. Round Table is delaying some closures pending the outcome of the lease negotiations.

## II. SALADINO'S AND BEVERAGE CONTRACTS

19.  With the exception of three written contracts (Saladino's, Pepsi and Dr. Pepper), all of the contracts which are the subject of the pending assumption motion are open account supply contracts and, as previously noted all or substantially all of "cure" relates to goods delivered within 20 days of the bankruptcy filing and hence is entitled to administrative claim status. As to those contracts, assumption does not alter the counter-party's rights and a subsequent rejection would not give rise to damages: since these are small, open account relationships, the contract can be "terminated" by simply failing to order additional goods from the vendor, and no damages will be suffered or asserted. Assumption does, however, spare Round Table the extraordinary disruption and loss associated with the alternative: a store-by-store COD regime.

20.  The Pepsi and Dr. Pepper contracts are viewed as confidential and including trade secrets by the counter-parties, so they have not been filed with the Court, although they have been shared as confidential documents with the Creditors Committee and GECC / Prudential. In each case, Round Table has already satisfied its minimum volume requirements and is free to terminate the contract by its terms. Thus, were assumption followed by rejection or termination in the future, there would be no damages to the counter-party or loss to the estate. On the other hand, the Pepsi and Dr. Pepper contracts have very favorable limitations on price increases, such that they function much like a hedge against rises in the corn and sugar commodities prices. The Pepsi and Dr. Pepper contracts are very favorable to Round Table, and should be preserved.

21.  Again, the "cure" relates to goods delivered within 20 days of the Petition Date, and hence are already entitled to administrative status. Since the contracts can be terminated at will, rejection damages following assumption is not a realistic risk. But assumption will allow Round Table to return to ordinary payment terms without the disruption of shifting to COD.

22.  Some responses to the motion have speculated that assumption of the Saladino's contract might result is a significant rejection damages claim if the company is ultimately sold to someone who does not want the Saladino's contract. I think that a large rejection damages claim under those circumstances is unlikely. The contract allows for termination in the event of a

change in control; ¶13. The principal consequence of termination is a duty on the parties' part to assist the distributor by purchasing and disposing of Proprietary Products; ¶17b.

23. If the company was sold to a buyer who did not want the Saladino's contract, the shift in distributors would require time and planning, in all likelihood requiring at least 45 days to effect the shift with a minimum of disruption. During that planning process, Saladino's inventories could be brought down, so that Saladino's actual damages associated with inventory and proprietary products could be severely limited or eliminated. For example, Round Table coordinated with Saladino's in advance respecting the anticipated Store Closings, such that even though Saladino's supplies 20 less stores, it has no excess proprietary inventory.

24. The Saladino's contract permits adverse adjustments to pricing under the current circumstances; ¶¶ 6(a), 6(f). Saladino's has assured Round Table that it will not make adverse adjustments to pricing and will permit Round Table to enjoy the favorable pricing contemplated by the contract if the contact is assumed.

25. The Saladino's contract provides that certain pricing terms can be altered if Round Table drops below a minimum number of stores. That number, calculated by reference to a redacted schedule, is 87 stores. Currently, Round Table operates 108 stores. Although there will be some additional store closings, Round Table does not believe that an additional 21 Store Closings – which would be required to trigger that provision – is a plausible outcome. On every internal analysis, the company retains an ample cushion of stores in excess of that trigger.

### III. CASH COLLATERAL

26. The discussion of the pre-petition sale process set forth in the Declaration of Mark Flamm and referred to as the "Agent's Declaration" is so abbreviated and incomplete as to be misleading. A fuller description is as follows:

27. As noted in my prior Declaration, the GECC / Prudential credit facility, obtained in March 2007, was designed to support a doubling of the number of Round Table's company stores. In a prudent response to the advent of the Great Recession, Round Table shelved its expansion plans by late 2007, but the credit facility remained.

28. Significantly, the GECC / Prudential credit facility contemplated an aggressive and increasing principal repayment schedule commencing in 2009, a schedule which would have been feasible for the company which was projected when the credit facility was obtained, but could not be achieved by Round Table as it actually was in 2007 and would be going forward. Commencing in early January 2008, Round Table repeatedly asked GECC / Prudential to consider restructuring the credit facility to address and avoid the default that would inevitably occur when the principal repayment provisions kicked in. GECC / Prudential's consistent response was that it did not want to solve tomorrow's problems today.

29. As a consequence, in response to the predictable and predicted default associated with the principal repayment terms and GECC / Prudential's complete unwillingness to engage in a restructure, management turned to a sale process as the only viable solution to a credit facility that could not be rendered feasible.

30. The threshold question in the sale process was whether GECC / Prudential would provide seller financing. This issue was critical for two reasons. First, following the collapse of Lehman Brothers and the credit markets, it became be exceedingly difficult to find a buyer with access to a fresh credit facility on the order of $30 million to finance an acquisition. Second, as Round Table's lender, GECC had access to the best internal information about the company and, as the largest lender to restaurants in the United States, GECC could be expected to apply the most sophisticated analysis to that information. GECC / Prudential's willingness to provide seller financing would be perceived by the market as a vote of confidence in Round Table; conversely, if GECC / Prudential was perceived to be running for the exits, prospective buyers would view that as a cause for serious concern about Round Table and its future.

31. Thus, the availability of seller financing was a critical threshold issue that would substantially affect the course of any marketing efforts. GECC repeatedly assured Round Table that it anticipated providing seller financing, and Round Table based its marketing and communications with prospective buyers on those assurances. Reflective is the following e-mail from Kyle Huffman of GECC regarding providing a "staple" to the company identified in the

Agent's Declaration as "First Bidder."  (A "staple" refers to a proposal for seller financing, because it is "stapled" to the purchase offer.)

_____

**From:** Huffman, Kyle (GE Capital) [mailto:Kyle.Huffman@ge.com]
**Sent:** Wednesday, August 25, 2010 10:55 AM
**To:** Davis, Keith (CFO)
**Cc:** Campbell, Kathleen (GE Capital)
**Subject:** RE: fyi, i passed your contact info along for a possible staple

Thank you Keith.

I will have our internal rep call on them about this inquiry.

My guess is that a staple for the final round potential buyers will be in that 2.5X to 3X EBTIDA range for senior debt, depending on the buyer.  As discussed, we would like to put staples together for the final round buyers you have in your process.  I know 1st round bids are due this friday.  How long do you think it will take you to determine who the final round participants will be?  At that point, I think it makes sense for us to provide staples for the final round bidders.

Your thoughts?  Thank you for the lead as well.

Kyle

32. The offer which was the subject of the foregoing e-mail was from the "First Bidder", as referred to in the Agent's Declaration, whose initial bid of $45 million went up to $47.5 million after management's presentation.  A few weeks into the process of finalizing a sale to the First Bidder, GECC / Prudential told the company to move on to the next bidder, without providing any explanation other than that they would not do business with the First Bidder.

33. The Second Bidder offered $45 million, premised on the assumption of financing. When GECC / Prudential advised it that they would not provide financing, the Second Bidder remained engaged, although as a result of the lenders' vote of no confidence, the purchase price dropped to $41.6 million.  The Second Bidder began a process of looking for financing, but required that GECC / Prudential agree not to impose draconian forebearance terms and to permit business to continue on an ordinary basis pending financing and a close.  When GECC / Prudential declined to agree, the Second Bidder withdrew.

34.  Given this context, GECC / Prudential's change of course in insisting on being taken out entirely predictably caused the sale process to crater.  Round Table, with GECC /

207683.7

10

OMNIBUS DECLARATION OF J. ROB MCCOURT

Case: 11-41431    Doc# 148    Filed: 03/07/11    Entered: 03/07/11 19:33:31    Page 10 of 11

| 1 | Prudential's knowledge and urging, assured prospective buyers that the most knowledgeable third
| 2 | party was so confident about the business that it was willing to provide seller financing. When
| 3 | instead GECC / Prudential's insisted running for the exits, prospective buyers predictably
| 4 | interpreted that as a loud vote of no confidence.  While accurate, the statement in the Agent's
| 5 | Declaration to the effect that "However, after the Agent refused to roll their debt or finance these
| 6 | proposals, the proposals were terminated," it fails to explain why, in context, there was necessarily
| 7 | a cause and effect relationship.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed March 7, 2011, at San Francisco, California.

                         */s/ J. Robert McCourt*
                         J. Robert McCourt