MCNUTT LAW GROUP LLP
SCOTT H. MCNUTT (CSBN 104696)
SHANE J. MOSES (CSBN 250533)
MARIANNE M. DICKSON (CSBN 249737)
188 The Embarcadero, Suite 800
San Francisco, California 94105
Telephone: (415) 995-8475
Facsimile: (415) 995-8487

MICHAEL ST. JAMES (CSBN 95653)
ST. JAMES LAW, P.C.
155 Montgomery Street, Ste. 1004
San Francisco CA 94104
Telephone: (415) 391-7566
Facsimile: (415) 391-7568

Proposed Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>Round Table Pizza, Inc.,<br><br>    Debtor. | Case No. 11-41431 RLE<br><br>(Jointly Administered with Case Nos. 11-41432 RLE, 11-41433 RLE, and 11-41434 RLE)<br><br>Chapter 11<br><br>**REPLY BRIEF IN SUPPORT OF USE OF CASH COLLATERAL**<br><br>Judge: Hon. Roger Efremsky<br>Date: March 11, 2011<br>Time: 10:30 a.m.<br>Place: 1300 Clay Street, 2nd Floor<br>        Oakland, California |

# I. SUMMARY

Notwithstanding rather extraordinary efforts at advocacy on GECC / Prudential's part, the relevant facts and law are clear:

1. GECC / Prudential is entitled to adequate protection only to the extent necessary to protect it from a deterioration in its collateral value. Since its collateral is appreciating in value, there is no need for adequate protection.

2. In addition, GECC / Prudential enjoys a substantial equity cushion, which would have been realized by a pre-petition sale but for GECC / Prudential's rather extraordinary conduct in connection with the sales effort.

3. Out of an abundance of caution, Round Table has offered GECC / Prudential a valuable replacement lien, which amply protects against the remote possibility of a diminution in collateral value and the even more remote possibility that the equity cushion will not suffice to protect it.

4. Finally, Round Table is willing to provide GECC / Prudential with some practical and procedural safeguards, such as maintaining the current relief on an interim basis until an appropriate calendar in April.

Recognizing that there is no legal or factual basis to afford GECC / Prudential greater relief now, it relies on misleading advocacy to suggest the existence of problems which it knows are not there. See, Chart of False and Misleading Statements, filed herewith.

# II. THERE IS NO PROSPECT OF DIMINUTION IN COLLATERAL VALUE

Logically, if there is to be a diminution in GECC / Prudential's collateral value, it must be associated with either the store collateral or the cash collateral.

Stores are ordinarily valued based on their financial performance, e.g., EBITDA. See, Exhibit B to Davis Dec. As a result of the 20 Store Closings to date, stores which "contributed" a negative $1,456,784 EBITDA in 2010 have been eliminated. Said differently, the EBITDA of GECC / Prudential's store collateral has increased by $1.46 million. Applying the EBITDA multiple proposed by Wells Fargo Securities (5.2x), store collateral value has increased by $7.6

million; applying the multiple proposed by Houlihan Lokey (6.25x), store collateral value has increased by $9.1 million. See, Exhibit B to Davis Dec. The foregoing also excludes the accreted impact of transferring some of the revenues from the closed stores to nearby Round Tables. Under any analysis, the value of GECC / Prudential's store collateral has increased dramatically since the case was filed due to the Store Closings.

The other alternative is a diminution in cash collateral. In order to support its contention that the Cash Budget is "grossly overstated," GECC / Prudential resorts to some peculiar advocacy.

First, the relevant concern would seem to be operating cash flow. During the 13 weeks forecast by the original cash budget, operating cash flow increases by $1,445,304, scarcely cause for concern. (In the 15 weeks covered by the Revised Cash Budget, operating cash flow increases by $1,887,075.)

In order to manufacture concern about cash, GECC / Prudential resorts to a strained analysis coupled with an arithmetic mistake. First, GECC / Prudential deducts asset sales, but continues to include additional utilities deposits. Then, when it subtracts $525,000 in asset sales from an $834,718 cash collateral balance, it contends that "the Budget shows a cash *diminution* of $326,229" rather than the actual increase of $309,718[1]. Opposition, Docket No. 125 at 13:22-25.

Finding no good basis on which to forecast a diminution in cash collateral, GECC / Prudential turns to challenging cash forecasts in general. Referring to the Revised Cash Budget, GECC / Prudential asserts:

> In addition, the Debtors increased, without explanation, their expected cash receipts during the thirteen week period from approximately $26.7 million in the Budget to approximately $28.9 million in the Revised Budget. At a minimum, the Revised Budget demonstrates the inherent speculative nature of the Debtors' budgeting.

---

[1] Mathematically, this is accomplished by not giving Round Table credit for the increase in cash collateral that occurred in the first week of the case, but no rationale to justify that has been presented.

GECC / Prudential Opposition, Docket No. 125 at 14:24-15:2. Of course,[2] the variance relates to the fact that the original cash budget covered 13 forecasted weeks, while the Revised Cash Budget covers 15 weeks (2 actual and 13 forecasted).

Finally, faced with a complete inability to manufacture any reason to fear a diminution in cash collateral, GECC / Prudential resorts to assertions in the face of reality: although the budget shows ever increasing cash balances derived from profitable operations, GECC / Prudential simply announces that the cash budget "significantly understates the Debtor's *cash burn* over the first thirteen weeks of the case." GECC / Prudential Opposition, Docket No. 125 at 15:10-11. Saying it doesn't make it so, as the foregoing analysis clearly demonstrates.

As a matter of law since the Supreme Court decided *Timbers,* adequate protection is available only to protect against a post-petition diminution in collateral value. Here, both aspects of GECC / Prudential's collateral – company stores and cash – are clearly and substantially increasing in value by many millions of dollars. That is, and should be, the end of any adequate protection analysis.

## III.  EQUITY CUSHION

GECC / Prudential's advocacy is at its most troubling when it refers to the ESOP Valuation and the sale process. These concerns are briefly summarized below, but the Court is encouraged to review the fuller presentation in the accompanying Declarations of J. Robert McCourt and Keith Davis.

In order to denigrate the $45 million ESOP Valuation, GECC / Prudential falsely implies that the 2010 revenues were "almost 50 percent less than" the projections used for the ESOP Valuation, when in fact the variance was about 2%; falsely suggests that the ESOP Valuation relied on projected EBITDA which was subject to substantial swings, rather than "representative level EBITDA" on which the ESOP Valuation actually relied, which had much more limited

---

[2]  Considering GECC's sophistication, it is difficult to believe this was mere error.

variances between projections and actual; and manufactured an artificially low 2010 EBITDA to exacerbate the variance. In the process, GECC / Prudential routinely and inexplicably misquotes the First Day Declaration.

In fact, the ESOP Valuation is not "woefully outdated to the point of being irrelevant." GECC / Prudential Opposition, Docket No. 125 at 9:24. When Round Table embarked upon its effort to sell the company, three different investment bankers identified the expected value of the company to be in the range indicated by the ESOP Valuation: Northpoint Advisors estimated a value of $40 – $60 million; Wells Fargo Securities estimated a value of $43 to $4745 million; and Houlihan Lokey estimated a value of $48 - $61 million. See, Davis Declaration.

This value was then confirmed by the sales process: prior to GECC's "bait and switch", the purchase offer received from the First Bidder was $47.5 million and the initial offer received from the Second Bidder was $45 million. See, McCourt Declaration

GECC / Prudential challenges the results of the sale process on the grounds that the offerors required GECC / Prudential to provide seller financing, and leaves out the most significant part of the story. At the outset, Round Table inquired whether GECC / Prudential would provide seller financing, for two reasons. First, in a post-*Lehman Brothers* world, obtaining $30+/- millions of fresh financing is very challenging, and the norm has become to expect seller financing. More significantly, GECC is the largest lender to restaurants and had access to the best information and analysis regarding Round Table: GECC's willingness to provide financing would be seen as an expression of confidence, just as its insistence on cashing out would be seen as a vote of no confidence. See, McCourt Declaration.

GECC repeatedly assured Round Table that it was prepared to provide seller financing, and Round Table so represented to prospective buyers. When GECC abruptly changed course, the First Bidder responded by walking, but the Second Bidder offered to find its own financing, albeit after lowering the price to $41.6 million in response to GECC's loud vote of no confidence. GECC refused to stand still while the Second Bidder obtained financing, resulting in its departure as well.

Round Table submits that all of the available evidence and indications are that GECC /

Prudential has always enjoyed a substantial equity cushion. Before the improvements effected by the Store Closings, the business was worth about $45 million, and that much or more could have been obtained through the sale process, but for GECC's extraordinarily harmful conduct.

## IV. REPLACEMENT LIENS

By insisting that the dispute regarding "replacement liens" be addressed exclusively in the abstract, GECC / Prudential has left the issue inscrutable.

Round Table offered a replacement lien on all of its post-petition assets with the same nature, extent, scope and validity as GECC / Prudential's pre-bankruptcy lien. GECC / Prudential complains that the offer of a "like kind" replacement lien has no value, because it was receiving no new collateral. GECC / Prudential Opposition, Docket No. 125 at 17:11-14.

In fact, the like kind replacement lien affords a very significant new value to GECC / Prudential. Absent the replacement lien, GECC / Prudential's lien on the revenues generated by the company's stores would evaporate: while GECC / Prudential has a lien on the foodstuff inventory on the Petition Date, most of the store revenues are created by applying labor to the foodstuffs (cooking, serving and delivering) and GECC / Prudential has no lien on future employee labor. By offering a replacement lien on post-petition cash, Round Table offers GECC / Prudential a duly protected first-priority lien on those store revenues to which it would not otherwise have access. Round Table submits that this is a significant element of new value offered to GECC / Prudential.

Instead, GECC / Prudential demands an entirely non-specific lien on "everything", with some carve-outs. GECC / Prudential does not identify, however, what is actually at stake: what potential collateral it thinks would be subject to the "everything" replacement lien but is not subject to the "like kind" lien. To date, only two such items have been identified, but GECC / Prudential agreed to carve out both (Chapter 5 causes of action and liens on the real estate leases themselves).

If GECC / Prudential will disclose what this dispute is about – what collateral is subject to an "everything" replacement lien but not subject to a "like kind" replacement lien – it might be possible to come to grips with the issue. But phrased exclusively in the abstract, one naturally fears some sort of ruse or unintended or unwarranted consequence (as was the case with the only two such items thus far identified).[3]

## IV  PAYMENTS

Where, as here, there is no basis for the provision of adequate protection, there is no justification for an Order compelling "adequate protection payments." Round Table has assured GECC / Prudential that it is willing to enter into negotiations that could include post-petition payments, and even made a proposal in that regard, but GECC / Prudential has thus far not provided any substantive response (except to threaten to accrue $100,000 per month in professional fees if it is not placated). Absent a material benefit to the estate associated with the payments, Round Table believes it better to retain the cash.

It is submitted that on the present record, where no diminution in collateral value is even in prospect, there is no sound basis for the Court to mandate payments to GECC / Prudential.

---

[3] The comment in the Objection of Manteca Stadium *et al.,* Docket No. 72 at 7:6-10 is of generally application:

> Landlords should not have to guess as to whether GECC/Prudential contend Lenders have a perfected security interest in Debtors' leasehold interests nor should Debtors' landlords potentially be subjected to the cost, uncertainty and distraction of future litigation in state courts over whatever contentions Lenders may later make regarding Debtors' leases following a default by the Debtors.

If no one knows and can identify the scope of the replacement lien collateral, it should not be granted.

207683.1                                                    7                    REPLY BRIEF ISO USE OF CASH COLLATERAL
Case: 11-41431    Doc# 149    Filed: 03/07/11    Entered: 03/07/11 23:59:45    Page 7 of 10

## V  PROCEDURAL ISSUES

In the penultimate section of its Opposition, Docket No. 125 at 18:17- 21:17, GECC / Prudential makes a number of practical proposals that warrant either response or accommodation, discussed below:

<u>Payments</u>: As discussed above, payments to GECC / Prudential are not legally required and, at present, would afford no benefit to creditors or the estate, so the Debtor declines the proposal.

<u>Replacement Liens</u>: As discussed above, if GECC / Prudential identifies what is covered by its proposed "everything" lien that is not covered by the existing "like kind" replacement lien, Round Table will address it, but granting liens without knowing what is at stake is reckless and inconsistent with Round Table's duties to the estate.

<u>Termination</u>: GECC / Prudential proposes that the use of cash collateral should terminate on April 3, 2011. Round Table does not object to continuing the current "interim" regime until the conclusion of the Court's April calendar, provided that some reasonable advance scheduling is established if there is to be a contested hearing on that date.

<u>Compliance with Budget</u>: GECC / Prudential proposes a regime in which Round Table is "required" to comply with the weekly cash budget within a 10% variance. This is useful solely to manufacture a default. Each week, Round Table provides GECC / Prudential with a report showing the variance between projected and actual performance for the preceding week. The three reports to date are attached. In the first week, the variance was -63%, in the second week, it was +311% and in the third week, it was +350%. In none of the cases was there a pathological reason for the variance; in almost every case, it related to timing: receiving revenues in one week or the next, disbursing payments in one week or the next. Round Table proposes to continue to provide weekly variance reports to GECC / Prudential (and the Creditors Committee) and is

confident that they will take appropriate action if the variance report indicates anything pathological.

<u>Access and Reporting:</u> Round Table and GECC / Prudential are working their way to a mutually agreeable exchange of information, and can probably report at the hearing on their success or lack of it. Round Table rejects the suggestion that it should be required to provide GECC / Prudential with "all written expressions of interest, offers, agreements and the like for asset sales outside the ordinary course of business, including for the sale of the company as a going concern." GECC / Prudential Objection, Docket No. 125 at 20:21-24. Whether a sale of the business is in the best interests of creditors and the estate should be the subject of a dialog, primarily between Round Table and the Creditors Committee, but certainly not one driven by lenders eager to exit.

<u>Automatic Termination of Cash Collateral Usage:</u> As noted above in connection with the budget variances, it would be easy to trip a hair trigger without having done anything pathological or justifying the draconian punishment proposed. Round Table suggests that, subject to the Court's availability, either party might terminate the *status quo* and demand a hearing or a cessation of the use of cash collateral on 10 days' notice. A more extreme remedy is simply not warranted.

<u>Sale Proceeds:</u> Round Table does not objection to a prohibition on the use of the proceeds of sales that are outside of the ordinary course of business absent further Order of the Court.

<u>Reservation of Rights:</u> Round Table agrees that all parties reserve all rights.

## VI CONCLUSION

There is no diminution of the value of GECC / Prudential's collateral in prospect, so there is no need for adequate protection. Round Table submits that the *status quo* should be continued in effect until the Court's April calendar, at which time the issues may be revisited. In the interim, the parties can certainly develop a fuller factual understanding of Round Table's business, and potentially engage in constructive negotiations.

Respectfully submitted,

DATED: March 7, 2011 ST. JAMES LAW, P.C.

By: /s/ *Michael St. James* .
Michael St. James
Proposed Attorneys for Round Table