SCOTT H. McNUTT (CSBN 104696)
SHANE J. MOSES (CSBN 250533)
MARIANNE M. DICKSON (CSBN 249737)
McNUTT LAW GROUP LLP
188 The Embarcadero, Suite 800
San Francisco, California 94105
Telephone: (415) 995-8475
Facsimile: (415) 995-8487

MICHAEL ST. JAMES (CSBN 95653)
ST. JAMES LAW, P.C.
155 Montgomery Street, Ste. 1004
San Francisco CA 94104
Telephone: (415) 391-7566
Facsimile: (415) 391-7568

Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>Round Table Pizza, Inc.,<br><br>        Debtor. | Case No.  11-41431 RLE<br><br>(Jointly Administered with Case Nos. 11-41432 RLE, 11-41433 RLE, and 11-41434 RLE)<br><br>Chapter 11<br><br>**DISCLOSURE STATEMENT TO ACCOMPANY PLAN OF REORGANIZATION DATED JUNE 9, 2011** |

216008.1

# SUMMARY OF PLAN TREATMENT

| Class | Creditors | Treatment |
|-------|-----------|-----------|
| Class 1 | GECC / Prudential (Owed approximately $35 million secured by all assets) | Interest only in 2011; interest and 5% of principal each year thereafter; fully due after 5 years; terms comparable to original Credit Facility terms |
| Class 1B | Other secured claim (Claims secured by assets of two Tahoe stores, seized from defaulted franchisee) | Payment, surrender of collateral or other permissible non-consensual treatment |
| Class 2 | Priority Claims ($256,000 obligation to ESOP ) | Paid in full on Effective Date (estimated October 1, 2011) |
| Class 3A | Unsecured claims up to $5,000 or who elect Class 3A treatment | Paid 50% of claim, amount up to $2,500, on the Effective Date (estimated October 1, 2011) in full satisfaction of claim |
| Class 3B | Unsecured claims greater than $5,000 or who elect Class 3B treatment | Paid in full with 3.25% interest from February 9, 2011 through payments twice a year of all Distributable Cash beginning in 2012, estimated to be completed in 2014 |
| Class 4 | ESOP equity ownership in Round Table | Preserved intact, but no funding for stock repurchases or additional contributions until all Class 3B claims are paid in full |

216008.1

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTORY STATEMENT ................................................................. 1

II. BACKGROUD LEADING TO THE BANKRUPTCY FILING .......................... 1

    A.    The Business ............................................................................. 1

    B.    The Credit Facility ...................................................................... 2

    C.    The Great Recession .................................................................. 2

    D.    Inability to Restructure Credit Facility .......................................... 4

    E.    The Current Business .................................................................. 5

    F.    The 2010-11 Sale Effort ............................................................. 7

III. THE BANKRUPTCY CASE .................................................................. 9

    A.    The Business Reorganization ....................................................... 9

    B.    Legal Developments in the Bankruptcy Case ................................ 11

        1.    Selection of Representatives ................................................ 11

        2.    Leases ............................................................................ 11

        3.    Plan Process ..................................................................... 12

IV. ROUND TABLE'S CONSTITUENCIES ................................................... 12

    A.    GECC / Prudential ..................................................................... 12

    B.    The Creditors Committee ............................................................ 13

    C.    The Unsecured Creditors ............................................................ 13

        1.    Lease Rejection Damages .................................................... 13

        2.    Trade Debt ....................................................................... 14

        3.    Management / Long Term Incentive Plan Debts ...................... 14

    D.    ESOP ...................................................................................... 15

V. THE SALE ALTERNATIVE .................................................................. 17

    A.    Over-Exposure to the Market ...................................................... 17

    B.    Basis for Valuation Analysis ....................................................... 17

    C.    Other Factors ........................................................................... 19

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431   Doc# 524   Filed: 06/09/11   Entered: 06/09/11 14:37:48   Page 3 of
48

D.    Consequences of a Current Sale ........................................................ 20

E.    Liquidation Alternative ................................................................... 20

VI. PLAN OF REORGANIZATION ............................................................... 21

A.    Summary ....................................................................................... 21

B.    Payment of Administrative Claims ................................................ 22

C.    Treatment of Creditor and Equity Classes ................................... 23

        Class 1:      GECC / Prudential ........................................... 23

        Class 2:      Priority Claims .................................................. 24

        Class 3:      General Unsecured Claims ................................. 25

        Class 4:      ESOP / Equity .................................................. 26

VII. EXECUTORY CONTRACTS ................................................................... 26

A.    Franchise Agreements .................................................................. 26

B.    Leases ........................................................................................... 28

C.    Employment Contracts .................................................................. 28

VIII. MEANS OF IMPLEMENTATION .......................................................... 30

A.    Revesting Subject to Plan .............................................................. 30

B.    Bankruptcy Transition and Procedure ......................................... 30

C.    Internal Operations and Management ........................................... 31

        1.      Dissolution of Round Table Pizza Nevada ................. 31

        2.      Cash Reserves ............................................................. 31

        3.      Management and Incentive Compensation ................. 31

        4.      Post-Petition Deposits ................................................ 34

        5.      Objections to Claims .................................................. 34

        6.      Unitary Debtor and Co-Obligor Claims ..................... 34

        7.      Discharge .................................................................... 36

IX. CONCLUSION ......................................................................................... 37

Case: 11-41431   Doc# 524   Filed: 06/09/11   Entered: 06/09/11 14:37:48   Page 4 of
48

# I. **INTRODUCTORY STATEMENT**

Round Table Pizza, Inc., The Round Table Franchise Corporation, Round Table Development Company, and Round Table Pizza Nevada LLC, the jointly administered debtors and debtors-in-possession in the above captioned Chapter 11 reorganization cases (collectively, "Round Table" or the "Debtor"), have filed their Plan of Reorganization dated June 9, 2011 (the "Plan").

This Disclosure Statement explains the circumstances leading to Round Table's bankruptcy filing, the business reorganization achieved in the first months of its Chapter 11 case, the Plan and its means of implementation and the available alternatives to the Plan. The Court has determined that this Disclosure Statement contains sufficient information to enable creditors to make an informed judgment about the Plan.[1] As described herein, Round Table believes that acceptance and confirmation of this Plan will provide the greatest return to creditors and other affected parties and is superior to any available alternative.

# II. **BACKGROUD LEADING TO THE BANKRUPTCY FILING**

## A.      **The Business**

Round Table's first restaurant opened in Menlo Park, California in 1959.  Over the past 50 years, Round Table has grown to dominate the Northern California market for pizza, to become a major West Coast chain with nearly 500 stores in seven States, and to engage in international franchise development.

Over the last 15 years, Round Table diversified from acting exclusively as a franchisor to also operating company owned stores, ultimately acquiring and developing 140 company-owned stores and increasing its employee base from 70 to a peak of more than 3,000 employees.

During the decade prior to the Great Recession, Round Table enjoyed tremendous growth.

---

[1]     This statement will be true when the Disclosure Statement is submitted to creditors in connection with the solicitation of ballots; it is not true as of the date this Disclosure Statement has been filed with the Court.

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 5 of 48

Between 1997 and 2006, revenues grew from $15 million to $120 million per year, and operating profits grew from $4.3 million to $10.5 million.

## B.    The Credit Facility

Having enjoyed consistent profitable expansion over the preceding decade, Round Table sought a new credit facility that would support further expansion, including a planned acquisition of more than 35 stores.  In February of 2007, Round Table closed a $65 million Credit Facility jointly provided by GECC / Prudential and paid them a closing fee of $538,073.

The Credit Facility provided for borrowings of up to $65 million dollars to fund further expansion.  The Credit Facility imposed a floating interest rate, originally set at 2.75% to 3.75% over LIBOR or 2.00% to 3.00% over prime.  Based on Round Table's performance, the initial interest rate on the Credit Facility was 3.25% over LIBOR.

The Credit Facility contemplated payment of interest only for the first year, followed by two years of relatively low amortization ($1.25 million in 2008 and $1.25 million in 2009) and then an abrupt rise to a high level of principal repayment: $5.625 million in 2010 and beyond.  At the time the schedule was negotiated, Round Table had been enjoying a decade of substantial and uninterrupted growth, was expecting imminently to acquire 35 company stores and to build an additional 65 company stores, and then projected 2010 revenue in excess of $210 million. Projecting the future on the basis of past experience and then-current plans for growth, the negotiated rates of principal repayment seemed reasonable to Round Table and GECC / Prudential.

## C.    The Great Recession

Unfortunately, the Great Recession followed shortly after the inception of the Credit Facility.  Round Table's management was sensitive to the economic environment, especially regarding employment, since there is an extremely close relationship between employment levels and Round Table's unit sales.  Round Table's management responded promptly to increases in unemployment in mid-2007 and the onset of the Great Recession.  In late 2007, management halted the growth which had driven the company for the preceding decade, shelving plans to

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 6 of
48

acquire more than 35 stores and ultimately terminating all efforts to acquire or develop new company stores.

As the Great Recession continued, the company focused on reducing expenses. General administrative and overhead expenses were reduced from $12.2 million dollars in 2006 to $6 million dollars in 2009, while Round Table increased market share by 4% during the same period. Round Table's management addressed the profitability and performance of the company stores by closing under-performing stores as leases expired, seeking concessions from landlords and selling some of the stores to franchisees. Round Table's management also reduced costs above the company store level, ultimately engaging in 5 rounds of lay-offs and severing a total of 54 employees.

Management led the cost reductions. Corporate employees and senior management received no merit increases in 2007, 2009 and 2010, and only a 2.6% increase in 2008. Historically, corporate employees had received low salaries counterbalanced by high bonuses, but only a nominal bonus ($125,000 among 85 employees) was paid in 2007, and no bonuses were earned or paid in 2008, 2009 and 2010. Management also forfeited more than $500,000 in earned compensation and vacation pay to improve the company's performance.

In addition, in response to the Great Recession, senior management deferred almost $2 million dollars in compensation, compensation which had been earned by exceeding performance targets from 2005 through 2007 but was first payable in 2008. Although ample funding was available to pay that compensation at the time, Round Table deferred the compensation because it recognized that the cash would be useful to the company in weathering the approaching storm.

In the midst of the Great Recession, Round Table was required to address and resolve two extraneous pressures. First, Round Table, as with many retail chains doing business in California, was sued in two wage and hour class action lawsuits. Aggregate costs associated with this litigation exceeded $4.3 million, imposing additional strains on the company's liquidity. Unpaid obligations under the class action settlements currently aggregate about $380,000.

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 7 of 48

In 2010, the pizza market became extremely price competitive as a result of the Great Recession. Round Table could not materially reduce the cost of its ingredients, since it had established its reputation as "the last honest pizza." The lower margins during this period put additional stress on Round Table's profitability.

Throughout this entire period management held quarterly briefings with senior leaders at GECC and Prudential outlining results, future plans and strategies to navigate this historical downturn. GECC and Prudential were complimentary about the management of the business during this downturn and provided no additional suggestions or criticisms.

**D.     Inability to Restructure Credit Facility**

Early in 2008, near the beginning of the Great Recession, Round Table recognized that the principal repayment schedule contemplated by the Credit Facility would be impossible to satisfy, and sought to negotiate modifications of its obligations under the Credit Facility that would permit ongoing performance in this changed economic environment

Instead, after nine months of negotiations with GECC / Prudential, GECC / Prudential was only willing to provide temporary relief, and that at substantial cost to Round Table. Specifically, through the "Second Amendment" effective September 15, 2008, the Credit Facility was reduced from $65 million to $33.575 million, but the principal repayment terms were still designed to ensure that Round Table would fail: $1.6 million in 2009 and 2010, twice that in 2011 and treble that in 2012 and beyond. Indeed, the Second Amendment *accelerated* the principal repayment: an immediate 6.5% increase in the principal payment in 2008 and a 26.3% increase in the principal payment in 2009.

In return for this non-relief, the Second Amendment increased the interest rate spread by 50.7%  and charged a loan modification fee of $158,000. Before the Second Amendment, Round Table was paying 3.75% over LIBOR; immediately after the Second Amendment Round Table was paying 5.65% over LIBOR. Additional covenants were imposed, seemingly to increase the likelihood of default, including covenants which required improvement each quarter over the prior quarter, a very hard task during a recession, let alone one of the depth and length of the Great

Case: 11-41431     Doc# 524     Filed: 06/09/11     Entered: 06/09/11 14:37:48     Page 8 of 48

Recession.

Round Table saw the impact of the Great Recession on the Credit Facility as a business problem that should be addressed directly and through negotiation. GECC / Prudential apparently saw it as an opportunity to increase interest rates, obtain fees and ensure that it would henceforth always be able to call a default, so as again to increase interest rates and obtain more fees.

Most recently, on December 7, 2010, GECC / Prudential announced that Round Table would no longer be permitted to use LIBOR as the reference interest rate and that as a consequence the interest rate would yet again be increased, now to 6.8% over prime, or currently 10.05%. Immediately before the announcement, the interest rate was 7.80625%. (By contrast, interest at the rate originally contemplated by the Credit Facility, would amount to less than 4% on a LIBOR loan or 6.25% on a prime rate loan.)

In addition, GECC / Prudential now applies a 2% increase for "default interest," yielding a total all-in interest rate of 12.05%. This 12.05% interest represents a 54% increase in the interest rate over the rate prior to December 7, 2010, which was 7.80625%.

GECC / Prudential's conduct has been nothing short of predatory: GECC / Prudential has exploited Round Table's efforts responsibly to address its business and the Credit Facility in the face of the Great Recession as an opportunity to charge fees and more than double its interest rate.

**E. The Current Business**

There are two core aspects to Round Table's business: Round Table franchises its business to independent third party owner-operators, and operates company-owned stores. In the aggregate, those two sectors provided a solid business, with operating profits. Below is a chart (in millions of dollars) of Round Table's operating profit in millions of dollars by quarter from 2007 to 2010 (excluding professional fees to remove the impact of class action litigation):

/ / /

/ / /

/ / /

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 9 of
48



In Millions

There are currently 348 franchised stores, operated by 150 franchisees. The franchise base is highly diversified: 91% of the franchisees own five stores or less, and only two franchisees own 20 to 25 stores. Management believes that the franchise segment of Round Table's business is sound, produces stable profits, and does not require reorganization. The below graph shows the combined The Round Table Franchise Corporation (" RTFC") operating profit net of the overhead associated with Round Table Pizza, Inc. ("RTP") in millions of dollars on an annual basis from 2007 to 2010.

**RTFC Op Profit** (in millions)

Prior to the petition date, Round Table operated 128 company-owned stores. That business segment suffered a very substantial erosion in operating profitability over the past four years due

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 10 of
48

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

to the Great Recession, as reflected below.



About half of that erosion in profitability was localized in about 30 unprofitable stores, which became increasingly unprofitable as the Great Recession continued.

**F.    The 2010-11 Sale Effort**

As noted, Round Table was wholly unable to persuade GECC / Prudential to restructure the Credit Facility so as to render on-going performance by Round Table possible. In response to anticipated default due to accelerated principal repayment terms and GECC / Prudential's complete unwillingness to engage in a restructure, management turned to a sale process as the only viable solution to a Credit Facility that could not be rendered feasible.

After a comprehensive review of the qualifications of three investment bankers, Round Table chose North Point Advisors as its investment banker: North Point was responsible for the sale of over half of restaurant companies that had been sold in the last five years, and had achieved attractive average market multiples in those sales. Through North Point, 118 potential buyers were contacted, of which 54 executed non-disclosure agreements and received due diligence materials. Round Table received 17 proposals (written and verbal) and proceeded to serious negotiations with the most favorable.

Early in the sale process, GECC made it clear that it would provide seller financing. This issue was critical for two reasons. First, following the collapse of Lehman Brothers and the credit

7

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 11 of
48

markets, it became exceedingly difficult to find a buyer with access to a fresh credit facility on the order of $50 million to finance an acquisition. Second, as Round Table's lender, GECC had access to the best internal information about the company and, as the largest lender to restaurants in the United States; GECC could be expected to apply the most sophisticated analysis to that information. GECC's willingness to provide seller financing would be perceived by the market as a vote of confidence in Round Table; conversely, if GECC was perceived to be running for the exits, prospective buyers would view that as a cause for serious concern about Round Table and its future.

Thus, the availability of seller financing was a critical threshold issue that would substantially affect the course of any marketing efforts. GECC repeatedly assured Round Table that it anticipated providing seller financing, and Round Table based its marketing and communications with prospective buyers on those assurances. Reflective is the following e-mail from Kyle Huffman, a Senior Vice President of GECC regarding providing a "staple" to the company identified as "First Bidder" by GECC / Prudential in prior pleadings in this case. (A "staple" refers to a proposal for seller financing, because it is "stapled" to the purchase offer.)

> From: Huffman, Kyle (GE Capital) [mailto:Kyle.Huffman@ge.com]
> Sent: Wednesday, August 25, 2010 10:55 AM
> To: Davis, Keith (CFO)
> Cc: Campbell, Kathleen (GE Capital)
> Subject: RE: fyi, i passed your contact info along for a possible staple
>
> Thank you Keith.
> I will have our internal rep call on them about this inquiry.
> My guess is that a staple for the final round potential buyers will be in that 2.5X to 3X EBTIDA range for senior debt, depending on the buyer. As discussed, we would like to put staples together for the final round buyers you have in your process. I know 1st round bids are due this friday. How long do you think it will take you to determine who the final round participants will be? At that point, I think it makes sense for us to provide staples for the final round bidders.
> Your thoughts? Thank you for the lead as well.
>
> Kyle

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 12 of
48

The offer which was the subject of the foregoing e-mail was from the "First Bidder," whose initial bid of $45 million went up to $47.5 million after management's presentation. A few weeks into the process of finalizing a sale to the First Bidder, GECC / Prudential told the company to move on to the next bidder, without providing any explanation other than that they would not do business with the First Bidder in spite of the First Bidder's credit worthiness.

The "Second Bidder" (as identified by GECC / Prudential) offered $45 million, premised on the assumption of financing, which again GECC / Prudential said would be forthcoming. When GECC / Prudential again reversed course and advised that they would not provide financing, the Second Bidder remained engaged for a while, although as a result of the lenders' vote of no confidence, the purchase price dropped to $41.6 million.

GECC / Prudential's decision to reverse course and insist on being taken out entirely predictably caused the sale process to crater. Round Table, with GECC / Prudential's knowledge and urging, had assured prospective buyers that the most knowledgeable third party was so confident about the business that it was willing to provide seller financing. When instead GECC / Prudential insisted on running for the exits, prospective buyers predictably interpreted that as a loud vote of no confidence, torpedoing the sales effort. Round Table rejected the Third Bidder's deteriorating and opportunistic offer on February 8, 2011, and filed the instant Chapter 11 case the following day.

### III. THE BANKRUPTCY CASE

**A.** **The Business Reorganization**

Over the first eight weeks of the Chapter 11 case Round Table closed unprofitable stores. Since the bankruptcy filing, Round Table has negotiated with landlords to render marginal stores profitable. The results of this effort have been dramatically favorable.

First and foremost, by closing 21 unprofitable stores, Round Table avoided $1.5 million in 2010 EBITDA[2] loss (after overhead), thereby directly increasing its EBITDA by that amount.

---

[2] Earnings Before Interest Taxes Depreciation and Amortization is a key measure of a business' operating profitability. Businesses, especially in Round Table's business segment, are often valued on the (footnote continued)

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Second, Round Table has transferred sales from the closed stores to nearby Round Table restaurants. Third, Round Table negotiated lease modifications which reduced rent by $1.8 million on locations Round Table will keep, thereby also increasing operating profitability. Fourth, Round Table has reduced its selling, general and administrative expenses. Finally, Round Table negotiated lease modifications that will eliminate $1.4 million in rejection damages claims it would otherwise face.

Round Table has largely concluded restructuring its business operations. There remain about five leases that may be rejected in the course of the balance of the case if suitable lease modifications are not finalized. Nonetheless, the bulk of the savings and improvements in profitability that Round Table sought have been obtained, such that its stabilized financial condition can be reasonably projected.

Specifically, on an annualized basis, Round Table's current operations generate $9.1 million of projected EBITDA in 2011 and, in the base case, $11 million of projected EBITDA for 2014.

In general, and subject to more refined expert witness testimony, Round Table believes that companies like it are valued at five to seven times EBITDA and actually sell at six to eight times EBITDA, in reported sales.[3] Unfortunately, as discussed below, the market values companies based on the preceding 12 months' operations, so it will be ten more months before Round Table's restructuring efforts will be reflected in its EBITDA for the purposes of establishing a purchase price. After adequate time has passed and Round Table's current operations are viewed as stable and well-established, Round Table believes that it will be able to realize a fair market value in the range of $50 to $60 million. As discussed below, those amounts are materially in excess of Round Table's debts, on any analysis. As a consequence, Round Table

---

basis of a multiple of EBITDA. The historical average EBITDA multiple from Round Table's annual ESOP appraisal is 6.2x EBITDA.

[3] For example, in May, 2011 California Pizza Kitchens announced a sale at a 7.5 multiple of its EBITDA.

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:32:48    Page 14 of
48

believes that equity – held by the Round Table Restated Employee Stock Ownership Plan & Trust (the "ESOP") – holds a very material stake in this case.

**B.  Legal Developments in the Bankruptcy Case**

    1.  <u>Selection of Representatives</u>

Following the commencement of the bankruptcy case, the Office of the United States Trustee selected three individuals to act as members of the Official Creditors Committee.  They are William Foley, Round Table's former Vice President of Operations, who asserts a claim for deferred incentive compensation and is a Participant in the ESOP; Laurel Leone of Leone Advertising, which is a trade creditor; and Mario Albert of Bowman Commercial Development, a commercial landlord which leased two premises to Round Table; one of whose leases was rejected and the other of which is presently performing.  Thereafter, the Creditors Committee retained Brownstein Hyatt Farber Schreck, LLP as its counsel and Bailey Elizondo Brinkman, LLC as its financial advisor.

Following the commencement of the case, Round Table brought a Motion to Appoint a Discretionary, Independent and Institutional Trustee to represent the interests of the Employee Stock Ownership Plan (the "ESOP").  Applicable ERISA law would have required the Board of Directors and Management to act *exclusively* in the interests of the ESOP beneficiaries had they continued to guide the ESOP, which would have conflicted with their duties under the Bankruptcy Code to act in the interests of *all* of the creditor constituencies.  The Motion was granted and First Bankers Trust Services was appointed the ESOP Trustee.  The ESOP Trustee retained Boylan Brown to act as its counsel.

The Round Table Owners Association moved the Court to an appoint an Official Franchisees' Committee.  The Court denied the Motion to appoint an Official Franchises' Committee.

    2.  <u>Leases</u>

The Bankruptcy Code establishes an arbitrary deadline for the assumption or rejection of leases.  Through an Order entered on April 14, 2011, the Court deferred that deadline to the

Case: 11-41431   Doc# 524   Filed: 06/09/11   Entered: 06/09/11 14:32:48   Page 15 of 48

furthest extent legally permissible, which is September 7, 2011. As discussed with respect to the business reorganization, above, Round Table engaged in extensive dialog with the landlords early in the case, renegotiating leases where practicable, rejecting leases where a renegotiation was not possible. With only a handful of minor exceptions, Round Table has determined to retain and assume all of the leases from which it currently operates Stores, such that the deadline for assumption or rejection will not prove problematic.

The major exception is the lease for Round Table's corporate headquarters, which represents a very major long-term commitment. Round Table hopes either to obtain through the landlord's consent an extension of the September 7, 2011 deadline or to engage in substantive dialog very promptly.

### 3. Plan Process

On April 25, 2011, Round Table filed its Initial Plan of Reorganization with the Court. The accompanying Explanatory Statement expressly stated that Round Table sought to present its thinking with clarity, and encouraged dialog with the key parties in interest to adjust the Initial Plan into a document that would enjoy broad support.

Unfortunately, there was little subsequent dialog. GECC / Prudential made it clear that it only sought to cash out through a sale, and would oppose any Plan which contemplated any different result. The Creditors Committee did not engage in substantive discussions regarding the Initial Plan, but rather, through counsel, urged consideration of the sale alternative.

The Bankruptcy Code affords an "exclusivity period" within which only the debtor may prosecute confirmation of a Plan of Reorganization. This Plan was filed within that exclusivity period.

## IV. ROUND TABLE'S CONSTITUENCIES

In evaluating its reorganization and the available alternatives, Round Table has been mindful of the motivations and entitlements of its key constituencies, described below.

### A. GECC / Prudential

GECC / Prudential has been clear and unwavering in its desire for a quick sale which will

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431     Doc# 524     Filed: 06/09/11     Entered: 06/09/11 14:32:48     Page 16 of 48

cash it out.  As discussed below, Round Table is convinced that a quick sale would leave unsecured creditors with a partial payment at best, and would destroy the substantial equity held by the ESOP.

GECC / Prudential does not have an enforceable legal right to insist on a quick sale. Rather, the Bankruptcy Code includes "cram down" provisions which could compel GECC / Prudential to accept payments over time.  Round Table believes that the Plan provisions governing Class 1 (GECC / Prudential) satisfy the "cram down" requirements.  Since a quick sale would destroy value otherwise available to the other constituencies in this case, Round Table believes it is required to pursue a reorganization that does not enjoy GECC / Prudential's consent.

**B.       The Creditors Committee**

The Creditors Committee has urged exploring a quick sale.  The reasons articulated are (a) that cramming down GECC / Prudential is not practicable and (b) that a quick sale might yield a positive result.  Round Table strongly disagrees with each point.  Unfortunately, to date there has been little meaningful dialog between Round Table and the Committee.

**C.       The Unsecured Creditors**

Round Table estimates that general unsecured claims will aggregate $7,206,000.   The unsecured creditors in this case fall into four distinct categories, as presented in the following table:

| | | |
|---|---|---|
| Lease Rejection Claims | $ | 1,316,000 |
| Trade / Other Unsecured | $ | 1,943,000 |
| Management Claims | $ | 2,710,000 |
| ESOP (less priority portion) | $ | 1,237,000 |
| Total General Unsecured | $ | 7,206,000 |

1.       Lease Rejection Damages

Since the filing date, Round Table has closed 21 unprofitable stores and rejected the associated leases; it also rejected 2 unexpired leases related to previously closed stores.  (There may be additional rejections of 5 leases, but for present purposes Round Table's modeling

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:32:48    Page 17 of 48

addresses only the rejections that have taken place to date.)  Round Table presently estimates aggregate lease rejection claims at $1,316,000, giving effect to certain agreements Round Table negotiated to reduce such claims.

    2.   <u>Trade Debt</u>

Round Table acknowledges $1,943,000 in trade debt and other general unsecured claims. The largest component of this category is approximately $638,000 in ordinary trade debt followed by $600,000 in outstanding obligations associated with promissory notes issued by Round Table to purchase company stores from franchisees.  Another significant component is approximately $361,000 owed in connection with a prior settlement of certain class action litigation.

    3.   <u>Management / Long Term Incentive Plan Debts</u>

Round Table acknowledges management-related claims aggregating approximately $2,710,000, primarily derived from a failure to pay earned and past-due long term incentive plan obligations.

Unlike many companies, Round Table is unable to offer senior managers stock as a significant portion of their compensation because it is wholly owned by an Employee Stock Ownership Trust.  Instead, Round Table has been principally reliant on monetary compensation to incentivize and reward management.  Historically, Round Table paid below-market fixed compensation and used performance bonuses, to render its managers' compensation competitive with the marketplace.

In response to the Great Recession, Round Table did not pay bonuses or other discretionary compensation.  In addition, Round Table deferred payment of almost $2 million in senior management compensation, compensation which had been earned by exceeding performance targets for the period from 2005 through 2007 and was contractually due and payable in 2008.  Although ample funding was available to pay that compensation at the time, Round Table deferred management's compensation because it recognized that the cash would be useful to the company in weathering the approaching storm.

Round Table recognizes or estimates other monetary obligations owed to management.

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 18 of 48

1  The next largest obligation consists of severance and related obligations owed to James Fletcher,

2  Round Table's former Chief Executive Officer, who was involuntarily severed shortly before the

3  filing of this case.  For purposes of estimation, Round Table has assumed that his claim will be

4  limited to one year's compensation pursuant to Section 502(b)(7) in the amount of approximately

5  $500,000 in salary and benefits.

6  **D.      ESOP**

7      Round Table is entirely owned by the Round Table Restated Employee Stock Ownership

8  Plan & Trust (the "ESOP").  The ESOP is subject to a separate legal regime ("ERISA").

9      Certain aspects of the ERISA regime are mandatory, other aspects are voluntary.  In

10 principal, a company may be required to make two types of payments to an ESOP.  The company

11 may make a monetary contribution to the plan, ordinarily measured as a percentage of wages (or

12 of a subset of wages).  Certain employer contributions are required under the Internal Revenue

13 Code of 1986, as amended (the "Code"), and/or ERISA.  One form of such required contributions

14 is the "safe harbor contributions" that an employer may make to a trust maintained pursuant to an

15 ERISA plan in order for an employer to satisfy certain non-discrimination requirements under the

16 Code for disparity in contributions by or for highly compensated employees versus non-highly

17 compensated employees. Through year-end 2010, Round Table's mandatory contribution level for

18 safe harbor contributions was 3% of designated types of wages for certain designated employees.

19 Commencing effective January 1, 2011, Round Table was not subject to a mandatory contribution.

20     For a variety of reasons, including the insistence of GECC / Prudential, certain safe harbor

21 contribution amounts that were or will be due to be paid for 2009 and 2010 in 2010 and 2011 were

22 not paid.  The ESOP Trustee has not yet filed a Proof of Claim, but Round Table believes that the

23 aggregate of the accrued but unpaid monetary obligations owed to the ESOP is approximately $1.5

24 million dollars, of which $256,000 accrued during the 180 days prior to the commencement of the

25 bankruptcy case and is entitled to "priority" treatment under Section 507(a)(5) (collectively, the

26 "ESOP Obligation").

27     Round Table believes that monetary safe harbor contributions owed to the ESOP that were

28

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:32:48    Page 19 of
48

incurred prior to the commencement of the bankruptcy case constitute general unsecured claims against its estate and are not subject to avoidance or subordination.  See, *In re Merrimac Paper Co.,* Inc., 420 F.3d 53 (1st Cir. 2005) (categorically rejecting subordination of stock redemption note given by debtor pursuant to an ESOP Plan).  Round Table estimates that the general unsecured claim held by the ESOP, less the priority claim portion, is approximately $1,237,000.

In addition, the ESOP holds all of the capital stock in Round Table, stock which Round Table believes should have material value as a result of the business reorganization described above.  Even in the "stress" case scenario in the Appendix, Round Table estimates the fair market value of the ESOP's equity ownership at over $15 million in 2014, although Round Table acknowledges that the value is not immediately recoverable, for the reasons discussed below.

ERISA imposes on Round Table a statutory obligation to enable the ESOP participants to "diversify" or to provide it with liquidity for certain portions of the Round Table stock allocated to their Stock Accounts (the "diversification obligation").  The ESOP's principal asset is illiquid stock in Round Table.  Under certain circumstances, individual ESOP participants become entitled to diversify a portion of their beneficial equity interest into a more liquid vehicle of investment; e.g., cash or marketable securities.  Round Table also has a continuing obligation, within certain parameters, to repurchase its stock that is distributed to ESOP participants who have this diversification right so as to provide cash to the ESOP participants, thereby providing liquidity to those ESOP participants and beneficiaries entitled to diversity their benefits.

ERISA further imposes certain requirements on the ESOP to provide distributions to ESOP participants and beneficiaries within specified these distributions may occur in the form of cash payments from the ESOP or in stock distribution that Round Table is required to repurchase.  Round Table has made filings with both the Internal Revenue Service and the U.S. Department of Labor that contemplate the future resolution of these distribution and diversification obligations in a manner  that is consistent with ERISA and the Internal Revenue Code.

/ / /

/ / /

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

# V. THE SALE ALTERNATIVE

GECC / Prudential and the Creditors Committee have advocated a post-petition sale effort. Round Table believes such an effort would be an inappropriate expenditure of material funds ($250,000 to $400,000) and efforts, deflecting and delaying the reorganization process, without plausibly providing a possibility of a positive outcome for the affected constituencies.

## A. Over-Exposure to the Market

As discussed above, North Point led Round Table through an aggressive sales process from the summer of 2010 through February 8, 2011, contacting all of the likely buyers. Management invested significant amounts of time, money and resources for over eight months making its best effort to sell Round Table. If Round Table returns to the same market four months later, the potential buyers are highly likely to remember and be guided by their prior impressions of the company, suggesting that their bids will not materially increase. They are also likely to focus on why the prior sales effort failed – because GECC, the most sophisticated lender to this industry, wanted out of the credit – a circumstance which remains unchanged and unfavorable. Not surprisingly, Round Table believes that it must stay out of the market for a material period of time if it is to hope that the buyers will reset their views of the company.

## B. Basis for Valuation Analysis

Purchasers value companies based on predictable and established operating results, ordinarily looking to the preceding 12 months of operations. The chart below shows the actual per store average cash flow, with each point on the graph representing an average of the preceding twelve months of store results. If store performance was improving, the graph would show an upward slant in the line and if the store performance was declining, the graph would show a downward slant in the line. The graph shows that the bidders saw four years of declining results from 2007 to 2010, with each year being progressively worse than the prior year as the Great Recession unfolded and the performance had yet to bottom out, stabilize and begin to recover.

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 21 of
48



In Dollars

**Store Cash Flow Trailing 12 Month Per Store Avg**
All Stores

| 4.5x to 5.5x | 5.5x + |
|---|---|
| Limited Positive History (two month trend) | Stable & Growing EBITDA |
| Sales Transaction Counts are Negative | Positive Sales Transactions |
| New Unit Investment Returns Under Pressure | Attractive New Unit Cash-on-Cash Returns |
| Economic Downturn | Economic Recovery |
| Bottom of Pizza Industry Cycle (Price Wars) | Industry Attracts Higher Multiples (Less Discounting) |

While the last few months of post-bankruptcy results clearly show improvement, two factors suggest that the improvement will not yield a material positive change in buyers' reactions. First, buyers will continue to dilute current profitability by averaging the preceding 12 months, weighing down the company's value with the burdens of the past. (By contrast, valuation for bankruptcy purposes is prospective, "freed from the heavy hand of past errors, miscalculations or disaster." *Consolidated Rock Products v. Du Bois,* 312 U.S. 510, 526 (1941)). As reflected in the chart, it will not be until 2012 and thereafter that an average of the preceding twelve months operations yields a significantly positive result. Indeed, actual results to date are *below* the projections provided to bidders in the prior sale process.

Second, in presenting information to the prospective buyers, Round Table presented projections for 2011 through 2014 which assumed the Great Recession promptly ended and robust economic recovery took its place. With more recent economic data, Round Table has updated its projections to comport to the current, less optimistic view that in California (where Round Table has a majority of its restaurants), the economic recovery will be stalled as the housing market and the job market recover at a slower pace. Thus, as reflected on the right side of the graph, Round

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 22 of
48

Table's currently projected future operations are less favorable than the projections provided to buyers in the recent sales effort.

Third, as noted in the table at the bottom of the above chart, there are five main factors that tend to lead bidders to a higher or lower valuation. None of those factors have improved generally or specifically for Round Table since the prior sales effort.

Thus, Round Table believes that were it to enter the market again, bidders would likely evaluate the company much as they did in the sales effort that concluded four months ago, but for a variety of reasons, the bids might actually decline.

**C.    Other Factors**

Other factors might affect a current sales effort for better or worse.

It has been suggested that the market would respond favorably to the fact that Round Table has already closed the unprofitable Stores and implemented its business reorganization. Round Table disagrees: all of the bidders with whom it was seriously engaged in the prior sale effort were factoring into their bids the impact of closing unprofitable Stores. The strategy of closing under-performing restaurants was central in Round Table's presentation to bidders of opportunities to maximize value from investing in Round Table. As such this is not a new development that should yield a higher valuation. An enhancement in price for accomplishing the expected seems unlikely.

Round Table believes that there is a stigma to bankruptcy and that a post-bankruptcy marketing effort would encourage opportunistic bidders. GECC / Prudential argues that the bankruptcy process provides clarity, certainty and "clean title" to buyers, but none of those issues were identified as problems in the prior sale effort.

Finally, Round Table believes that credit markets remain limited, such that strategic buyers would experience difficulties obtaining financing easily enough to participate in an auction. GECC / Prudential asserts that credit markets are not as bad as they were.

Although Round Table believes that these other factors would depress the result of a current sale effort, it seems at least fair to say that they would not enhance the result. Thus, taking

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

everything into account, Round Table believes that a current sale effort should not be expected to produce materially higher results than the prior sales effort.

**D.      Consequences of a Current Sale**

Had the best bid obtained in the prior sale process been implemented in 2010, it would have resulted in full payment to unsecured creditors, and a distribution to the ESOP.  Were the same bid accepted now, it would not.

In retrospect, the bids in excess of $40 million obtained in the prior sale process were all predicated upon the availability of seller-financing, and all of the bids which expressly provided for buyer-financing – the current circumstances – were less than $40 million.

Assuming a current sale process could attain a $40 million buyer-financed bid, the result would nonetheless be dramatically inferior to the Plan. A sale would not yield a benefit to Round Table's constituencies – other than GECC / Prudential – comparable to what could be obtained through confirmation of the Plan.

**E.      Liquidation Alternative**

Round Table believes that a true liquidation would be unreasonable and ineffective. Round Table does not own any real estate; all of its company operated restaurants are leased.  The liquidation value of company store assets is probably around $4.5 million[4] – 40% of that current cash on hand – and the value of its franchise business is unclear, but likely to be severely deflated by closing the company stores, which represent 25% of the system.

There are two realistic alternatives: are a going concern sale, heavily discounted to provide a quick exit for GECC / Prudential, but generating little or no recovery for other constituents, or

| [4]   Tangible Asset Description | Market Value | Percent Realizable | Liquidation Value |
|---|---|---|---|
| Cash, Deposits, Amounts in Escrow | $1.8 | 100% | $1.8 |
| Accounts and Notes Receivable | 0.4 | 50% | 0.2 |
| Office and Restaurant Equipment | 4.5 | 50% | 2.2 |
| Owned Building on a Ground Lease | 0.4 | 50% | 0.2 |
| Restaurant Inventory | 0.6 | 10% | 0.1 |
| Total | $7.7 | 69% | $4.5 |

DISCLOSURE STATEMENT TO ACCOMPANY PLAN OF REORGANIZATION

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 24 of 48

full repayment for all constituencies from operating cash flow.

# VI. PLAN OF REORGANIZATION

## A.     Summary

Prior to the commencement of this case, Round Table was able to generate millions of dollars of operating profits.  Were it not for the extraordinary issues associated with the GECC / Prudential Credit Facility – specifically, its unreasonable principal repayment schedule, the Lenders' unwillingness to negotiate a viable principal repayment schedule and the Lenders' torpedoing the sales process – Round Table might not have filed a bankruptcy case.

Once a bankruptcy filing became necessary in order to preserve its value, Round Table utilized the case to maximize that value, closing unprofitable stores, transferring sales to nearby Round Table restaurants, reducing selling, general and administrative expenses and negotiating favorable lease modifications.  The result of those efforts is to increase Round Table's operating profitability by having fewer, more profitable stores.

Round Table's profitability makes it possible for it to propose a self-funded Plan that will repay unsecured creditors in full, provide secured creditors with appropriate debt service and principal repayment and enable Round Table to sell or refinance within a few years, realizing material value for the participants and beneficiaries of its ESOP.  That is the approach contemplated by the Plan of Reorganization.

Specifically, Round Table prepared sets of projections for performance under a Plan of Reorganization which has the following key provisions:[5]

---

[5] Additional financial and operating assumptions included in these projections are: (i) the May year to date sales comp trend vs. 2009 of down -2.2% will continue through 2011, mostly offset by the benefit of sales transfer received from the 21 RTDC closures since the filing date; (ii) 2011 operations are projected the same in every case and are consistent with Round Table's 2011 cash budget; (iii) following 2011, it is assumed the employment levels begin to recover, resulting in a topline improvement in comparable sales of 3% in the base case, 4.5% in the high case for 2012 through 2014 and 3% thereafter, and 0.0% in the low and stress cases;  (iv) in 2012 through 2016, incentive compensation has been assumed at historical levels; i.e., it is indexed to performance (Round Table's practice is to pay less incentive compensation for lower performance and higher incentive compensation for higher performance); (v) Round Table's current low levels of capital spending continue through the end of 2011 at $560,000 and then in 2012 and beyond capital spending return to the historical levels (calculated on a per store average basis, this aggregates $1.1 million);  (vi) the stress case assumes no sales growth (0.0%) coupled with a higher principal balance and a (footnote continued)

Case: 11-41431     Doc# 524     Filed: 06/09/11     Entered: 06/09/11 14:32:48     Page 25 of 48

(a)     The GECC / Prudential credit facility is restructured on fairly ordinary terms (interest only in 2011, interest and a 5% principal reduction in 2012 and thereafter);

(b)     Payment on the Effective Date (assumed to be October 1, 2011) of all of the obligations which must be paid to confirm a Plan of Reorganization;

(c)     Establishment and maintenance of a $4 million cash reserve;  and

(d)     A sweep of all excess cash to fund payments on unsecured debts.

A fuller explanation of the Plan treatment modeled in these projections is provided in the following section.

The foregoing assumptions were then applied to four sets of projections: a "base case," representing Round Table's expectations for future operations and generally assumes a 3% rate of growth in sales, a "low" case which assumes no growth at all, a "high" case, which assumes 4.5% sales growth during a robust economic recovery, and a "stress case," which assumes low sales growth and materially adverse resolutions of the interest rate payable to GECC / Prudential.  The results are presented in the Appendix, and can be summarized as follows:  In each alternative, even the "low" case alternatives, there are sufficient funds both to pay GECC / Prudential and to retire all of the unsecured debt, with interest, in less than two years and only four years in the "stress" case alternative.

## B.      Payment of Administrative Claims

In order to confirm a Plan of Reorganization, all administrative expenses must be paid in cash, in full, not later than the Effective Date.

In this case, administrative claims fall in three distinct categories.  The largest group of administrative expenses are the fees and costs of professionals (law firms and financial advisors) employed by the bankruptcy estate; e.g., Round Table and the Creditors Committee.  These fees have been estimated on the basis of a monthly "burn rate" through an assumed Effective Date of October 1, 2011.  Also within this category is the success fee owed to HMS with respect to its

---

higher interest rate on the GECC / Prudential debt .

efforts to achieve lease modifications.

Second, the Office of the United States Trustee is entitled to a fee measured by disbursements during the pendency of the bankruptcy case.

Finally, Round Table is required to pay "stub rent" on all leases for the period February 9 through February 28, 2011.

For the purposes of preparing projections and models, Round Table assumes that it accumulates cash through the Effective Date and pays all administrative claims on the Effective Date. In fact, many of these obligations may be partially paid prior to the Effective Date, reducing both the obligation and the cash on hand as of the Effective Date.

Round Table's current estimate of administrative expenses payable as of the Effective Date is as follows:

| | | |
|---|---|---|
| Professionals (Round Table & Creditors Committee ) | $ | 1,406,000 |
| ESOP Trustee & Professionals | $ | 200,000 |
| HMS | $ | 915,000 |
| US Trustee (due end of October 2011) | $ | 40,000 |
| Stub Rent | $ | 309,000 |
| Administrative Expenses | $ | 2,870,000 |

**C.     Treatment of Creditor and Equity Classes**

The Plan has three significant classes: GECC / Prudential's secured debt, the unsecured creditors, and the ESOP. The unsecured creditor class is offered an election regarding its treatment. The classes and their treatment are discussed below.

**Class 1:        GECC / Prudential**

For purposes of this Plan of Reorganization, Round Table assumes that GECC / Prudential holds a duly perfected and enforceable security interest and valid and enforceable loan documents supporting a claim in the amount it contends:  approximately $35.9 million as of the expected

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 27 of
48

Effective Date (the "GECC / Prudential Claim"). Round Table believes that the predatory and overreaching conduct described above affords it significant claims against GECC / Prudential which it intends to pursue and which it believes should result in a reduction of its net obligation to GECC / Prudential. Nonetheless, in order to provide conservative projections, for present purposes Round Table accepts GECC / Prudential's claim as asserted.

Plan Treatment:

The Plan contemplates that GECC / Prudential will receive interest payments on a current basis from the Effective Date through the end of 2011, and thereafter, each at the end of each calendar quarter. The interest rates are assumed from the Original Credit Agreement in February 2007. The Plan further assumes no principal payments in 2011, and a 5% annual reduction in principal in 2012 and 10% annual reduction in principal thereafter (all payable in installments at the end of each calendar quarter), with the loan becoming fully due and payable five years after the Effective Date. The Credit Facility is modified somewhat, primarily so as to prevent the lenders from prematurely asserting a default and accelerating the obligation; the specific terms of the modification is set forth in a Plan Supplement filed herewith. Round Table believes that this treatment complies with Section 1129(b) and can be confirmed notwithstanding GECC / Prudential's opposition.

The Plan proposes that after the Effective Date, the interest rate should be the rate originally applicable to this loan from the February 2007 Credit Facility agreement, which varies as a percentage over LIBOR based on Round Table's financial covenant performance, but provides that the Court can set whatever other interest rate it deems appropriate to satisfy the requirements of Section 1129(b).

**Class 2:        Priority Claims**

As of the filing date, Round Table had priority claim obligations to various taxing authorities and its employees. Through the First Day Orders, the Court approved the payment of all tax priority and all employee priority claims, so those have already been paid in full and are no longer at issue.

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:32:48    Page 28 of
48

The only remaining extant priority claim is the employee benefit claim of the ESOP respecting Plan contributions accrued during the 180 days prior to the filing date. Round Table estimates that amount to be $256,000.

Plan Treatment:

Round Table proposes to pay in full on the Effective Date the allowed amount of any priority claim. That amount is reflected in Effective Date payments on Schedule A.

**Class 3: General Unsecured Claims**

Under the Plan, all general unsecured creditors will receive payment in full, with interest at the rate of 3.25% from February 9, 2011 (Class 3B). Holders of small claims are given the alternative of receiving 50% of their claims, up to $2,500, on the Effective Date in full satisfaction (Class 3A).

Plan Treatment:

*Class 3B:* Under the Plan, Round Table will dedicate all Distributable Cash to the payment of general unsecured claims, along with interest at 3.25% fixed, starting from the Petition Date. Distributable Cash is all cash in excess of $4 million measured at least each March 31st and September 30th, beginning in 2012. Payments will be made to creditors within 30 days of each measurement date, until they have received payment in full. Round Table believes that all unsecured claims will be repaid in full within two years. Set forth in the Appendix are Round Table's "base case" projections, together positive and negative variations (based on the rate of growth in the economy) and a "stress case" which assumes both the negative variation and uniformly adverse resolutions of all issues in dispute with GECC / Prudential. Even the "stress case" projections reflect all unsecured claims being paid in full within four years.

*Class 3A:* Creditors holding small claims are given an opportunity to "cash out" with a 50% payment, up to a maximum of $2,500, paid on the Effective Date of the Plan, anticipated to be October 1, 2011.

*Election:* The election must be made on the Ballot. Holders of Allowed claims of $5,000 or less are assumed to prefer the Class 3B cash-out, but can instead elect to receive

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431   Doc# 524   Filed: 06/09/11   Entered: 06/09/11 14:32:43   Page 29 of
48

payment in full with interest (Class 3A treatment).   Holders of Allowed claims of more than $5,000 are assumed to prefer payment in full with interest under Class 3A, but can instead elect to receive a cash-out of up to $2,500 by choosing Class 3B treatment.

**Class 4:      ESOP / Equity**

The ESOP holds all of Round Table's stock.  The Plan provides that the ESOP will keep the stock, subject to the obligations established by the Plan.  The Plan also provides that Round Table will make no contributions to the ESOP on account of post-petition Plan Years, nor will it repurchase stock from the ESOP, unless and until Class 3B unsecured creditors have been paid in full.  As soon as the Class 3B unsecured creditors have been paid in full, Round Table will dedicate all of its Distributable Cash and efforts to returning the ESOP to full compliance with ERISA and the Internal Revenue Code and to satisfying its obligations to the ESOP.   (As discussed more fully elsewhere, the ESOP is also a creditor, holding a $256,000 priority claim treated under Class 2 and approximately a $1.5 million unsecured claim treated under Class 3B.)

# VII.  EXECUTORY CONTRACTS

The Bankruptcy Code classifies contracts as to which further performance is due from both sides as "executory".  Over the course of the bankruptcy case or under its Plan of Reorganization, a debtor must "assume" or "reject" all executory contracts.   In order to assume a contract, the debtor must cure all defaults and thereafter comply with the contract according to its terms.  If a contract is rejected, performance on both sides ordinarily terminates and the other party is entitled to assert a claim for damages, which will be treated as a general unsecured pre-bankruptcy claim; i.e., a Class 3 claim.  In this case, there are three important groups of executory contracts which will be assumed under the Plan of Reorganization:  Franchise Agreements, leases and employment contracts.

**A.      Franchise Agreements**

Round Table, through RTFC acts as franchisor to 150 independent franchisees that collectively own and operate 348 stores.   The attorney who represented the Round Table Owners

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:32:48    Page 30 of 48

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Association characterized the Round Table Franchise Agreement as "the best in the industry."

RTFC routinely and predictably generates between $11 million and $13 million per year in net profits, based on franchise fee revenues of $15 million to $18 million and operating expenses of $4 million to $5 million. RTFC and the franchise relationship represent the product of 45 years of hard work and constitute a valuable asset of its estate.

In order to preserve this asset, all of the Franchise Agreements under which RTFC is the franchisor will be assumed, except to the extent that any individual Franchise Agreement has been separately rejected during the course of the case or is identified as rejected on Schedule B.

Round Table believes that RTFC as franchisor has not breached any of the Franchise Agreements, and as a consequence, there is nothing it will be required to "cure" upon assumption of the Franchise Agreements. The Franchise Agreement requires franchisees who wish to assert breaches to afford RTFC written notice and an opportunity to cure, and no such notice has been received in at least a decade.

In certain cases, Round Table entered into "area development agreements" with franchisees providing exclusivity rights within a specified geographical area, ordinarily in return for commitments to develop those areas with additional franchised stores. All of the area development agreements as to which RTFC is a party will be assumed, except to the extent that any individual area development agreement has been separately rejected during the course of the case or is identified as rejected on Schedule B.

Round Table believes that it has not breached any of the area development agreements that will be assumed under the Plan of Reorganization, and as a consequence, there is nothing it will be required to "cure" upon assumption of the area development agreements. (There is a pre-petition claim of less than $10,000 associated with a few area development agreements that it will reject.) The area development agreement requires counter-parties who wish to assert breaches to afford RTFC written notice and an opportunity to cure, and no such notice has been received with respect to any area development agreement to be assumed under the Plan of Reorganization.

Round Table also acts as franchisee with respect to approximately 107 company stores

1    operated by Round Table Development Company ("RTDC") or its wholly owned subsidiary,

2    Round Table Pizza Nevada, LLC.  Under the Plan, Round Table will assume the Franchise

3    Agreements as franchisee in order to preserve the substantial value of the company stores.

4         RTDC and Round Table Pizza Nevada, LLC failed to pay contributions to the Ad Fund

5    which were due on February 10, 2011, the day after the commencement of its bankruptcy case,

6    measured by revenues received in January, 2011, in the approximate amounts of $322,000 and

7    $19,000, respectively.  Since these were unsecured pre-petition obligations, Round Table thus far

8    has not paid them.  Round Table will pay the portion of these obligations relating to operating

9    Stores in order to "cure" its obligations as franchisee and assume the Franchise Agreement with

10   respect to those Stores.  Those cure amounts are reflected in Effective Date payments on Schedule

11   A.  The Ad Fund holds a Class 3B Claim for the February Ad Fund contributions relating to

12   closed Stores. A.

13   **B.      Leases**

14        Following the commencement of its bankruptcy case, Round Table rejected 23 leases and

15   entered into lease modification agreements with numerous landlords.  That process has largely

16   concluded as of the date of this Plan of Reorganization, although five leases will be rejected in the

17   course of the balance of the case if suitable lease modifications are not finalized.

18        Under the Plan of Reorganization, Round Table will assume all of the leases that have not

19   been previously rejected and are not identified in Schedule B.  As part of assuming those leases,

20   Round Table must cure any outstanding arrearages.  In general, those arrearages consist of

21   February, 2011 rent, although in many cases a portion of that rent has already been paid or the

22   landlord has agreed to waive that payment.  Round Table estimates that its cure obligation

23   respecting the leases it will retain (exclusive of "stub rent," discussed below) will amount to

24   approximately $198,000, and that cure amount is identified in its schedule of Effective Date

25   payments.

26   **C.      Employment Contracts**

27        Under Round Table's employee benefit plans, employees are allowed to accrue vacation

28

Case: 11-41431     Doc# 524     Filed: 06/09/11     Entered: 06/09/11 14:37:48     Page 32 of
48

and sick leave benefits which they may thereafter use from time to time. At the outset of the case, Round Table obtained a First Day Order authorizing it to honor employee vacation and sick leave claims, as well as salary that had accrued pre-petition, up to an aggregate of $11,750 per employee.

35 employees had entitlements to vacation and sick leave benefits in excess of the $11,750 aggregate maximum per employee ("employee benefits"), and their right to access those employee benefits was been suspended during the pendency of the bankruptcy case. Under the Plan of Reorganization, the obligations associated with the employee benefit plans will be assumed and all employees will be entitled to make use of their employee benefits, subject to Round Table's usual policies.

The suspended employee benefits aggregate $340,000, which obligation would otherwise constitute a Class 3 claim. Round Table has never permitted employees to cash out benefit entitlements while employed by Round Table, and believes that it is preferable to accept ongoing responsibility for providing the employee benefits by assuming the employee benefit obligation.

In addition, 7 members of current senior management have written employment or "change in control" contracts that will be assumed. On the one hand, these members are principally responsible for Round Table's past and future success and deserve assumption of their contracts. Round Table believes that a loss of senior management, as would likely result from the rejection of their contracts, would cast serious doubt on its ability successfully to operate in the future consistent with its projections.)

On the other hand, rejection of these contracts would give rise to rejection damages claims, limited by Section 502(b)(7) of the Bankruptcy Code to one year's salary. One year's salary for the members of this group would aggregate $1.7 million. Although Section 502(b)(7) only establishes a cap on damages, most of the members of management have severance rights under these contracts equal to or in excess of one year's salary, so it is reasonable to estimate these aggregate rejection damages claims as equivalent to the cap; that is, approximately $1.7 million. Were the employment contracts instead rejected, these damages claims would be entitled to

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

treatment under Class 3B.

## VIII. MEANS OF IMPLEMENTATION

### A. Revesting Subject to Plan

On the Effective Date, all property will revest in the Reorganized Debtor, free and clear of claims and liens, except as specified in the Plan. From and after the Effective Date, the Reorganized Debtor can freely use or transfer cash and its assets, enforce its rights and exercise its powers, and otherwise conduct its business in its unfettered discretion, subject only to the requirements of the Plan and otherwise applicable non-bankruptcy law.

Specifically, Round Table expects promptly after the Effective Date to transfer up to 10 Stores to current managers or franchises for little or no payment. As operated by Round Table, the stores are no more than marginal and Round Table would close these stores if it was unable to transfer them. Round Table believes that transferring these stores to local single store operators will improve the performance of these stores and consequently the chain and continue payment of franchise fees and Ad Fund contributions.

The Reorganized Debtor may also effect a sale of substantially all of its assets if (a) the sale complies with otherwise applicable law and unsecured creditors' Claims receive the treatment provided herein, or (b) the Court so permits.

### B. Bankruptcy Transition and Procedure

Matters subject to the Court's retained jurisdiction will be initiated and prosecuted following the Effective Date substantially as they were initiated and prosecuted prior to the Effective date. Notice of post-Confirmation matters will be given to the U.S. Trustee, GECC / Prudential and persons who request notice in writing *after* the Confirmation Date. The Creditors Committee will be dissolved as of the Confirmation Date. Round Table will file quarterly reports and continue to pay U.S. Trustee fees after the Confirmation Date and until entry of the Final Decree.

/ / /

/ / /

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 34 of
48

**C.** **Internal Operations and Management**

1. <u>Dissolution of Round Table Pizza Nevada</u>

Round Table Pizza Nevada LLC will be wound up and dissolved as rapidly as is practicable after the Effective Date. All assumed leases respecting Stores operated by Round Table Pizza Nevada, LLC will be assigned to Round Table Development Company as soon as requisite permits and licenses have been obtained. The assignment and transfer will be effective upon a notice delivered by Round Table to the Landlord following the Effective Date.

2. <u>Cash Reserves</u>

As a general matter, Round Table ordinarily requires approximately $2.5 million of cash to cover seasonal fluctuations in its operating expenses, payments of liabilities, capital expenditures and working capital needs in the ordinary course of business. Recognizing that it has a duty to ensure that its future operations will successfully withstand market vicissitudes and that it likely will not have access to the sorts of revolving credit facilities that are ordinary for companies of its size, Round Table has determined to maintain a $4 million cash reserve to be available for operating purposes post-confirmation. Distributions to unsecured creditors under the Plan will be deferred to the extent necessary to preserve the $4 million cash reserve at all times.

3. <u>Management and Incentive Compensation</u>

Management and the Board of Directors shall continue in effect post-petition, unless and until they are changed pursuant to otherwise applicable non-bankruptcy law.

The members of the Board of Directors[6] are Peter H. Mattson; Robert A. Fox; Eric H. Bjerkholt; Jack Robertson; J. Robert McCourt; Ted S. Storey; and Keith Davis.

The officers who comprise senior management[7] are J. Robert McCourt, Chief Executive

---

[6]    The four outside Directors are paid $5,000 per quarter in compensation; the three members of management receive no additional compensation for serving on the Board of Directors.

[7]    Base compensation for the officers who comprise senior management is J. Robert McCourt, $440,000; Tinka Gordon, $261,000; Ted Storey, $252,000; Keith Davis, $259,000; James Robertson, $210,000; Gregg Fleury, $143,000 and Tom Guilford, $151,000.

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 35 of
48

Officer, Chief Operating Officer and President; Ted Storey, Vice President / Business Development and Secretary; D. Keith Davis, Vice President / Finance and Chief Financial Officer; James M. Robertson, Vice President / Human Resources and Chief Privacy Officer; Tom Guilford, Vice President / Information Systems and Chief Information Officer; Tinka Gordon, Vice President / Marketing and Chief Marketing Officer and Gregg Fleury, Vice President / Operations

As noted, Round Table has historically offered low base salaries and high incentive compensation to achieve market compensation packages for management. During the course of the Great Recession to date, base compensation has remained largely frozen, but there has been virtually no incentive compensation. Under the Plan an incentive compensation regime will be restored.

For 2011, the Board of Directors approved three types of incentive compensation directed toward Round Table's personnel:

 (a) seven members of senior management would receive incentive compensation in the amount of 80% of base salary, upon Confirmation of the Plan, payable 50% on the Effective Date and 50% 6 months after the Effective Date;

 (b) the three principal officers – the Chief Executive Officer, the Chief Financial Officer and General Counsel – would receive $20,000 each for achieving each of three objectives. Two objectives (closing 21 Stores in the first two months at an aggregate cost of less than $2.6 million, and filing an Initial Plan of Reorganization within the first three months) were accomplished, yielding entitlements of $40,000 each, the third, yielding an additional $20,000 each, was to confirm a Plan of Reorganization within 12 months; and

 (c) a non-executive Incentive Plan consisting of 30% of EBITDA (excluding one-time reorganization costs) in excess of $9,114,000 up to a cap of $617,000 in 2011.

For 2012 and thereafter, the Annual Incentive Plan and Executive Incentive Plan (the "Incentive Plans") will be reinstated. The Incentive Plans will receive funding only to the extent

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:32:48    Page 36 of
48

that Round Table exceeds $8.6 million EBITDA in the relevant year. By way of comparison, in the 12 months to February 28, 2011, representative level EBITDA was $8.1 million. After the threshold is reached, each Incentive Plan will be equally funded with the next $500,000 in EBITDA. Once $9.1 million in pre-incentive EBITDA is attained each Incentive Plan will fund *pro rata* at various payout rates depending on business performance, as set by the Board of Directors. For example in 2012, under the stress/low case each Incentive Plan would earn $386,000 however as business performance improves, the Incentive Plans in 2012 would increase to $698,000 under the base case scenario. Each Incentive Plan is capped at $1.5 million annually. To earn the maximum level of incentive, Round Table would need to generate $14.6 million in pre incentive EBITDA or $11.6 million of EBITDA after incentive payments.

More broadly, the annual Incentive Plan pool funds both corporate and field bonuses based on the positions' historical bonus opportunity levels. Payment will be made annually after approval by the Board of Directors for the corporate bonus, and quarterly without the requirement of Board of Directors approve for the field bonus (Area Managers and below). The Executive Incentive Plan will be paid annually based on Board of Directors approval through 2014. Executives will annually be granted performance units based on historical awards, executive performance, and market data to ensure the company rewards and retains top management.

The Incentive Compensation Plans are subject to the following three principles:

✓ No payment will be made under an Incentive Plan if Round Table is in default of its obligations under the Plan of Reorganization;

✓ No compensation will be paid or accrued under an Incentive Plan unless and until Round Table generates at least $8.6 million in EBITDA[8] in the respective calendar year; and

---

[8]  By way of comparison, rep level EBITDA for the 12 months ending March 31, 2011 was only $8.1 million.

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:32:48    Page 37 of
48

✓   Subject to the foregoing, Round Table will review and modify the Incentive Plans each year to ensure that its employee compensation remains competitive.

### 4.   Post-Petition Deposits

Utilities must refund their post-petition deposits within 90 days after the Effective Date unless, within 60 days after the Effective Date, the utility files a Motion to retain the post-petition deposit on the grounds that it is necessary to protect the utility's interest.

With respect to all post-petition deposits that are not voluntarily returned, Round Table may, at its election, offset the deposit against either post-Effective Date billings or against distributions on the holder's unsecured claim, or may otherwise obtain recovery of the deposit.

### 5.   Objections to Claims

Any party in interest may Object to any claim or interest treated herein by filing such Objection with the Court and serving it upon the respondent and the Debtor not later than (a) the 10th day before the first day set for the Confirmation Hearing, or (b) the 90th day after the applicable Claims Bar Date, whichever shall first occur.  Upon the filing of an Objection, the respondent Claim or Interest shall be a Disputed Claim. If both the Debtor and another party Objects to a Claim, the Debtor's Objection shall proceed and any other Objections shall be suspended and deferred.  Upon the entry of an Order allowing or disallowing the Claim in connection with the Debtor's Objection, all other Objections shall be dismissed.   The Reorganized Debtor may Object to any claim or interest at any time.

### 6.   Unitary Debtor and Co-Obligor Claims

The Plan treats all unsecured creditors alike, regardless of the entity that owes the debt, and regardless of whether other entities have guaranteed the debt.  Round Table believes that this treatment is consistent with economic reality and with creditor expectations, and that the alternative would yield arbitrary and unreasonable results, at the cost of unnecessary complexity

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 38 of
48

1  and administrative expense.[9]

2  As a matter of economic reality, the four Round Table entities have functioned as a single

3  unitary business.  All receipts have been bundled into a single consolidation account and

4  substantially all disbursements were made from a single disbursing account, regardless of the

5  entity involved.

6  To the extent that creditors thought about the issue, they perceived the unitary business as

7  their credit risk.  If a financial statement was requested, the creditor was provided with a copy of

8  Round Table's annual audited financial statement, which was prepared exclusively on a

9  consolidated basis.  (Although a separate financial statement was prepared for The Round Table

10  Franchise Corporation, it was provided only to regulatory authorities and not to creditors; creditors

11  would have received only the consolidated financial statement, because that was the only one that

12  was prepared and distributed.)  Thus, while a number of landlords requested guarantees from other

13  Round Table entities, for example, they could only know those entities as names, and could not

14  have evaluated them – let alone relied on them – as separate credit risks.

15  Indeed, Round Table believes that the requests for guarantees made by its landlords

16  support its proposed treatment:  Since the landlords could not have attributed specific financial

17  substance to the guarantor, the guarantee must be seen as a demand that the unitary business stand

18  behind the obligation.  The guarantee represents an attempt to prevent Round Table from

19  _____

20  [9]  Without taking into account guarantees, the following summarizes the financial condition of the four
21  Round Table entities if treated as stand-alone Debtors (without taking into account the secured debt and
    administrative claims, which are owed by all of the entities):

22

23
| Entity | Unsecured Debt (including Employee Benefit Claims) | Percent of Annual Operating Profit or Loss |
24
| --- | --- | --- |
| RTP | $4.3 million | (42%) |
25
| RTFC | $0.1 million | 132% |
| RTDC | $3.0 million | 11% |
26
| RTP Nevada, LLC | $0.1 million | (1%) |
| **Total** | **$7.5 million** | **100%** |

27

28

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 39 of
48

jettisoning one piece of its business (say, the operating stores) and continuing on with another piece (say, the franchise business) free of the claims of the closed operations. Under the Plan, the unitary business remains responsible to all creditors, thereby accomplishing the objective of the landlords' demands for guarantees.

This is accomplished through the "Co-Obligor Claims" provisions of the Plan. Essentially, those provisions require that every claim which could have been asserted against any Round Table entity (a "Related Claim") be asserted as a single claim against Round Table. The merits of the claim will be determined by the disposition of the Related Claim, avoiding unnecessary and duplicative litigation.

If the Related Claim is Allowed, the creditor may not assert a comparable claim (a "Co-Obligor Claim") against anyone else (a "Co-Obligor", including a different Round Table entity, officers, directors, guarantors, etc.) for five years. If, as anticipated, the Related Claim is paid in full under the Plan prior to that date, the Co-Obligor Claim will be dismissed (since it has been paid in full).

If the Related Claim is discharged or disallowed, the claimant will not be permitted to pursue the Co-Obligor Claim, thereby preventing multiple "bites at the apple" and disruption to the business through the pursuit of meritless claims against managers or tertiary parties.

The premise of all of these provisions is that creditors are only entitled to be paid in full once, and the Plan provides an appropriate and efficient means of funding that payment.

7. <u>Discharge</u>

The Plan provides for a broad discharge of all claims that are not timely asserted in the bankruptcy case, or which are asserted and disallowed by the Bankruptcy Court.

/ / /

/ / /

/ / /

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 40 of
48

# IX. <u>CONCLUSION</u>

As a result of Round Table's current operating profitability, it can propose a readily confirmable Plan of Reorganization which pays all unsecured creditors in full within a few years, and preserves all equity and substantial fair market value for the ESOP. Round Table urges all creditors to vote in favor of the Plan.

DATED: June 9, 2011     McNUTT LAW GROUP, LLP
              ST. JAMES LAW, P.C.


              By:   /s/  *Michael St. James*  .
                Michael St. James
              Counsel for the Debtor

37

Case: 11-41431  Doc# 524  Filed: 06/09/11  Entered: 06/09/11 14:37:48  Page 41 of 48

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

**SCHEDULES**

A.    Effective Date Payments

38    DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

## SCHEDULE A: EFFECTIVE DATE PAYMENTS

| (in thousands) | Subtotal | | Q3 YTD '11 | 10/1/2011 |
|---|---|---|---|---|
| **Administrative Claims** | | | | |
| Estate Professional Fees: | | | | |
| Debtor & Committee | $ | 1,406 | $ - | $ 1,406 |
| HMS (Debtor Leases) | | 945 | 30 | 915 |
| ESOP Trustee | | 200 | - | 200 |
| US Trustee | | 69 | 69 | - |
| Total Professional Fees | | 2,620 | 99 | 2,521 |
| Management Bonus | | 866 | - | 866 |
| Reclamation Claims | | - | - | - |
| Stub Rent | | 609 | 300 | 309 |
| Total Administrative Claims | $ | 4,095 | $ 399 | $ 3,696 |
| Cure Assumed Leases | | 198 | - | 198 |
| Cure RTDC Franchise Agmt | | 341 | - | 341 |
| Total Cure Claims | $ | 539 | $ - | $ 539 |
| **Priority Claims** | | | | |
| Employee Benefit Plan (ESOP) | $ | 256 | $ - | $ 256 |
| Total Priority Claims | $ | - | $ - | $ 256 |
| **Total Effective Date Payments** | | | | $ 4,491 |

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:32:48    Page 43 of 48

**APPENDIX**

Projections with various sales and business assumptions are presented below, in thousands of dollars.

    A.  Base Case

    B.  Low Case

    C.  High Case

    D.  Stress Case

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

# APPENDIX A:  BASE CASE[10]

| | Total | Q3 YTD '11 | Q4 2011 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|
| RTDC Sales | $ 537,363 | $ 63,968 | $ 19,107 | $ 83,075 | $ 85,567 | $ 88,134 | $ 90,778 | $ 93,502 | $ 96,307 |
| RTFC Sales | 71,902 | 8,226 | 2,890 | 11,116 | 11,449 | 11,793 | 12,147 | 12,511 | 12,886 |
| Total Sales | $ 609,264 | $ 72,193 | $ 21,997 | $ 94,191 | $ 97,016 | $ 99,927 | $ 102,925 | $ 106,013 | $ 109,193 |
| **Adjusted EBITDA** | **$ 64,665** | **$ 6,134** | **$ 2,981** | **$ 9,114** | **$ 9,424** | **$ 10,004** | **$ 11,022** | **$ 11,827** | **$ 13,274** |
| **Ending Cash Balance** | | **$ 6,281** | **$ 4,079** | **$ 4,079** | **$ 4,000** | **$ 6,203** | **$ 10,732** | **$ 13,035** | **$ 16,350** |
| **Distributions:** | | | | | | | | | |
| **Administrative Claims** | $ 4,901 | $ 399 | $ 3,736 | $ 4,135 | $ 766 | $ - | $ - | $ - | $ - |
| **Cure Claims** | 539 | - | 539 | 539 | - | - | - | - | - |
| **Secured Debt** | | | | | | | | | |
| Interest | 5,934 | - | 358 | 358 | 1,407 | 1,271 | 1,139 | 968 | 791 |
| Principal | 16,137 | - | - | - | 1,793 | 3,586 | 3,586 | 3,586 | 3,586 |
| Total Secured Debt | 22,071 | - | 358 | 358 | 3,200 | 4,857 | 4,725 | 4,554 | 4,377 |
| **Priority Claims** | | | | | | | | | |
| Employee Benefit Plan (ESOP) | 256 | - | 256 | 256 | - | - | - | - | - |
| Total Priority Claims | 256 | - | 256 | 256 | - | - | - | - | - |
| **General Unsecured Claims** | | | | | | | | | |
| Class 3A Claims < $5,000 | 173 | - | 173 | 173 | - | - | - | - | - |
| *Class 3A Claims Payout %* | *50%* | | *50%* | *50%* | *0%* | *0%* | *0%* | *0%* | *0%* |
| Class 3B Claims > $5,000 | 7,360 | - | - | - | 4,886 | 2,474 | - | - | - |
| *Class 3B Claims Payout %* | *107%* | | | | *71%* | *36%* | *0%* | *0%* | *0%* |
| Employee Benefits | - | - | Reinstated | - | - | - | - | - | - |
| **Grand Total Distributions** | **$ 35,301** | **$ 399** | **$ 5,062** | **$ 5,461** | **$ 8,852** | **$ 7,331** | **$ 4,725** | **$ 4,554** | **$ 4,377** |

---

[10] Assumes sales growth of 3.0% in 2012 and thereafter.

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:32:48    Page 45 of 48

# APPENDIX B: LOW CASE[11]

| | Total | Q3 YTD '11 | Q4 2011 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|
| RTDC Sales | $ 498,450 | $ 63,968 | $ 19,107 | $ 83,075 | $ 83,075 | $ 83,075 | $ 83,075 | $ 83,075 | $ 83,075 |
| RTFC Sales | 66,695 | 8,226 | 2,890 | 11,116 | 11,116 | 11,116 | 11,116 | 11,116 | 11,116 |
| Total Sales | $ 565,145 | $ 72,193 | $ 21,997 | $ 94,191 | $ 94,191 | $ 94,191 | $ 94,191 | $ 94,191 | $ 94,191 |
| **Adjusted EBITDA** | **$ 52,721** | **$ 6,134** | **$ 2,981** | **$ 9,114** | **$ 8,742** | **$ 8,746** | **$ 8,717** | **$ 8,695** | **$ 8,707** |
| **Ending Cash Balance** | | **$ 6,281** | **$ 4,079** | **$ 4,079** | **$ 4,000** | **$ 4,000** | **$ 6,950** | **$ 7,489** | **$ 7,918** |
| **Distributions:** | | | | | | | | | |
| **Administrative Claims** | $ 4,901 | $ 399 | $ 3,736 | $ 4,135 | $ 766 | $ - | $ - | $ - | $ - |
| **Cure Claims** | 539 | - | 539 | 539 | - | - | - | - | - |
| **Secured Debt** | | | | | | | | | |
| Interest | 6,233 | - | 358 | 358 | 1,429 | 1,312 | 1,212 | 1,063 | 859 |
| Principal | 16,137 | - | - | - | 1,793 | 3,586 | 3,586 | 3,586 | 3,586 |
| Total Secured Debt | 22,370 | - | 358 | 358 | 3,222 | 4,898 | 4,798 | 4,649 | 4,445 |
| **Priority Claims** | | | | | | | | | |
| Employee Benefit Plan (ESOP) | 256 | - | 256 | 256 | - | - | - | - | - |
| Total Priority Claims | 256 | - | 256 | 256 | - | - | - | - | - |
| **General Unsecured Claims** | | | | | | | | | |
| Class 3A Claims ≤ $5,000 | 173 | - | 173 | 173 | - | - | - | - | - |
| *Class 3A Claims Payout %* | *50%* | | *50%* | *50%* | *0%* | *0%* | *0%* | *0%* | *0%* |
| Class 3B Claims > $5,000 | 7,388 | - | - | | 4,023 | 3,271 | 94 | - | - |
| *Class 3B Claims Payout %* | *108%* | | | | *59%* | *48%* | *1%* | *0%* | *0%* |
| Employee Benefits | - | - | Reinstated | - | - | - | - | - | - |
| **Grand Total Distributions** | **$ 35,628** | **$ 399** | **$ 5,062** | **$ 5,461** | **$ 8,011** | **$ 8,169** | **$ 4,892** | **$ 4,649** | **$ 4,445** |

---

[11] Assumes 0.0% sales growth in 2012 and thereafter.

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431   Doc# 524   Filed: 06/09/11   Entered: 06/09/11 14:32:48   Page 46 of 48

# APPENDIX D:  HIGH CASE[12]

| | Total | Q3 YTD '11 | Q4 2011 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|
| RTDC Sales | $ 553,632 | $ 63,968 | $ 19,107 | $ 83,075 | $ 86,813 | $ 90,720 | $ 94,802 | $ 97,646 | $ 100,576 |
| RTFC Sales | 74,079 | 8,226 | 2,890 | 11,116 | 11,616 | 12,139 | 12,685 | 13,066 | 13,458 |
|   Total Sales | $ 627,711 | $ 72,193 | $ 21,997 | $ 94,191 | $ 98,429 | $ 102,859 | $ 107,487 | $ 110,712 | $ 114,033 |
| **Adjusted EBITDA** | **$ 71,925** | **$ 6,134** | **$ 2,981** | **$ 9,114** | **$ 9,709** | **$ 11,063** | **$ 12,530** | **$ 13,998** | **$ 15,510** |
| **Ending Cash Balance** | | **$ 6,281** | **$ 4,079** | **$ 4,079** | **$ 4,000** | **$ 7,561** | **$ 13,154** | **$ 15,232** | **$ 18,169** |
| **Distributions:** | | | | | | | | | |
| **Administrative Claims** | $ 4,901 | $ 399 | $ 3,736 | $ 4,135 | $ 766 | $ - | $ - | $ - | $ - |
| **Cure Claims** | 539 | - | 539 | 539 | - | - | - | - | - |
| **Secured Debt** | | | | | | | | | |
| Interest | 5,934 | - | 358 | 358 | 1,407 | 1,271 | 1,139 | 968 | 791 |
| Principal | 16,137 | - | - | - | 1,793 | 3,586 | 3,586 | 3,586 | 3,586 |
|   Total Secured Debt | 22,071 | - | 358 | 358 | 3,200 | 4,857 | 4,725 | 4,554 | 4,377 |
| **Priority Claims** | | | | | | | | | |
| Employee Benefit Plan (ESOP) | 256 | - | 256 | 256 | - | - | - | - | - |
|   Total Priority Claims | 256 | - | 256 | 256 | - | - | - | - | - |
| **General Unsecured Claims** | | | | | | | | | |
| Class 3A Claims $\leq$ $5,000 | 173 | - | 173 | 173 | - | - | - | - | - |
| *Class 3A Claims Payout %* | *50%* | | *50%* | *50%* | *0%* | *0%* | *0%* | *0%* | *0%* |
| Class 3B Claims > $5,000 | 7,347 | - | - | - | 5,278 | 2,069 | - | - | - |
| *Class 3B Claims Payout %* | *107%* | | | | *77%* | *30%* | *0%* | *0%* | *0%* |
| Employee Benefits | - | - | Reinstated | - | - | - | - | - | - |
| **Grand Total Distributions** | **$ 35,288** | **$ 399** | **$ 5,062** | **$ 5,461** | **$ 9,244** | **$ 6,926** | **$ 4,725** | **$ 4,554** | **$ 4,377** |

---

[12] Assumes 4.5% sales growth in 2012 through 2014 and thereafter at 3.0%.

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:32:48    Page 47 of 48

# APPENDIX D:  STRESS CASE[13]

| | Total | Q3 YTD '11 | Q4 2011 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|---|---|
| RTDC Sales | $ 498,450 | $ 63,968 | $ 19,107 | $ 83,075 | $ 83,075 | $ 83,075 | $ 83,075 | $ 83,075 | 83,075 |
| RTFC Sales | 66,695 | 8,226 | 2,890 | 11,116 | 11,116 | 11,116 | 11,116 | 11,116 | 11,116 |
|    Total Sales | $ 565,145 | $ 72,193 | $ 21,997 | $ 94,191 | $ 94,191 | $ 94,191 | $ 94,191 | $ 94,191 | $ 94,191 |
| **Adjusted EBITDA** | **$ 52,721** | **$ 6,134** | **$ 2,981** | **$ 9,114** | **$ 8,742** | **$ 8,746** | **$ 8,717** | **$ 8,695** | **$ 8,707** |
| **Ending Cash Balance** | | **$ 6,281** | **$ 3,692** | **$ 3,692** | **$ 4,001** | **$ 4,000** | **$ 4,000** | **$ 3,297** | **$ 4,226** |
| **Distributions:** | | | | | | | | | |
| **Administrative Claims** | $ 4,901 | $ 399 | $ 3,736 | $ 4,135 | $ 766 | $ - | $ - | $ - | $ - |
| **Cure Claims** | 539 | - | 539 | 539 | - | - | - | - | - |
| **Secured Debt** | | | | | | | | | |
|   Interest | 12,784 | - | 745 | 745 | 2,915 | 2,736 | 2,444 | 2,143 | 1,801 |
|   Principal | 16,587 | - | - | - | 1,843 | 3,686 | 3,686 | 3,686 | 3,686 |
|     Total Secured Debt | 29,371 | - | 745 | 745 | 4,758 | 6,422 | 6,130 | 5,829 | 5,487 |
| **Priority Claims** | | | | | | | | | |
|   Employee Benefit Plan (ESOP) | 256 | - | 256 | 256 | - | - | - | - | - |
|     Total Priority Claims | 256 | - | 256 | 256 | - | - | - | - | - |
| **General Unsecured Claims** | | | | | | | | | |
|   Class 3A Claims ≤ $5,000 | 173 | - | 173 | 173 | - | - | - | - | - |
|   *Class 3A Claims Payout %* | *50%* | | *50%* | *50%* | *0%* | *0%* | *0%* | *0%* | *0%* |
|   Class 3B Claims > $5,000 | 7,604 | - | - | - | 2,099 | 1,748 | 1,712 | 2,045 | - |
|   *Class 3B Claims Payout %* | *111%* | | | | *30%* | *25%* | *25%* | *30%* | *0%* |
|   Employee Benefits | - | - | Reinstated | | - | - | - | - | - |
| **Grand Total Distributions** | **$ 42,845** | **$ 399** | **$ 5,449** | **$ 5,848** | **$ 7,623** | **$ 8,170** | **$ 7,842** | **$ 7,874** | **$ 5,487** |

[13] Assumes 0.0% sales growth in 2012 and thereafter, along with adverse rulings on all issues respecting GECC / Prudential, adding $1.0 million to principal and a higher interest rate.

DISCLOSURE STATEMENT TO ACCOMPANY
PLAN OF REORGANIZATION

Case: 11-41431    Doc# 524    Filed: 06/09/11    Entered: 06/09/11 14:37:48    Page 48 of 48