LATHAM & WATKINS LLP
  Gregory O. Lunt (CA Bar No. 173297)
355 South Grand Avenue
Los Angeles, California  90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
gregory.lunt@lw.com

BINGHAM McCUTCHEN LLP
  William Bates (CA Bar No. 063317)
1900 University Avenue
East Palo Alto, CA 94303-2223
Telephone: (650) 849.4400
Facsimile: (650) 849.4800
bill.bates@bingham.com

*Attorneys for General Electric Capital Corporation,
as Agent*

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| In re | CASE NO. 11-41431 (RLE) |
| **ROUND TABLE PIZZA, INC.,**[1] | Chapter 11 (Jointly Administered) |
| | **MOTION OF GENERAL ELECTRIC CAPITAL CORPORATION, AS AGENT, FOR ORDER DIRECTING APPOINTMENT OF EXAMINER PURSUANT TO 11 U.S.C. §§ 1104(c) TO INVESTIGATE A SALE OF THE DEBTORS' BUSINESS** |
| Debtors. | |
| | Date: July 13, 2011 |
| | Time: 2:00 p.m. |
| | Place: U.S. Bankruptcy Court 1300 Clay Street, Ctrm. 201 Oakland, CA |
| | Judge: Hon. Roger L. Efremsky |

---

[1]  The Debtors in these chapter 11 cases are Round Table Pizza Inc., Round Table Development Co., The Round Table Franchise Corp. and Round Table Pizza Nevada, LLC.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2273346.1

i

MOTION TO APPOINT EXAMINER
TO INVESTIGATE SALE

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................. 1

II.  FACTS ........................................................................ 2

     A.   The Debtors' Financial Decline ........................................ 2

     B.   The Plan and the Debtors' Failure to Explore Alternatives ............. 3

     C.   Management's Contrived Projections .................................... 7

     D.   The Treatment Of Management Under The Plan ............................ 8

     E.   The Debtors' Continuing Refusal To Consider A Sale .................... 9

III. AUTHORITY .................................................................... 9

     A.   Immediate Investigation Of A Sale Is Necessary To Avoid
          Significant Harm ...................................................... 9

          1.   The Debtors' Plan Is Doomed ..................................... 10

          2.   The September Lease Assumption Deadline Adds To The
               Urgency ........................................................ 11

     B.   A Sale Is Viable and Likely The Best Outcome In These Cases .......... 12

          1.   The Current Economic Environment Is Conducive For A
               Sale ........................................................... 12

          2.   The Debtors' Reasons For Not Considering A Sale Now
               Are At Odds With Reality ....................................... 13

               a.   The Debtors' "Over-Exposure" Concerns Are
                    Unjustified And Unsupported ............................... 13

               b.   The Debtors' Historic Performance Is Relevant ............. 14

               c.   The Debtors' Other Justifications ......................... 15

          3.   Bankruptcy Sales Result In Fair Value ........................... 16

          4.   A Sale Is The Best Indicator Of Value ........................... 17

     C.   The Debtors Are Not Capable Of Running A Credible Sale Process ....... 18

          1.   The Debtors Have Not Seriously Explored A Sale In These
               Cases .......................................................... 18

          2.   Management Is Self-Interested ................................... 18

          3.   Management Is Conflicted ........................................ 20

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 2 of
29

| | | | |
|---|---|---|---|
| | | 4. | Management Is Already Overwhelmed .................................................. 20 |
| | D. | | An Examiner Should Be Appointed To Investigate A Sale................................ 21 |
| | | 1. | An Examiner Is Required In These Cases ................................................ 21 |
| | | 2. | The Proposed Mandate For The Examiner. ........................................... 22 |
| IV. | CONCLUSION.......................................................................................................... 24 |

# TABLE OF AUTHORITIES

## CASES

Balser v. DOJ, 327 F.3d 903 (9th Cir. 2003) ............................................................ 22

Boileau v. Dillaway (In re Boileau), 736 F.2d 503 (9th Cir. 1984) ............................ 21

Comerica Bank-California v. GTI Capital Holdings, L.L.C. (In re GTI Capital
   Holdings, L.L.C.), 2007 Bankr. LEXIS 4853 (B.A.P. 9th Cir. Mar. 29, 2007) ......... 21

Consolidated Rock Products Co. v. Du Bois, 312 U.S. 510 (U.S. 1941) ................... 14

Howard v. Shay,
   100 F.3d 1484 (9th Cir. 1996), cert. denied, 520 U.S. 1237 (1997) ........................ 20

In re 3dfx Interactive, Inc., 389 B.R. 842 (Bankr. N.D. Cal. 2008) ............................ 17

In re Carnegie Int'l Corp.,
   51 B.R. 252 (Bankr. S.D. Ind. 1984) ....................................................................... 21

In re Cleary Bros. Constr. Co., 9 B.R. 40 (Bankr. S.D. Fla. 1980) ............................ 22

In re Fontainebleau Las Vegas Holdings, LLC, Case No. 09-21481 (AJC) (Bankr.
   S.D. Fla., Oct. 14, 2009) ......................................................................................... 22

In re Gilman Services, Inc., 46 B.R. 322 (Bankr. D. Mass. 1985) ....................... 21, 22

In re John Peterson Motors, Inc., 47 B.R. 551 (Bankr. D. Minn. 1985) .................... 21

In re Landscaping Servs., Inc., 39 B.R. 588 (Bankr. E.D.N.C. 1984) ....................... 21

In re Liberal Market, Inc., 11 B.R. 742 (Bankr. S.D. Ohio 1981) .............................. 21

In re UNR Indus., 30 B.R. 609 (Bankr. N.D. Ill. 1987) ............................................... 21

In re World Indus. Ctr., Ltd., 1993 U.S. App. LEXIS 9917 (9th Cir. 1993) ............... 22

In re Yuba Consol. Industries, Inc., 242 F. Supp. 561 (N.D. Cal. 1965) ................... 14

Peltz v. Hatten, 279 B.R. 710 (D. Del. 2002) ............................................................ 17

VFB LLC v. Campbell Soup Co., 482 F.3d 624 (3d Cir. 2007) .................................. 17

## STATUTES

11 U.S.C. § 1104(c) .................................................................................................. 21

11 U.S.C. § 1104(c)(1) .............................................................................................. 21

11 U.S.C. § 1106(a)(3) .............................................................................................. 21

11 U.S.C. § 1106(b) .................................................................................................. 21

11 U.S.C. § 1129(a)(1)-(3) ........................................................................................ 11

LATHAM&WATKINS LLP  LA\2273346.1
ATTORNEYS AT LAW
LOS ANGELES

iii

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE

1    11 U.S.C. § 1129(a)(10) ................................................................................ 10

2    11 U.S.C. § 363(f) ....................................................................................... 16

3    11 U.S.C. § 365 ........................................................................................... 11

4    11 U.S.C. § 365(d)(4) .................................................................................. 11

5    11 U.S.C. § 365(d)(4)(B) ............................................................................. 11

6    11 U.S.C. § 502(b)(6) .................................................................................. 15

7    11 U.S.C. § 502(b)(7) .................................................................................. 17

8    29 U.S.C. § 1104(a)(1)(B) ........................................................................... 20

9    29 U.S.C. § 1109 ......................................................................................... 20

10   Cal. Corp. Code § 1001 ............................................................................... 17

11                        **OTHER AUTHORITIES**

12   Charles M. Elson & Christopher J. Gyves, *The Enron Failure and Corporate
        Governance Reform*, 38 Wake Forest L. Rev. 855 (2003) .............................. 19

13
     Harvey R. Miller & Shai Y. Waisman, *Is Chapter 11 Bankrupt?*, 47 B.C. L. Rev.
14      129 (2005) ............................................................................................ 15

15   James H.M. Sprayregen et al., *Chapter 11: Not Perfect, but Better than the
        Alternative*, Am. Bankr. Inst. J., Oct. 2005 ................................................ 15

16
     Robert E. Steinberg, *The Seven Deadly Sins in §363 Sales*, Am. Bankr. Inst. J.,
17      June 2005 ............................................................................................. 15

18

19

20

21

22

23

24

25

26

27

28

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 5 of
                                       29

## I.    INTRODUCTION

The Debtors concede that a sale of their business or refinancing of their debts is inevitable. The issue is whether to explore a sale now or, as the Debtors insist, wait until after confirmation of a plan.

Both the Secured Lenders and the Committee (as such terms are defined below) have repeatedly requested that the Debtors investigate a sale now. The Secured Lenders believe that the Debtors' proposed reorganization plan is not confirmable and would inevitably lead to a time-consuming, costly and futile confirmation process. The Secured Lenders believe that a sale is likely to be a much more attractive and viable exit in these cases.

The Debtors continue to refuse these requests. They assert that a future sale will result in greater realized value than a sale today. But, this assertion is pure speculation. What is known is that the current market is conducive for a sale, and numerous potential buyers have expressed interest since the commencement of these cases. The state of future markets and the level of interest in a future sale are not, and cannot, presently be known. Moreover, if the macro economic climate fails to improve as rapidly and dramatically as the Debtors project, then the value of their business will likely decline, and with it, their prospects in a future sale.

Even more troubling, it is becoming increasingly apparent that the Debtors' reasons for not considering a sale now are nothing more than a pretext for what is really driving their decision: the Debtors' senior management is hopelessly conflicted and self-interested. The Debtors' executive officers are motivated to pursue the interests of the Debtors' employee stock ownership plan (the "ESOP"), even to the disadvantage of other stakeholders, as a way to mitigate against the risk of litigation and personal liability arising from the sole and exclusive duty that they owe to the ESOP as fiduciaries under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"). In addition, senior management stands to gain millions of dollars more through a future sale than they would receive in a sale during these cases.

Because of management's inherent conflicts and evident self-interest in not pursuing a bankruptcy sale, a third party is needed to impartially and independently investigate whether a sale now is viable and in the best interest of these estates. Accordingly, the Court

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 6 of
29

1 should appoint an examiner, pursuant to section 1104(c) of the Bankruptcy Code, to investigate,

2 and if appropriate, pursue a sale of the Debtors' business.

3 **II.    FACTS**

4     **A.    The Debtors' Financial Decline**

5         In the decade before February 9, 2011 (the "Petition Date"), the Debtors engaged

6 in an aggressive, and ultimately unsuccessful, high growth strategy.  See *Declaration of J.*

7 *Robert McCourt in Support of First Day Motions* [Docket No. 13] (the "McCourt Decl.") at ¶¶ 3-

8 5; *Submission of Initial Plan of Reorganization* [Docket No. 401] (the "Submission") at 3:19-22.

9 In February 2007, the Debtors obtained a secured credit facility (the "Prepetition Facility") from

10 General Electric Capital Corporation ("GECC") and The Prudential Insurance Company of

11 America (together, the "Secured Lenders") to further that strategy.[2]  See McCourt Decl. at ¶ 6.

12         Within a year after obtaining the Prepetition Facility, the Debtors began to

13 experience a significant deterioration in their financial performance.  See *Disclosure Statement*

14 *to Accompany Plan of Reorganization Dated June 9, 2011* [Docket No. 524] (the "Disclosure

15 Statement") at 2:25-4:4; 6:26-7:10.  The Debtors have attributed their financial downturn

16 primarily to the "Great Recession," but have also indentified a number of other contributing

17 factors, including: (i) the amount and terms of the Prepetition Facility, (ii) requirements and

18 limitations imposed on the Debtors because they are owned by the ESOP, (iii) competitive

19 pressure; and (iv) underperforming stores.  See McCourt Decl. at ¶¶ 7-10, 13, 18, 23-24;

20 Disclosure Statement at 6:26-7:12.

21         From 2008 through 2010, the Secured Lenders agreed to a series of four

22 amendments to the Prepetition Facility.  See Docket Nos. 54-3 through 54-6.  These amendments

23 waived both payment and non-payment defaults.  They adjusted the Prepetition Facility's

24 principal repayment schedule and financial covenants in response to the Debtors' financial

25 difficulties.  See Flamm Decl. at ¶ 4.  They also modified the interest rate to reflect the Debtors'

26

27

---

28 [2]    More than $20 million of the Prepetition Facility was used to repay outstanding debt.  See Declaration of Mark Flamm, filed concurrently with this Motion (the "Flamm Decl."), at ¶ 3.

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 7 of 29

deteriorating creditworthiness. Id. The Debtors' current Chief Financial Officer signed each of these amendments. See Docket Nos. 54-3 through 54-6.

The Secured Lenders were under no contractual or legal obligation to modify the Prepetition Facility, waive any defaults or forbear from enforcing remedies as to their collateral, which consists of substantially all of the Debtors' assets. See McCourt Decl. at ¶ 40. Thus, these amendments permitted the Debtors to continue to operate their business and maintain their assets while they tried to address their financial difficulties, notwithstanding their inability to perform in accordance with the original terms of the Prepetition Facility.

The deterioration in the Debtors' financial condition and profitability accelerated in 2010, in large part due to management's decision to pursue an aggressive discounting strategy. See Flamm Decl. at ¶ 5. By the end of November 2010, the Debtors were yet again in default under the Prepetition Credit Facility for failing to make required principal and interest payments and comply with certain covenants. Id. at ¶ 7. The agreements for the Prepetition Facility provided that the occurrence of such defaults gave the Secured Lenders the right to charge default interest and terminate the Debtors' right to select a LIBOR-based interest rate. The Lenders exercised these rights in December 2010. Id.

**B.       The Plan and the Debtors' Failure to Explore Alternatives**

Upon filing these cases, the Debtors embarked on their "business reorganization," which ultimately entailed the closing of 21 unprofitable stores and the renegotiation of a number of leases. See Disclosure Statement at 9:21-10:6. While implementing their business reorganization, the Debtors said that they were considering two potential exits in these cases: (i) a sale of their businesses or (ii) a restructuring of their secured debt. See, e.g., Docket Nos. 4 at p. 4; 12 at p. 4; 45 at p. 5; 135 at p. 4; 250 at p. 4; and 380 at p. 3.

The Debtors largely completed this business reorganization by the middle of April 2011. See Submission at 7:12-16. On April 25, 2011, the Debtors filed their *Initial Plan of Reorganization Dated April 25, 2011* [Document No. 401-1] (the "Initial Plan"). The Debtors filed the Initial Plan before having any discussions with the Secured Lenders or the official committee of unsecured creditors (the "Committee") regarding a potential exit strategy in the

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 8 of
29

cases.  See Declaration of Gregory O. Lunt, filed concurrently with this Motion (the "Lunt Decl."), at ¶¶ 3, 4.

At the time the Debtors filed the Initial Plan, their senior management was the fiduciary of the ESOP.  In that capacity, management was obligated under ERISA, to act in the best and sole interest of plan participants and beneficiaries of the ESOP, to the exclusion of all other duties.  See *Motion to Approve (1) Appointment of Discretionary, Independent, and Institutional ESOP Trustee (2) Amendments to ESOP and Trust Agreement Organizational Documents, and (3) to Afford Administrative Expense Status to the Fees and Costs of the ESOP Trustee* [Docket No. 380] (the "ESOP Trustee Motion"), at 5:10-6:3.  In other words, the Debtors filed the Initial Plan at a time when ERISA precluded their management from exercising the fiduciary duties that they owe to creditors under the Bankruptcy Code.  One business day before filing the Initial Plan, the Debtors filed the ESOP Trustee Motion to try to address management's compromised position.[3]  As of the date of this Motion, an independent ESOP trustee has not yet been appointed.

In filing the Initial Plan, the Debtors asserted that alleged "weakness" in the credit markets, the stigma of being debtors and the Secured Lenders' desire to exit the Prepetition Facility, would prevent the estates from realizing sufficient value in a sale.  See Submission at 10:11-14.  In later filings, the Debtors have said unspecified "problems" in the economy and the credit industry made a sale during these cases unattractive.  See, e.g., *Motion to Sell Certain Equipment Free and Clear of Liens* [Document No. 475] at 4:1-2.

It now appears that the Debtors never seriously considered a sale in these cases.  They never retained an investment banking firm or financial advisor.  They took no apparent actions to gauge interest in a potential sale or to evaluate the viability of a sale in the current economic climate.  In fact, the Debtors apparently failed to discuss a sale with any of the at least 15 different parties that since the Petition Date have expressed unsolicited interest in a acquiring their business.  See Lunt Decl. at ¶ 5. The Debtors' assertions about weakness and problems in

---

[3]  The ESOP Trustee Motion was filed on April 22, 2011.  See Docket No. 380.  The Initial Plan was filed on April 25, 2011.  See Docket No. 401-1.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
LA\2273346.1

the credit markets and credit industry are directly at odds with current trends.  See Declaration of Mark A. Roberts, filed concurrently with this Motion (the "Roberts Decl."), at ¶ 6.  Today's commercial lending environment is robust, and significantly more active than a year ago.  Id.

After reviewing the Initial Plan, the Secured Lenders told the Debtors that they believed it was not confirmable under the Bankruptcy Code and would not support it.  See Lunt Decl. at ¶ 6.  The Secured Lenders continued to encourage the Debtors to commence a sale process as an alternative to the Initial Plan.  Id.  They expressed their strong disagreement with the Debtors' views that a sale was not viable and offered to provide market data showing the vibrancy of the credit markets and the viability of a sale.  Id.  When the Debtors failed to respond to their requests, the Secured Lenders sent a letter directly to the Debtors' board of directors requesting that the Debtors commence a sale process overseen by an independent director to allay growing concerns about management and its motives.  See Flamm Decl. at ¶ 9.

The Debtors eventually offered to have two independent directors meet directly with the Secured Lenders to discuss the Initial Plan and a proposed sale.  See Lunt Decl. at ¶ 8.  This meeting was held on June 9, 2011.  See Flamm Decl. at ¶ 11.  Despite the Debtors' offer to have two independent directors attend the meeting, only one independent director, Eric Bjerkholt, attended the meeting.  Id.  He was eventually accompanied by Keith Davis, the Debtors' chief financial officer.  Id.  Unfortunately, the meeting was not successful in bridging the significant gap between the Secured Lenders and the Debtors concerning an appropriate exit in these cases.  Id.

The Committee also told the Debtors that the Initial Plan could not be confirmed.  See Lunt Decl. at ¶ 7.  On multiple occasions, the Committee requested that the Debtors commence a sale effort.  See Id.

On June 9, 2011, the Debtors filed the *Plan of Reorganization Dated June 9, 2011* [Document No. 523] (the "Amended Plan") and the Disclosure Statement.  In the Disclosure Statement, the Debtors assert that they will be able to reduce the amount outstanding under the

LATHAM & WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2273346.1

5

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 10 of 29

Prepetition Facility through litigation or settlement.[4] See Disclosure Statement at 24:1-4. They propose to roll all allowed post-petition interest and reimbursable costs into principal under the Prepetition Facility and extend the maturity date to 2016. Id. at ¶ 24:10-13. In the interim, they propose to pay post-confirmation interest at a rate well-below the market rate and make nominal principal repayments. Id. They also propose to strip the Secured Lenders' lien on cash and various other unspecified assets that they propose to transfer to third-parties after the effective date of the Amended Plan. See Amended Plan at 11:20-23; Disclosure Statement 30:9-14.

Unsecured creditors also do not fare well under the Amended Plan. Unsecured creditors holding claims of less than $5,000 (or who agree to reduce their claims to $5,000) would receive a cash payment equal to 50% of their allowed claim amount. See Disclosure Statement at 25:23-25. Other unsecured creditors would be paid from time to time when the Debtors' cash balance exceeded $4 million. Id. at 25:13-16. Assuming the Debtors had enough cash, these payments would begin in 2012. Id. If the Debtors do not have sufficient cash, no payments would be made. Interest on unsecured claims would accrue at 3.25% per annum from the Petition Date, a rate that is substantially below market. See Id.; Roberts Decl. at ¶ 8.

Under the Amended Plan, the ESOP retains 100% of the equity interests in the Debtors. See Disclosure Statement at 26:5-6.

---

[4] The Debtors make a number of untrue and unsupported aspersions about the Secured Lenders and, in particular, GECC in the Disclosure Statement. See Disclosure Statement at 5:3-5, 15-17; 7:26-9:18; 23:25-24:4. The Debtors have made similar aspersions throughout the cases. The Debtors allege that they have various claims against the Secured Lenders. Id. at 24:1-4. To date, they have not specified what they think these claims are nor provided any legal basis for their assertions. In fact, the Secured Lenders have acted fully in compliance with their contractual and legal obligations. They will defend themselves vigorously if the Debtors pursue the threatened baseless and frivolous claims. The Secured Lenders believe that, in reality, the Debtors' aspersions and threats are merely a smokescreen by the Debtors to try to avoid scrutiny of their historic performance and future prospects. They are part of the Debtors' overall effort to marginalize the constituencies that do not agree with them. See, e.g., *Reply to Opposition to Debtors' Motion for Order Allowing Management Administrative Claims* [Docket no. 145] at 2:18-24 (challenging franchisees' standing to appear in the cases); Disclosure Statement at 13:13-14 (stating that there has been little meaningful dialog between the Debtors and the Committee in light of the Committee's repeated requests that the Debtors explore a sale).

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES
LA\2273346.1

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE

## C. Management's Contrived Projections

The Debtors included internally-prepared summary cash projections in the Disclosure Statement. Id. at 21:19-22:17; App. A-D. These projections are even rosier than the projections filed with the Initial Plan. See Submission at 13:6-16:16. Management prepared the projections on a "top-down" basis. See Declaration of Eric K. Bradford, filed concurrently with this Motion (the "Bradford Decl.") at ¶3. Thus, instead of starting with their current performance on a store-by-store basis and building the projection from there, the Debtors estimated a total base-line level of sales and profitability and made high level adjustments to each using general assumptions. This performance was then rationalized on a store-level basis. Id.

The "Base Case" projections assume that the overall economy will suddenly improve beginning in 2012, and that this improvement will result in a 3% jump in sales beginning on January 1, 2012, reversing a four year trend of declining and stagnant sales. Management has conceded that the Debtors have no planned operational improvements or other initiatives that would, in the absence of an improving economy, drive their projected financial improvement. Id. at 11. If the macro economy does not turn around in January 2012, the Debtors' "Base Case" projections will be worthless until it does, because they are premised on improved sales produced by a macroeconomic turnaround. Even with an improving macro economy, there can be no assurance that the Debtors would receive the hoped-for jump in sales and profitability. In fact, their revenues could very well continue to decline or stagnate as has been the historic trend over the past four years, a trend which the Debtors project to continue through the end of 2011. See Disclosure Statement at 7:2-9, 18:1-7; Bradford Decl. at ¶ 11.

The projections assume only emergency repair and maintenance expenses for 2011, and an ordinary repair and maintenance budget for 2012 through 2014. Id. Thus, the Debtors do not contemplate any significant capital improvements to their aging portfolio of stores during the first three years of the projections.[5] During this same period, the Debtors' better-capitalized competitors will be in a position to make investments in their products,

---

[5] The Debtors have acknowledged that they need to invest between $10 million and $13 million to modernize and refresh their store portfolio. Id. at ¶ 10.

LATHAM&WATKINS<sup>LLP</sup><br/>ATTORNEYS AT LAW<br/>LOS ANGELES

LA\2273346.1

processes and facilities putting the Debtors' business at a further significant disadvantage. Eventually, the Debtors will need to invest in their stores or they will run their business into the ground. See Roberts Decl. at ¶ 5. However, if they fail to perform to their projections, they are likely to lack the resources to do so even in the later years of the projections. The projections also use the below-market interest rates for the Prepetition Facility and unsecured claims proposed in the Amended Plan. Id. at ¶¶ 7, 8.

The Debtors acknowledge that even under their rosiest projections they would need to consummate a sale or refinancing to repay the Prepetition Facility at the proposed maturity. See Disclosure Statement at 21:14-17, App. D (p. 43). However, there can be no assurance that a sale or refinancing then would result in greater realized value than a sale today. If the Debtors' performance does not dramatically improve or they fail to reinvest in their stores, a future sale would likely result in less realized value.

### D. The Treatment Of Management Under The Plan

The primary beneficiary under the Amended Plan is the Debtors' management. Under the Amended Plan, the Debtors seven most senior officers keep their jobs and receive up to $15 million or more in benefits and bonuses. These benefits and bonuses include:

- Bankruptcy bonuses of more than $1.5 million. Id. at 32:12-16.

- Post-confirmation bonuses of approximately $6.6 million from 2012 and 2016 under the Debtors' "Base Case" projections. See id. at 32:26-33:10; Bradford Decl. at ¶ 7. The minimum EBITDA target for management to qualify for post-confirmation bonuses is below even the Debtors' "Low Case" and "Stress Case" projections. See Disclosure Statement at 32:27-33:1; App. B, D (pp. 42, 44).

- Assumption of management's change of control agreements. Id. at 29:15-16. Under these agreements, if there is a post-confirmation sale, the Debtors would be obligated to pay senior management up to $6.0 million and provide them with health insurance coverage and other welfare benefits for more than a year after the closing of a sale. See Bradford Dec. at ¶ 4.

- Allowance and payment of more than $1.1 million of prepetition deferred compensation to management. Id. at 14:10-15:5.

- Retention of management's beneficial equity interest in the Debtors. The Debtors' senior officers are participants in the ESOP and thus would benefit from the treatment afforded to the ESOP under the Plan. See Round Table Pizza, Inc. Statement of Financial Affairs [Docket No. 186] at 11.

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 13 of 29

1    This package of management bonuses and benefits was approved by a board of

2    directors that management apparently appointed.  See ESOP Trustee Motion at 4:8-10[6];

3    Disclosure Statement at 32:12-13.  Moreover, three[7] of the seven members of the Debtors' board

4    are the executives that stand to receive the richest bonuses under the Amended Plan.  See

5    Disclosure Statement at 32:14-32.

6    **E.    The Debtors' Continuing Refusal To Consider A Sale**

7    The Disclosure Statement stresses the Debtors' refusal to consider a sale.  See

8    Disclosure Statement at 17:1-20:13.  The Debtors assert that spending what they estimate to be

9    $250,000 to $400,000 (or between a sixth and a quarter of what they propose to pay their senior

10   officers in bankruptcy bonuses) on a sale process would not be appropriate based on their

11   internal valuation views.  Id. at 17:3-5.  The Debtors assert that these internal views on valuation

12   are a more reliable and accurate assessment of their true value than what independent third

13   parties would be willing to pay.  Id. at 10:15-22; 48:3-13.

14   **III.    AUTHORITY**

15   **A.    Immediate Investigation Of A Sale Is Necessary To Avoid Significant Harm**

16   A confluence of factors in these cases necessitates the immediate investigation of

17   a sale of the Debtors' business.  The Amended Plan is deeply flawed and cannot be confirmed.

18   Both the Secured Lenders and the Committee have repeatedly asked the Debtors to consider

19   other options.  The Debtors have refused.

20   Thus, the Debtors are embarking on what is likely to be a heavily contested

21   confirmation process with the attendant costs to these estates and without having seriously

22   considered other more viable and less contentious options.  If this process runs its course, the

23

24

---

25   [6]    The ESOP's rights as the sole shareholder of the Debtors were delegated to an ESOP
       administrative committee consisting of member of the Debtors' executive management.  See
26   ESOP Trustee Motion at 4:15-18.  Thus, it is the ESOP administrative committee (i.e. the
       Debtors' executive management) that apparently elected the Debtors' board.  Id. at 4:8-13.

27   [7]    These three directors are:  J. Robert McCourt, the Debtors' Chief Executive Officer, Chief
       Operating Officer and President, Ted Storey, Vice President/Business Development and
28   Secretary, and Keith Davis, Vice President/Finance and Chief Financial Officer.  See
       Disclosure Statement at 31:20-21, 32:12-23.

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 14 of
29

1    Court and creditor constituencies will find themselves months down the road back where they

2    are now, albeit with a diminished estate and fewer options.

3              At the same time, the estates are facing an early September deadline to assume or

4    reject real property leases.  Potential acquirers are likely going to want the flexibility to decide

5    which locations to acquire.  Once the September deadline passes neither potential acquirers nor

6    the estates will have this flexibility unless the affected landlords consent.  Consequently,

7    commencing the investigation of a sale now is critical if potential acquirers are to retain that

8    flexibility, thus maximizing the prospects for a sale and quite likely the ultimate recoveries to

9    stakeholders in these cases.

10                   1.      The Debtors' Plan Is Doomed

11             The Debtors have embarked on what is doomed to be a futile plan process.  This

12   plan process is going to cost the estates and interested parties significant amounts and will likely

13   delay a conclusion to these cases.  More troubling, the Amended Plan cannot satisfy the

14   requirements of section 1129 of the Bankruptcy Code.  It cannot be confirmed.  Here are a few

15   problems for illustrative purposes:[8]

16           **There is no consenting class.**  The three impaired creditor classes under the Amended
         Plan would either be paid at a steep discount or paid over time at below-market interest
17           rates.  See Disclosure Statement at 23:24-24:22, 25:7-26:3.  The sole equity class would
         retain its entire equity stake, and management would receive up to $15 million or more in
18           bonuses and other benefits.  Id. at 26:4-13; 29:15-16; 32:12-33:10.  The Secured Lenders
         have told the Debtors that they will not agree to such treatment.  The Debtors' only hope
19           is that they can hoodwink one creditor class to vote in favor of a plan that gives it far less
         than what it is legally entitled to.  More realistically, the Debtors are not going to have a
20           consenting class and will not satisfy the requirements of section 1129(a)(10) of the
         Bankruptcy Code.
21
         **The Amended Plan Violates the Absolute Priority Rule.**  The Amended Plan puts
22           creditor recoveries at significant risk in an attempt to create value for equity (and
         management) through the Debtors' hoped-for, but highly speculative future performance.
23           Such a transfer of risk to creditors violates the absolute priority rule.  The Amended Plan
         also provides a recovery to a junior class even though creditors in senior classes would
24           receive property of a value significantly less than the allowed amount of their claims.

25

26

27

28   [8]    The Secured Lenders reserve all of their rights with respect to the Disclosure Statement and
        the Amended Plan.

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 15 of
                                      29

**The Amended Plan is not feasible.** Based on their own projections, the Debtors would exit bankruptcy with insufficient cash to maintain the viability of their business. See Disclosure Statement at 31:9-16; Bradford Decl. at ¶ 8. They would also exit bankruptcy with significantly more debt than when they entered and with no external source of working capital. See Disclosure Statement at 31:9-16; Bradford Decl. at ¶ 12. They would have an aging store portfolio and no resources to make capital improvements for several years. Id. at ¶ 11. Their only hope to reverse years of declining and stagnant performance is that (i) the economy as a whole will dramatically improve within the next six months and (ii) that improvement will trickle down to the Debtors. Id. Absent such a macroeconomic turnaround, the Debtors would not be able to perform under the Amended Plan, would be in a worse position to sell their business and would have no option but again seek bankruptcy protection.

**The Amended Plan was not filed in good faith.** The Debtors filed the Amended Plan at a time their senior officers were precluded by ERISA from complying with their Bankruptcy Code duties to creditors. See ESOP Trustee Motion at 5:10-6:3. Until that acknowledged conflict was resolved, the Debtors should have held off formulating and filing a plan. The fact that they didn't, but instead filed a plan that would benefit the ESOP to the detriment of creditors, demonstrates that the Amended Plan was not filed in good faith or in compliance with the Bankruptcy Code. See 11 U.S.C. §§ 1129(a)(1), (2), (3). Even more troubling, management has loaded up to $15 million or more in bonuses and benefits for itself in the Amended Plan. See Bradford Decl. at ¶¶ 4-7. That amount represents between 25% and 30% of the Debtors' own estimate of the fair market value that ultimately might be realized by the estates. See Disclosure Statement at 10:20-22. Such self-dealing demonstrates that the Amended Plan was not filed in good faith.

The Amended Plan raises a number of very troubling issues. At a minimum, these issues will be litigated. More likely, they will prevent confirmation of the Amended Plan. The costs of such a confirmation process would further reduce the Debtors' limited cash balances, thus further impairing their viability. These costs would also ultimately reduce the recoveries realized by creditors and other stakeholders.

It is therefore in all parties' interests, with the exception of management's, fully to explore other alternatives before committing the estates to such a costly and uncertain process.

2.    <u>The September Lease Assumption Deadline Adds To The Urgency</u>

Under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Congress amended section 365 of the Bankruptcy Code to impose an absolute deadline of 210 days after the petition date for a debtor to assume non-residential real property leases unless the affected landlords otherwise consent in writing. See 11 U.S.C. § 365(d)(4)(B). Any leases that have not been assumed by such deadline are deemed rejected. See 11 U.S.C. § 365(d)(4).

The Debtors' exclusivity period currently runs until August 8, 2011, which is only 30 days before the lease assumption deadline in these cases. If the Court denies confirmation of

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

LA\2273346.1

11

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE

Case: 11-41431   Doc# 574   Filed: 06/22/11   Entered: 06/22/11 14:09:00   Page 16 of 29

the Amended Plan, which the Secured Parties believe is the likely result, there will simply not be enough time before the lease assumption deadline to start a sale process, have bidders identify the leases they want and complete the necessary court proceedings to assume those leases. Unfortunately, that could negatively affect the sale and the recoveries realized by the estates and their stakeholders.

The Secured Lenders believe that preserving flexibility so that a potential buyer could choose the leases it wants to assume could have a significant impact on the purchase price that a buyer is willing to pay and thus the success of a sale process. Accordingly, it is critical that a sale be explored now, well before the lease assumption deadline.

**B.      A Sale Is Viable and Likely The Best Outcome In These Cases**

The Debtors' financial condition and lack of liquidity to refresh their stores and compete in a continuing uncertain and challenging economy prevent the Debtors from reorganizing on a stand-alone basis without a significant infusion of capital and a reduction of their debts. The Amended Plan does not contemplate any new capital and would leave the Debtors with millions of dollars of additional debt. Consequently, a sale is likely the best and perhaps only viable outcome in these cases.

1.      The Current Economic Environment Is Conducive For A Sale

The current economic climate is conducive for a sale. The credit and capital markets are robust. <u>See</u> Roberts Decl. at ¶ 6. These markets have improved significantly from just a year ago. <u>Id.</u> In fact, a number of sales of restaurant chains have recently been announced or completed. <u>Id.</u> at ¶ 9. Within the last month, household names including California Pizza Kitchen, Arby's and Il Fornaio have all been sold. Bankruptcy sales, whether pursuant to section 363 of the Bankruptcy Code or a plan of reorganization, continue to be prevalent and successful in chapter 11 cases of the size and complexity of the Debtors' cases. <u>Id.</u> at ¶ 10.

During these cases, the Debtors have closed 21 unprofitable stores and renegotiated a number of leases. <u>See</u> Disclosure Statement at 9:24-10:6. Thus, what was only a possibility during last year's prebankruptcy sale effort has now become a reality with a quantifiable impact on the Debtors' costs and margins. Bidders no longer need to factor into

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

LA\2273346.1

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE

their bids the costs and uncertainty of these store closings.  These operational improvements make the Debtors a more attractive target to prospective purchasers.  <u>See</u> Roberts Decl. at ¶ 11.

There also continues to be significant interest in an acquisition of the Debtors' business.  Since the Petition Date, the Debtors have received unsolicited indications of interest from at least 15 prospective purchasers.  <u>See</u> Lunt Decl. at ¶ 5.  The Debtors would likely be attractive to both financial and strategic acquirers, including a number that participated in last year's sale process.  Moreover, funds and companies that specifically target bankruptcy sales could very well become involved in a sale effort.

    2.    <u>The Debtors' Reasons For Not Considering A Sale Now Are At Odds With Reality</u>

The Debtors assert that a sale at this time is not a viable exit in these cases.  <u>Id.</u> at 17:3-5.  The Debtors are wrong.  Among other things, the Debtors claim that they would not realize sufficient value from a sale because: (i) their business has been overexposed in the market due to their prepetition sale effort; (ii) prospective purchasers would value the business based on its poor past performance; (iii) their future performance will not be as robust as what they had represented to bidders in the pre-bankruptcy sale process; (iv) bidders would be unwilling to give any credit to the Debtors' store closing and lease renegotiation initiatives; (v) the Debtors have been stigmatized by the bankruptcy cases; and (vi) the credit markets remain limited such that strategic buyers would have difficulty in getting financing for their bids.  <u>See</u> Disclosure Statement at 17:1-20:2.  These justifications are untrue, pure speculation and mere contrivances.

    a.    The Debtors' "Over-Exposure" Concerns Are Unjustified And Unsupported

The Debtors suggest that a sale process now is unlikely to result in higher bids than the pre-bankruptcy sale process because prospective buyers already have views about the business.  <u>See</u> Disclosure Statement at 17:6-16.  In reality, buyers are going to look at the business and its prospects as they exist now, not in the past.  To the extent that the business and its outlook have improved, as the Debtors suggest, then sophisticated buyers will adjust their views accordingly.  <u>See</u> Roberts Decl. at ¶ 13.

LATHAM&WATKINS LLP  LA\2273346.1
ATTORNEYS AT LAW
LOS ANGELES

13

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 18 of 29

1    The Debtors assert that a sale now is doomed because bidders would remember

2    that the Secured Lenders, and GECC in particular, "wanted out of the credit." See Disclosure

3    Statement at 17:12-14.  That circumstance is unlikely to change in a post-confirmation sale.  If

4    bidders in a bankruptcy process would factor GECC's views of the business into their bids, then

5    it is highly likely that bidders in a post-confirmation sale process would do likewise.

6                    b.      The Debtors' Historic Performance Is Relevant

7              The Debtors assert that prospective buyers would undervalue the Debtors'

8    business because of the Debtors' performance over the last four years.  See Disclosure Statement

9    at 17:18-19:8.  This concern is, at best, curious.  The fact is that any valuation that ignores the

10   Debtors' performance over the past four years is entirely unreliable.  See Consolidated Rock

11   Products Co. v. Du Bois, 312 U.S. 510, 526 (U.S. 1941) (an estimate of value "must be based on

12   an informed judgment which embraces all facts relevant to future earning capacity and hence to

13   present worth, including, of course . . . the past earnings record, and all circumstances which

14   indicate whether or not that record is a reliable criterion of future performance."); In re Yuba

15   Consol. Industries, Inc., 242 F. Supp. 561 (N.D. Cal. 1965) (same).

16             Buyers will focus on what they perceive to be the current value of the future

17   prospects and profitability of the business based on the strategies they intend to employ.  See

18   Roberts Decl. at ¶ 13.  Those perceptions will obviously and necessarily be based in part on how

19   the business has performed historically.  However, buyers will also look to any operational

20   improvements that have been made or that could be made and any other apparent opportunities

21   to enhance profitability.  Id.

22             When the Debtors conduct the post-bankruptcy sale that they anticipate, will the

23   Debtors' performance look better?  They propose to exit bankruptcy with the exact same

24   business model, with the same management, the same lenders, the same competitive landscape

25   and the same limited working capital resources that they had prepetition.  Their performance

26   continues to trend downward, and they would exit with more debt than when they entered

27   bankruptcy.  Confirmation of the Amended Plan would not address any of these issues.

28

1    What the Debtors are proposing is that instead of realizing value for stakeholders

2    today, creditors should be put on hold for several years to see if the economy improves and with

3    it the Debtors' performance and prospects, such that the ESOP (and management) might realize a

4    greater recovery.  Obviously, a sale now might not allow that to happen.  Yet, the absolute

5    priority rule requires a valuation of the Debtors as of confirmation, not a determination of their

6    potential value years in the future based on the Debtors' speculative projections.

7                          c.        The Debtors' Other Justifications

8                 The Debtors assert that the bidders involved in the prepetition sale process

9    factored into their bids the perceived savings and improvements of closing unprofitable stores.

10   As a result, the Debtors assert that bids in a bankruptcy sale are unlikely to be higher than the

11   prebankruptcy bids.  <u>See</u> Disclosure Statement at 19:11-18.  This assertion is untrue.  While

12   bidders might have contemplated closing stores in connection with their prebankruptcy offers,

13   they would have had to buy out the full remaining terms of those leaseholds.  Now, bidders can

14   leave behind rejection damage claims that are capped by section 502(b)(6) of the Bankruptcy

15   Code, making the value of the acquired business concomitantly greater.  In addition, the Debtors

16   have been able to renegotiate leases that also add to the value of the business.

17               The Debtors also claim that the stigma of bankruptcy would encourage

18   opportunistic bidders.  <u>Id.</u> at 20:19-22.  Bankruptcy sales have become increasingly common and

19   are attracting sophisticated financial and strategic buyers.  <u>See</u> Roberts Decl.; <u>see also</u> Harvey R.

20   Miller & Shai Y. Waisman, *Is Chapter 11 Bankrupt*?, 47 B.C. L. Rev. 129, 156–57 (2005)

21   (listing some of the factors contributing to the prevalence of asset sales and citing numerous

22   recent court cases); James H.M. Sprayregen et al., Chapter 11: *Not Perfect, but Better than the*

23   *Alternative*, Am. Bankr. Inst. J., Oct. 2005, at 1, 60 (describing those who "decr[y] the increasing

24   frequency and rise in importance of §363 sales"); Robert E. Steinberg, *The Seven Deadly Sins in*

25   *§363 Sales*, Am. Bankr. Inst. J., June 2005, at 22, 22 (stating that Section 363(b) sales "have

26   become the preferred method of monetizing the assets of a debtor company").  That some buyers

27   might be "opportunistic" is irrelevant.  The relevant issue is how much the highest bidder is

28   willing to pay.  The Debtors have made no effort to determine that.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

LA\2273346.1

15

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 20 of
29

1        Finally, the Debtors assert that the credit markets remain "limited" such that

2 strategic buyers would experience "difficulties" obtaining financing to participate in an auction.[9]

3 See Disclosure Statement at 19:23-25. This assertion is directly at odds with empirical market

4 data. See Roberts Decl. at ¶ 14. Yet, even if the Debtors were right and the credit markets were

5 limited for strategic buyers, a sale would still be a viable option given the number of potential

6 financial buyers. In fact, the three lead bidders in the prebankruptcy sale process (designated as

7 the "First Bidder," the "Second Bidder" and the "Third Bidder" in the Disclosure Statement)

8 were all financial acquirers. See Flamm Decl. at ¶ 6.

9        The Debtors acknowledge that a sale is one of two options available to them post-

10 confirmation to address their outstanding debts. See Disclosure Statement at 21:16-17.

11 However, the Debtors have identified no investments or further operational changes that they

12 intend to make over the next several years that suggest that the company will be more attractive

13 to prospective purchasers. Rather, their store portfolio will only be older.

14        Accordingly, now is an ideal time to explore a sale of the business.

15        3.    Bankruptcy Sales Result In Fair Value

16        Bankruptcy also gives sellers and buyers a number of advantages that can result in

17 greater realized value. Buyers and sellers generally have greater flexibility in bankruptcy sales

18 to negotiate which contracts and leases will be assumed as part of a sale. Bankruptcy permits the

19 assignment of contracts that might not be assignable outside of bankruptcy. Buyers get the

20 benefit of a Court order providing that the sale is free and clear of interests thus insulating them

21 from the seller's prior conduct and financial dealings. See 11 U.S.C. § 363(f).

22        In the present case, the Debtors likely could more easily address issues relating to

23 the ESOP in a bankruptcy sale than they could in a non-bankruptcy sale. Under the Bankruptcy

24 Code, this Court could approve a sale without the ESOP's consent or over its objection. Outside

25 of bankruptcy, the ESOP, or its fiduciary, would need to consent to a sale of the business or

26

27   [9]    The Debtors do not explain how the credit markets are "limited" and why these limitations
apparently apply only to strategic buyers and not financial buyers. The Debtors also do not
provide any evidence that the credit markets are likely to improve for strategic buyers in the
28 future. Thus, the Debtors do not demonstrate that market conditions for a sale within the
next five years are likely to be any more favorable than today.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

LA\2273346.1

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE

1  substantially all of its assets.  See, e.g., Cal. Corp. Code § 1001.  It would also be easier and

2  significantly less expensive to address management's employment agreements in a bankruptcy

3  sale than in a non-bankruptcy sale.  If the buyer did not want to employ certain senior officers,

4  claims arising under their employment agreements would be capped by the Bankruptcy Code.

5  See 11 U.S.C. § 502(b)(7).  In a non-bankruptcy sale, no cap would apply.

6          These benefits generally make bankruptcy sales less complicated, costly and time-

7  consuming to complete than non-bankruptcy sales.  See Roberts Decl. at ¶ 16.  They also could

8  have a significant positive impact on the value the estates ultimately recover, as compared to a

9  non-bankruptcy sale.  In this matter, a sale would have added benefit of avoiding a costly and

10 contentious confirmation process involving a number of difficult issues.

11          4.      A Sale Is The Best Indicator Of Value

12          Courts recognize that what an independent third party is willing to pay is a more

13 reliable indicator of value than expert testimony. Although experts often apply the same

14 analytical tools to value companies, they often disagree on the value because financial models

15 and analyses are driven by subjective inputs.  See In re 3dfx Interactive, Inc., 389 B.R. 842, 864-

16 65 (Bankr. N.D. Cal. 2008) (adopting the reasoning of the Delaware court in Peltz v. Hatten, 279

17 B.R. 710 (D. Del. 2002) and stating that "[s]imply put, when it comes to valuation issues,

18 reasonable minds can and often do disagree.") (citations omitted).  Therefore, "in determining

19 whether a value is objectively 'reasonable' the court gives significant deference to marketplace

20 values."  Id.  See also VFB LLC v. Campbell Soup Co., 482 F.3d 624, 633 (3d Cir. 2007)

21 (holding that, absent some reason to distrust it, a market price is a more reliable measure of value

22 than expert testimony).  Thus, a sale process would, at a minimum, provide this Court and

23 interested parties with an unbiased and more accurate assessment of the true value of the estates.

24          For the foregoing reasons, a sale is a viable option in these cases that merits real

25 consideration.  Overall market conditions and the apparent continuing interest among potential

26 acquirers make now an ideal time to conduct a sale.  The Debtors' speculative and contrived

27 reasons for not considering a sale are directly at odds with these conditions and the hundreds of

28 bankruptcy sales that are successfully consummated each year.  The Debtors provide no

LATHAM&WATKINS LLP  LA\2273346.1
ATTORNEYS AT LAW
LOS ANGELES

17

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 22 of
29

assurance whatsoever that market conditions would be any better post-confirmation when they would need to sell their business or refinance the Prepetition Facility.

## C. The Debtors Are Not Capable Of Running A Credible Sale Process

The Debtors' management team is self-interested, conflicted and already stretched too thin. It has never seriously explored a sale since commencing these cases despite assurances that it would. Consequently, the Debtors lack the credibility and resources to investigate adequately and fairly the viability of a sale as a potential exit.

### 1. The Debtors Have Not Seriously Explored A Sale In These Cases

From the Petition Date to the filing of the Initial Plan, the Debtors repeatedly asserted that they were considering a sale of their business as one of two potential exit strategies. See Docket Nos. 4 at p. 4; 5 at p. 4; 6 at p. 6; 7 at p. 4; 8 at p. 3; 9 at p. 4; 10 at p. 4; 11 at p. 4; 12 at p. 4; 13 at ¶¶ 33-35; 37 at p. 4; 39 at p. 10; 42 at p. 4; 45 at p. 5; 135 at p. 4; 137 at p. 4; 229 at p. 6; 250 at p. 4; 272 at p. 4; 313 at p. 4; 325 at p. 3; 380 at p. 3. However, the Debtors never really intended to consider a sale, despite their assurances to this Court and interested parties.

They never sought to employ an investment banker. They never responded to any of the unsolicited indications of interest they have received since the Petition Date. They refused the multiple requests of their primary creditor constituencies to pursue a sale process. Instead, they offered up contrived, unconvincing and unsupported justifications for not considering a sale.

### 2. Management Is Self-Interested

While disappointing, the Debtors' refusal to consider a sale is not surprising. As discussed above, the Debtors' seven most senior officers would receive millions of dollars in bonuses and benefits upon confirmation of the Amended Plan and before a material distribution to creditors. It is therefore unsurprising that the Debtors' remain adamant that a sale should occur after confirmation (see Disclosure Statement at 10:17-22): a future sale will line management's pockets,[10] but a present sale would not.

---

[10] As discussed above, the Amended Plan proposes to assume management's employment agreements. Id. at 29:15-16. Under these agreements, management would be entitled to $6 million or more in change of control payments and other benefit in the event of a post-bankruptcy sale. See Bradford Decl. at ¶ 4.

LATHAM&WATKINS<sup>LLP</sup>
ATTORNEYS AT LAW
LOS ANGELES

LA\2273346.1

18

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 23 of 29

1    Creditors on the other hand are forced to wait years for a recovery. That recovery
2    is entirely contingent on an improving economy driving the Debtors' future profitability. If the
3    economy does not improve or the Debtors do not realize the benefits of an improving economy
4    and cannot hit their projections, creditor recoveries would be put at risk, but management would
5    still have pulled millions of dollars out of the estates.

6    Management's fundamentally flawed and speculative projections, which they
7    have offered as support for the Amended Plan, further evidence its self-interest and lack of
8    regard for the Debtors' creditor constituencies. It appears that instead of preparing realistic
9    projections building up from store-level data and then formulating a plan, the Debtors formulated
10   their plan and then developed unrealistic top-down projections to support it.

11   Management's track record in projecting macro economic trends, not to mention
12   the Debtors' own performance, has been an unmitigated disaster over the past four years. The
13   Debtors' 2007 projections, for example, overestimated their 2010 revenues by more than 87%.
14   See Disclosure Statement at 2:14-17, 3:25-26. Similarly, the projections provided to bidders
15   during the prepetition sale process one year ago, which like their current projections projected an
16   imminent macro economic recovery, also overestimated actual performance. Id. at 18:22-19:2.
17   Given management's stake in the Amended Plan, there is every reason to believe that
18   management has once again overestimated the Debtors' future performance.

19   What makes management's actions even more troubling is that typical corporate
20   controls apparently have not applied to the Debtors. See, e.g., Principles of Corp. Governance
21   § 3.01 (1992) (management should be conducted by "officers and employees to whom the
22   management function is delegated by the board or those executives, subject to the functions and
23   powers of the board"); Law of Corp. Officers and Directors § 2.18 (2011) ("directors or officers
24   may violate the duty of care and/or loyalty through lack of attention or failure to adequately
25   supervise officers or employees"); Charles M. Elson & Christopher J. Gyves, *The Enron Failure*
26   *and Corporate Governance Reform*, 38 Wake Forest L. Rev. 855, 868 (2003) ("To fulfill their
27   oversight responsibilities effectively, directors must be independent of management and holders
28   of a personally meaningful equity stake in the enterprise."). Instead of management being

LATHAM&WATKINS LLP   LA\2273346.1
ATTORNEYS AT LAW
LOS ANGELES
                                    19

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 24 of
29

beholden to the Board, it appears that the opposite is true here – the Board was selected by and has served at the discretion of management. See ESOP Trustee Motion at 4:8-12.

### 3. Management is conflicted

In addition to being entirely self-interested, the Debtors' management also owes duties under ERISA and the Bankruptcy Code that the Debtors acknowledge are irreconcilable. See ESOP Trustee Motion at 5:10-6:3 (quoting Howard v. Shay, 100 F.3d 1484 (9th Cir. 1996), cert. denied, 520 U.S. 1237 (1997)). The Debtors filed both the Initial Plan and the Amended Plan when their management was subject to an exclusive duty to the ESOP, to the exclusion of the duties they owe creditors under the Bankruptcy Code.

Management has liability under ERISA to the extent that it has breached its duties to the ESOP. See 29 U.S.C. § 1104(a)(1)(B) ("a fiduciary shall disgorge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . ."); 29 U.S.C. § 1109 (liability for breach of fiduciary duty). The existence of such potential liability only amplifies the serious questions about the Debtors' motivation in pursuing the Amended Plan.

### 4. Management Is Already Overwhelmed

Since commencing these cases, the Debtors have emphasized how limited their internal resources are and how hard their senior officers have been forced to work. See *Motion for Order Allowing Management Administrative Claims* [Docket No. 42] at 4-6 (stating that "a very substantial strain" was placed on management during the transition into Chapter 11); *Reply to Opposition to Debtors' Motion for Order Allowing Management Administrative Claims* [Docket No. 145] at 2-3 ("Senior management has seen its burdens double . . . as a result of the bankruptcy filing . . ."). Thus, in addition to managements' evident self-interest and acknowledged conflicting duties, it also appears that management is already overwhelmed and lacks the internal resources to credibly and adequately investigate a sale effort.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2273346.1

20

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 25 of 29

1    For the foregoing reasons, it is critical that an independent third party be brought

2  in immediately to investigate a potential sale of the Debtors' business.

3         **D.      An Examiner Should Be Appointed To Investigate A Sale**

4              1.      An Examiner Is Required In These Cases

5    Section 1104(c) of the Bankruptcy Code provides a ready solution to the current

6  situation.  It directs a court to appoint an examiner to "conduct any investigation of the debtor as

7  is appropriate," if  "such appointment is in the interest of creditors, any equity security holders,

8  and other interests of the estate."  11 U.S.C. § 1104(c).  Such an investigation can extend to "any .

9  . . matter relevant to the case or to the formulation of a plan."  11 U.S.C. § 1106(a)(3); see also

10  11 U.S.C. § 1106(b).  Appointment of an examiner under Section 1104(c)(1) is within the sound

11  discretion of the Court.  See In re Gilman Services, Inc., 46 B.R. 322, 327 (Bankr. D. Mass.

12  1985) (appointing examiner to investigate sale of debtor's assets and certain reporting

13  deficiencies).

14    Courts have great flexibility in fashioning the scope of an examiner's mandate.

15  See In re Liberal Market, Inc., 11 B.R. 742 (Bankr. S.D. Ohio 1981) ("We direct attention to the

16  authority in [11 U.S.C. § 1106(b)] authorizing an examiner to perform 'any other duties of the

17  trustee that the court orders the debtor-in- possession not to perform.'  Hence, the court may give

18  an examiner additional duties not specifically enumerated as circumstances . . . warrant."); see

19  also H.R. Rep. No. 95-595, 95th Cong. (1st Sess. 1977) ("The court is authorized to give the

20  examiner additional duties as the circumstances warrant.").

21    The Ninth Circuit has held that courts can authorize examiners to "perform a

22  myriad of functions normally carried out by a trustee."[11]  Boileau v. Dillaway (In re Boileau),

23  736 F.2d 503, 506 (9th Cir. 1984).  Thus, courts have appointed examiners to investigate and/or

24

_____

25  [11] Among the myriad duties examiners have performed are the investigation and prosecution of
causes of action on behalf of a debtor, see In re Carnegie Int'l Corp., 51 B.R. 252, 255 (Bankr.
26  S.D. Ind. 1984); In re John Peterson Motors, Inc. 47 B.R. 551, 553 (Bankr. D. Minn. 1985),
aiding in breaking deadlocked plan negotiations, see In re Landscaping Servs., Inc., 39 B.R. 588
27  (Bankr. E.D.N.C. 1984); In re UNR Indus., 30 B.R. 609 (Bankr. N.D. Ill. 1987), and controlling
a debtor's bank accounts, funds and disbursements, see Comerica Bank-California v. GTI
28  Capital Holdings, L.L.C. (In re GTI Capital Holdings, L.L.C.), 2007 Bankr. LEXIS 4853 (B.A.P.
9th Cir. Mar. 29, 2007).

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 26 of
29

conduct asset sales in a number of cases. See, e.g., In re Fontainebleau Las Vegas Holdings, LLC, Case No. 09-21481 (AJC) (Bankr. S.D. Fla., Oct. 14, 2009) (appointing examiner to examine, negotiate and supervise a § 363 sale of assets); In re Cleary Bros. Constr. Co., 9 B.R. 40 (Bankr. S.D. Fla. 1980) (examiner appointed to effect a sale of debtor's property); see also, e.g., Balser v. DOJ, 327 F.3d 903, 906 (9th Cir. 2003) (noting that examiner had been appointed to manage rental property and conduct a sale of properties); In re World Indus. Ctr., Ltd., 1993 U.S. App. LEXIS 9917 (9th Cir. 1993) (examiner appointed to negotiate a sale of debtor's property where debtor did not move expeditiously toward reorganization).

As discussed above, appointment of an examiner to investigate the viability of a sale in these cases is in the interest of creditors and other interested parties. In fact, the benefits to the estates from the appointment of an examiner far outweigh the costs. See In re Gilman, 46 B.R. at 328 ("The appointment of an examiner is a cautious, intermediate procedure which is more economical than the appointment of a trustee."). If the examiner concludes that a sale is viable and in the best interest of the estates, the estates might avoid the significant costs and harms of a contested confirmation process. The costs of the examiner will be more than offset by these savings. If, on the other hand, the examiner concludes that a sale is not viable or attractive, interested parties will be better informed to negotiate the terms of an appropriate and confirmable plan.

2.     The Proposed Mandate For The Examiner.

Given the unique circumstances of these cases and the urgency of the situation, an examiner in these cases should be given the following powers and duties:

- The examiner would investigate the level of interest and the likely prospects of a sale by immediately commencing a sale effort. The examiner would retain a knowledgeable and respected investment banking firm at the estates' expense to solicit interest in a potential sale and conduct the sale effort under the direction of the examiner. Before the Petition Date, the Debtors used North Point Advisors as their investment banker. North Point Advisors accumulated a significant amount of information about the Debtors and has developed a lengthy list of prospective buyers. The Secured Lenders believes that there would likely be significant benefits from the examiner considering North Point Advisors to act as its investment banker, though the ultimate decision would be left up to the examiner subject to approval of the Court.

- The examiner would direct the preparation of solicitation and information materials and coordinate due diligence by prospective purchasers. The Debtors prepared similar

LATHAM&WATKINS LLP   LA\2273346.1
ATTORNEYS AT LAW
LOS ANGELES

22

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE

Case: 11-41431   Doc# 574   Filed: 06/22/11   Entered: 06/22/11 14:09:00   Page 27 of
29

materials for their prepetition sales effort and such materials could likely be supplemented and updated in short order and at a modest cost.

- The examiner would evaluate the various bidders interested in participating in the sale process to ensure the financial viability and credibility of their bids.

- The examiner would negotiate with prospective purchasers. If the examiner determines that a sale is viable and appropriate in these cases, it would determine which of the following three options (the "Sale Options") to pursue: (i) an auction for the Debtors' business or assets with a stalking horse bid, (ii) an auction for the Debtors' business or assets without a stalking horse bid; or (iii) a private sale of the Debtors' business or assets without an auction. The Examiner would need to obtain the consent of the Secured Lenders and the Committee for its selected Sale Option before seeking Court approval for a sale. Once the examiner has obtained such consent, it would file a motion with the Court seeking authority to sell the Debtors' business or assets in accordance with its selected Sale Option (the "Sale Motion").

- If an auction is held, the examiner would develop and promulgate bidding procedures and rules. In consultation with the Secured Lenders and the Committee, the examiner would determine whether any bid received at the auction is higher and better than the previous bid. At the conclusion of the auction, the examiner, in consultation with the Secured Lenders and the Committee, would determine the highest and best offer received. The examiner would then seek Court approval of such offer at the hearing on the Sale Motion.

- If the examiner determines that a sale is not viable or would not be appropriate in the cases, the examiner would promptly notify the Debtors, the Secured Lenders and the Committee and give them the reasons for its determination. The examiner would also promptly file a report with the Court to that effect.

- The examiner would provide periodic updates to Court and would be required to maintain an open dialogue with the various constituencies in these cases, including the Secured Lenders and the Committee.

The Secured Lenders will work with the Committee prior to the hearing on this Motion to attempt to identify appropriate candidates to serve as examiner.

Of course, no sale effort would be successful without the cooperation of the Debtors and their senior management. As a result, the Court should direct that the Debtors cooperate fully with the examiner, including providing the examiner and its professional advisors with access to the Debtors' books, records, locations, management and other personnel in order that the examiner can perform the duties set forth above.

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2273346.1

23

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE

Case: 11-41431    Doc# 574    Filed: 06/22/11    Entered: 06/22/11 14:09:00    Page 28 of
29

## IV. **CONCLUSION**

Throughout these cases, the Secured Lenders have tried to work with the Debtors and the Committee to resolve disputes and minimize contested matters. However, they and the Committee have been wholly unsuccessful in convincing the Debtors to explore a sale process in these cases. Developments in these cases have now exposed the reason for the Debtors' refusal – their management is conflicted and self-interested. The Debtors are therefore committed to pursuing a plan that significantly impairs creditor recoveries, puts those recoveries at substantial risk and leaves the Debtors' business exposed to the same challenges that precipitated these cases, all so that its executive officers can limit their potential liability to the ESOP and pay themselves millions of dollars in bonuses and benefits.

Yet, while the Amended Plan might be the best exit for management, it is not the best exit for these estates. Thus, it is critical that a sale process be considered now before the estates are forced to spend the time and resources pursuing a contested plan. Even if a sale is not consummated, the sale process will help inform interested parties and this Court as to an appropriate exit in these cases. Accordingly, the Secured Lenders respectfully request that the Court enter an order substantially in the form of Exhibit "A" hereto appointing an examiner and granting such other relief as is just and proper.

Dated: June 22, 2011

Respectfully Submitted,

*/s/ Gregory O. Lunt*
Gregory O. Lunt (CA Bar No. 173297)
LATHAM & WATKINS LLP
355 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
gregory.lunt@lw.com

BINGHAM McCUTCHEN LLP
William Bates (CA Bar No. 063317)
1900 University Avenue
East Palo Alto, CA 94303-2223
Telephone: (650) 849.4400
Facsimile: (650) 849.4800
bill.bates@bingham.com

*Attorneys for General Electric Capital Corporation,*
*as Agent*

LATHAM&WATKINS LLP
ATTORNEYS AT LAW
LOS ANGELES

LA\2273346.1

24

MOTION TO APPOINT EXAMINER TO
INVESTIGATE A SALE