1
2
3
4
5
6
7
8

SCOTT H. McNUTT (CSBN 104696)
SHANE J. MOSES (CSBN 250533)
McNUTT LAW GROUP LLP
188 The Embarcadero, Suite 800
San Francisco, California 94105
Telephone: (415) 995-8475
Facsimile: (415) 995-8487

MICHAEL ST. JAMES (CSBN 95653)
ST. JAMES LAW, P.C.
155 Montgomery Street
Ste.1004
San Francisco CA 94104
Telephone: (415) 391-7566
Facsimile: (415) 391-7568
Counsel for Debtor

9

10              UNITED STATES BANKRUPTCY COURT

11              NORTHERN DISTRICT OF CALIFORNIA

12                     OAKLAND DIVISION

13

14  In re                              Case No.  11-41431 RLE

15  Round Table Pizza, Inc.,           (Jointly Administered with Case Nos.
                                       11-41432 RLE, 11-41433 RLE, and
16          Debtor.                    11-41434 RLE)

17

18                                     Chapter 11

19                                     **DEBTORS' DISCLOSURE STATEMENT
                                       TO ACCOMPANY FIRST AMENDED
20                                     JOINT PLAN OF REORGANIZATION
                                       DATED OCTOBER 26, 2011**
21

22

23

24

25

26

27

28

## SUMMARY OF JOINT PLAN TREATMENT

| Class | Creditors | Treatment |
|---|---|---|
| Class 1 | Secured Lenders (Owed approximately $37.4 million secured by all assets) | Quarterly payments of interest at 9% annual principal amortization payable quarterly beginning in 2012; fully due on July 31, 2013; other terms generally comparable to original Credit Facility terms |
| Class 1B | Other secured claims (Claims secured by assets of two Tahoe stores, seized from defaulted franchisee) | Payment, surrender of collateral or other consensual or permissible non-consensual treatment |
| Class 2 | Priority Claims ($256,000 obligation to ESOP ) | Paid in full (with accrued interest) on Effective Date (estimated December 15, 2011) |
|  | Unimpaired Creditors | Gift Certificates and Employee Benefit claims in excess of the priority cap will be honored in the ordinary course of business post-Confirmation |
| Class 3A | Allowed unsecured claims up to $5,000 or who elect Class 3A treatment, up to a maximum of $2,165,000in claims | Paid 40% of claim on the Effective Date (estimated December 15, 2011) in full satisfaction of claim |
| Class 3B | All unsecured claims not included in Class 2 and not subject to Class 3A treatment | Paid in full with 6% interest; equal quarterly distributions of principal from March 31, 2012 through December 31, 2015; accrued interest paid with final quarterly installment; somewhat different treatment afforded to ERISA unsecured claims |
| Class 4 | ESOP equity ownership in Round Table | Preserved intact, but limited funding for stock repurchases or additional contributions until all Class 3B claims are paid in full |
| Class 5 | RTP's ownership interest in subsidiaries and affiliates | Unimpaired |

220588.1

# TABLE OF CONTENTS

**Page**

I. INTRODUCTORY STATEMENT ...................................................................... 1

II. BACKGROUND LEADING TO THE BANKRUPTCY FILING ...................... 2

    A. The Business ................................................................................. 2

    B. The Credit Facility ....................................................................... 2

    C. The Great Recession ..................................................................... 3

    D. Inability to Restructure Credit Facility ...................................... 4

    E. The Current Business .................................................................... 5

    F. The 2010-11 Sale Effort ............................................................... 6

III. THE BANKRUPTCY CASE ............................................................................ 7

    A. The Business Reorganization ....................................................... 7

    B. Legal Developments in the Bankruptcy Case ............................. 8

        1. The Debtor............................................................................ 8

        2. Selection of Estate Representatives ................................... 9

        3. Leases ................................................................................. 10

        4. Plan Process ....................................................................... 11

IV. ROUND TABLE'S CONSTITUENCIES ....................................................... 11

    A. The Secured Lenders .................................................................. 11

    B. The Unsecured Creditors............................................................ 12

        1. Lease Rejection Damages .................................................. 12

        2. Trade Debt .......................................................................... 12

        3. Management / Long Term Incentive Plan Debts ............. 12

    C. ESOP ........................................................................................... 13

V. PLAN OF REORGANIZATION ..................................................................... 16

    A. Summary ...................................................................................... 16

    B. Payment of Administrative Claims ............................................ 16

    C. Treatment of Creditor and Equity Classes ............................... 18

DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

Case: 11-41431    Doc# 1056    Filed: 10/26/11    Entered: 10/26/11 17:12:16    Page 3 of
53

Class 1: The Secured Lenders ........................................................ 18

Class 2: Priority Claims ............................................................... 20

Class 3: General Unsecured Claims .............................................. 21

Class 4: ESOP / Equity ............................................................... 24

D.   Executory Contracts ........................................................................ 25

1.   Franchise Agreements ............................................................. 25

2.   Leases ..................................................................................... 27

3.   Employment-Related Contracts ............................................. 27

E.   Means of Implementation ................................................................ 28

1.   Revesting Subject to Joint Plan ............................................. 28

2.   Bankruptcy Transition and Procedure ................................... 29

3.   Internal Operations and Management .................................... 30

4.   Post-Petition Deposits ............................................................ 33

5.   Objections to Claims .............................................................. 33

6.   Unitary Debtor and Co-Obligor Claims ................................ 34

7.   Discharge ................................................................................ 35

8.   Releases .................................................................................. 35

VI.   ALTERNATIVES TO THE JOINT PLAN .................................................... 36

A.   Going Concern Sale ........................................................................ 36

B.   Liquidation ...................................................................................... 37

C.   Non-Consensual Plan ...................................................................... 39

VII.   OTHER MATERIAL ISSUES ........................................................................ 40

A.   Feasibility of the Joint Plan ............................................................ 40

B.   Risk Factors ..................................................................................... 42

C.   Tax Consequences ........................................................................... 43

1.   Tax Treatment of Creditors .................................................... 44

2.   Tax Treatment of Round Table ............................................... 44

D.   Conclusion ....................................................................................... 44

ii       DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

VIII.   CONCLUSION .............................................................................................. 44

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# I. **INTRODUCTORY STATEMENT**

Round Table Pizza, Inc., The Round Table Franchise Corporation, Round Table Development Company, and Round Table Pizza Nevada LLC, the jointly administered debtors and debtors-in-possession in the above captioned Chapter 11 reorganization cases (collectively, "Round Table" or the "Debtor"), and General Electric Credit Corporation, as Agent for the Secured Lenders (the "Secured Lenders", and collectively with the Debtor, the "Proponents") have filed their First Amended Joint Plan of Reorganization dated October 26, 2011 (the "Joint Plan"). Capitalized terms used in this Disclosure Statement without definition shall have the meanings given to them in the Joint Plan.

*While the Secured Lenders are joint proponents of the Joint Plan, this Disclosure Statement was prepared by the Debtors. Except as otherwise noted herein, the opinions, conclusions, views and statements included in this Disclosure Statement are solely those of the Debtors, and do not necessarily reflect the opinions, conclusions, views or positions of the Secured Lenders. The Secured Lenders are in no way responsible, and expressly disclaim any such responsibility, for the accuracy or completeness of the information contained in this Disclosure Statement.*

This Disclosure Statement explains the circumstances leading to Round Table's bankruptcy filing, the business reorganization achieved in the first months of its Chapter 11 case, the Joint Plan and its means of implementation and certain available alternatives to the Joint Plan. The Court has determined that this Disclosure Statement contains sufficient information to enable creditors to make an informed judgment about the Joint Plan. As described herein, the Debtors believe that acceptance and confirmation of this Joint Plan will provide the greatest return to creditors and other affected parties and is superior to any available alternative.

*The Debtors are providing the information in this Disclosure Statement solely for the purpose of informing holders of Claims and Interests entitled to vote on the Joint Plan. Nothing in this Disclosure Statement may be used by any Person for any other purpose. This Disclosure Statement shall not constitute or be construed as an admission of any fact, liability,*

DISCLOSURE STATEMENT TO ACCOMPANY FIRST AMENDED JOINT PLAN DATED OCT. 26, 2011

*stipulation or waiver.  This Disclosure Statement shall not be used for any litigation purpose whatsoever, and shall not be admissible in any proceeding involving the Debtors, the Reorganized Debtors, the Secured Lenders or any other Person, nor shall it be construed to be conclusive advice regarding the tax or other legal effects of the Joint Plan as to the holders of Claims against, or Interests in, the Debtors.  Persons holding or trading in or otherwise purchasing, selling, or transferring Claims against or Interests in the Debtors should evaluate this Disclosure Statement in light of the purpose for which it was prepared.  All Persons should consult with their own legal counsel and financial advisors in evaluating this Disclosure Statement, the Joint Plan, the proposed treatment of such Persons thereunder and the potential tax and other legal effects of the Joint Plan based on their individual circumstances.*

## II.  BACKGROUND LEADING TO THE BANKRUPTCY FILING

**A.     The Business**

Round Table's first restaurant opened in Menlo Park, California in 1959.  Over the past 50 years, Round Table has grown to dominate the Northern California market for pizza, to become a major West Coast chain with more than 450 stores in seven States, and to engage in international franchise development.

Over the last 15 years, Round Table diversified from acting exclusively as a franchisor to also operating company owned stores, ultimately acquiring and developing 140 company-owned stores and increasing its employee base from 70 to a peak of more than 3,000 employees.

During the decade prior to the Great Recession, Round Table enjoyed tremendous growth in revenues and operating profits.  Between 1997 and 2006, revenues grew from $15 million to $120 million per year, and operating profits grew from $4.3 million to $10.5 million.

**B.     The Credit Facility**

Having enjoyed consistent profitable expansion over the preceding decade, Round Table sought a new credit facility that would support further expansion, including a planned acquisition of more than 35 stores.  In February of 2007, Round Table closed a $65 million Credit Facility jointly provided by the Secured Lenders.

2
DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

The Credit Facility provided for borrowings of up to $65 million dollars to repay outstanding indebtedness and to fund further expansion. The Credit Facility imposed a floating interest rate, originally set at 2.75% to 3.75% over LIBOR or 2.00% to 3.00% over prime. Based on Round Table's performance, the initial interest rate on the Credit Facility was 3.25% over LIBOR.

The Credit Facility contemplated payment of interest only for the first year, followed by two years of relatively low amortization ($1.25 million in 2008 and $1.25 million in 2009) followed by a high level of principal repayment: $5.625 million in 2010 and beyond. In 2006-07, at the time the schedule was negotiated, Round Table had been enjoying a decade of substantial and uninterrupted growth, was expecting imminently to acquire 35 company stores and to build an additional 65 company stores, and then projected 2010 revenue in excess of $210 million. Projecting the future on the basis of past experience and then-current plans for growth, the negotiated rates of principal repayment seemed reasonable to Round Table.

**C.     The Great Recession**

Unfortunately, the Great Recession followed shortly after the inception of the Credit Facility. Round Table's management was sensitive to the economic environment, especially regarding employment, since there is an extremely close relationship between employment levels and Round Table's unit sales. Round Table's management responded promptly to increases in unemployment in mid-2007 and the onset of the Great Recession. In late 2007, management halted the growth which had driven the company for the preceding decade, shelving plans to acquire more than 35 stores and ultimately terminating all efforts to acquire or develop new company stores.

As the Great Recession continued, the company focused on reducing expenses. General administrative and overhead expenses were reduced from $12.2 million dollars in 2006 to $6 million dollars in 2009, while Round Table increased market share by 4% during the same period. Round Table's management addressed the profitability and performance of the company stores by closing under-performing stores as leases expired, seeking concessions from landlords and selling

3     DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

some of the stores to franchisees. Round Table's management also reduced costs above the company store level, ultimately engaging in 5 rounds of lay-offs and severing a total of 54 employees.

Management led the cost reductions. Corporate employees and senior management received no merit increases in 2007, 2009 and 2010, and only a 2.6% increase in 2008. Historically, corporate employees had received low salaries counterbalanced by high bonuses, but only a nominal bonus ($125,000 among 85 employees) was paid in 2007, and no bonuses were earned or paid in 2008, 2009 and 2010. Management also forfeited more than $500,000 in compensation rights and vacation pay to improve the company's performance.

In addition, in response to the Great Recession, senior management deferred almost $2 million dollars in compensation, compensation which had been earned by exceeding performance targets from 2005 through 2007 but was first payable in 2008. Although ample funding was available to pay that compensation at the time, Round Table deferred entitlements to the receipt of compensation because it recognized that the cash would be useful to the company in weathering the approaching storm.

In the midst of the Great Recession, Round Table was required to address and resolve two significant issues. First, Round Table, as many retail chains doing business in California, was sued in two wage and hour class action lawsuits. Round Table disputed the allegations and settled the litigation without any acknowledgment of guilt or wrongdoing, but aggregate costs associated with these lawsuits exceeded $4.3 million, imposing additional strains on the company's liquidity. Unpaid obligations under the class action settlements currently aggregate about $380,000.

In 2010, the pizza market became extremely price competitive as a result of the Great Recession. Round Table could not materially reduce the cost of its ingredients, since it had established its reputation as "the last honest pizza." The lower margins during this period put additional stress on Round Table's profitability.

**D.      Inability to Restructure Credit Facility**

4      DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

Early in 2008, near the beginning of the Great Recession, Round Table recognized that the principal repayment schedule contemplated by the Credit Facility would be impossible to satisfy, and sought to negotiate modifications of its obligations under the Credit Facility that would permit ongoing performance in this changed economic environment. Ultimately, Round Table entered into four amendments to the Credit Facility with the Secured Lenders. However, as the Great Recession continued, it became clear to Round Table that it would not be able to perform its obligations under the Credit Facility, as amended, without additional significant modifications. The Secured Lenders were not willing to agree to such modifications.

By December 2010, Round Table was in default under the Credit Facility. As a result, in accordance with the rights given to them under the Credit Facility, the Secured Lenders terminated Round Table's right to use LIBOR as the reference interest rate under the Credit Facility, and imposed a default interest rate. As of the Petition Date, the interest rate being charged on the Credit Facility was 12.05%.

**E.      The Current Business**

There are two core aspects to Round Table's business: Round Table franchises its business to independent third party owner-operators, and operates company-owned stores. In the aggregate, those two sectors provided a solid business, with operating profits.

There are currently approximately 348 franchised stores, operated by approximately 150 franchisees. The franchise base is highly diversified: 91% of the franchisees own five stores or less, and only two franchisees own 20 to 25 stores. Management believes that the franchise segment of Round Table's business is sound, produces stable profits, and does not require reorganization. The below graph shows The Round Table Franchise Corporation ("RTFC") operating profit net of the overhead associated with Round Table Pizza, Inc. ("RTP") in millions of dollars on an annual basis from 2007 to 2010.

DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011



Prior to the petition date, Round Table operated 128 company-owned stores. That business segment suffered a very substantial erosion in operating profitability over the past four years due to the Great Recession, as reflected below.



About half of that erosion in profitability was localized in about 30 unprofitable stores, which became increasingly unprofitable as the Great Recession continued.

**F.    The 2010-11 Sale Effort**

As noted, due to declining profits precipitated by the Great Recession, Round Table was unable to perform its obligations under Credit Facility. As a result, management turned to a sale process.

After a comprehensive review of the qualifications of three investment bankers, Round Table chose North Point Advisors as its investment banker: North Point was responsible for the sale of over half of restaurant companies that had been sold in the last five years, and had achieved attractive average market multiples in those sales. Through North Point, 118 potential buyers

6          DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

were contacted, of which 54 executed non-disclosure agreements and received due diligence materials. Round Table received 17 proposals (written and verbal) and proceeded to serious negotiations with the most favorable.

In commencing the sale process, Round Table felt that it had assurances from the Secured Lenders to support the process and provide financing to prospective bidders. However, the Secured Lenders assert that they never made any commitment or other agreement or undertaking to provide financing to any bidder, and declined to finance the highest bids that Round Table received in the sale process. Ultimately, these bidders withdrew from the sale process and the only remaining bids were insufficient to satisfy all of Round Table's liabilities and provide a recovery for the ESOP.

Round Table believes that the Secured Lenders' refusal to finance these bids was not consistent with the prior assurances that Round Table believes it was given. As a result, Round Table believes that it might have potential claims and causes of action against the Secured Lenders. The Secured Lenders adamantly dispute that Round Table has any claims or causes of action against them related to the sale process or the Credit Facility. Among other things, the Secured Lenders assert that (i) they never made any commitment or other agreement or undertaking to provide financing to any bidders, and specifically the bidders identified by Round Table, (ii) notwithstanding the lack of any contractual or legal obligation to do so, they did in fact support the sale process by waiving certain defaults under the Credit Facility and agreeing to certain amendments to the Credit Facility, (iii) they fully adhered to their contractual and legal obligations at all times, and (iv) bidders withdrew from the sale process due to a number of reasons and factors unrelated to the financing. The Secured Lenders have stated that they would defend themselves vigorously if any claim or cause of action were brought against them.

Due to the failure of the sale process, Round Table commenced the instant Chapter 11 case on February 9, 2011.

### III. THE BANKRUPTCY CASE

**A.     The Business Reorganization**

DISCLOSURE STATEMENT TO ACCOMPANY FIRST AMENDED JOINT PLAN DATED OCT. 26, 2011

Over the first eight weeks of the Chapter 11 case Round Table closed unprofitable stores. Since the bankruptcy filing, Round Table has negotiated with landlords to render marginal stores profitable. The results of this effort have been dramatically favorable.

First and foremost, by closing 22 unprofitable stores, Round Table avoided $1.5 million in 2010 EBITDA[1] loss (after overhead), thereby directly increasing its EBITDA by that amount. Second, Round Table has transferred sales from the closed stores to nearby Round Table restaurants. Third, Round Table negotiated lease modifications which reduced rent by $1.8 million on locations Round Table will keep, thereby also increasing operating profitability. Fourth, Round Table has reduced its selling, general and administrative expenses. Finally, Round Table negotiated lease modifications that will eliminate $1.4 million in rejection damages claims it would otherwise face.

Round Table has concluded restructuring its business operations. Specifically, on an annualized basis, Round Table projects that its current operations will generate $9.1 million of annual EBITDA commencing in 2012.

**B.    Legal Developments in the Bankruptcy Case**

1.    The Debtor

Round Table's core management team consists of J. Robert McCourt, CEO and President, Ted Storey, Vice President and General Counsel, and D. Keith Davis, Chief Financial Officer. Round Table's Board of Directors (the "Board of Directors"), which met regularly and actively engaged in the Chapter 11 process, consists of the foregoing core management team and the following independent outside directors: Peter H. Mattson; Robert A. Fox; Eric H. Bjerkholt; and Jack Robertson, Chairman of the Board.

---

[1]    Earnings Before Interest Taxes Depreciation and Amortization is a key measure of a business' operating profitability. Businesses, especially in Round Table's business segment, are often valued on the basis of a multiple of EBITDA. The historical average EBITDA multiple from Round Table's annual ESOP appraisal is 6.2x EBITDA.

DISCLOSURE STATEMENT TO ACCOMPANY FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

Through Orders entered on April 15, 2011 [Docket Nos. 334, 335], the Court authorized Round Table to retain the McNutt Law Group, LLP and St. James Law, P.C. as Chapter 11 co-counsel.  Thereafter, the Court entered Orders authorizing the employment of the following special counsel and professionals :

| Professional | Specialty |
|---|---|
| Snell & Wilmer, LLP | Franchise Law |
| Littler Mendelson P.C. | Employment Law |
| Hinman & Carmichael LLP | Liquor Law |
| Farella Braun & Martel LLP | Corporate Law, Advice to Board of Directors, Litigation |
| Davis Wright Tremaine LLP | ERISA / Tax Advice, Trademark Law |
| Johanson Berenson LLP | ERISA Law |
| Cooper White & Cooper LLP | Franchise Litigation |
| Frank, Rimerman + Co LLP | Auditors and Tax Accountants |
| Huntley Mullaney Spargo & Sullivan ("HMS") | Real Estate Lease Consultants |
| InfoSync Services | Out-Sourced Accounting Department |

2.    <u>Selection of Estate Representatives</u>

Following the commencement of the bankruptcy case, the Office of the United States Trustee issued its initial Appointment of members to the official Creditors' Committee (the "Creditors' Committee") which designated the following members of the Creditors' Committee: William Foley, Round Table's former Vice President of Operations, who asserts a claim for deferred incentive compensation and is a Participant in the ESOP; Laurel Leone of Leone Advertising, which is a trade creditor; and Mario Albert of Bowman Commercial Development, a commercial landlord which leased two premises to Round Table; one of which was rejected and the other of which has been assumed.

Thereafter, on August 18, 2011, the Office of the United States Trustee issued its Supplemental Notice of Appointment of Creditors' Committee [Docket No. 749] adding N&A Ventures Inc. and the Harlan Family Trust to the Committee, both of which are unsecured note

1  holders.

2      Through an Order entered on April 15, 2011, the Court authorized the Creditors'

3  Committee to retain as its counsel Brownstein Hyatt Farber & Shrek LLP [Docket No. 336].

4  Through an Order entered on April 29, 2011, the Court authorized the Creditors' Committee to

5  retain Bailey, Elizondo Brinkman LLC as its financial advisor [Docket No. 414].

6      Following the commencement of the case, Round Table brought a Motion to Appoint a

7  Discretionary, Independent and Institutional Trustee to represent the interests of the Employee

8  Stock Ownership Joint Plan (the "ESOP"). Applicable ERISA law would have required the Board

9  of Directors and Management to act *exclusively* in the interests of the ESOP beneficiaries had they

10 continued to guide the ESOP, which would have conflicted with their duties under the Bankruptcy

11 Code to act in the interests of *all* of the creditor constituencies. On June 29, 2011, the Court

12 entered its Order granting the Motion and authorizing the appointment of First Bankers Trust

13 Services, Inc. as ESOP Trustee [Docket No. 614].

14     Thereafter, the Court entered orders authorizing the ESOP Trustee to employ Boylan

15 Brown as its general counsel and Wendel Rosen Black & Dean LLP as its local counsel. On

16 September 2, 2011, Counsel for the ESOP Trustee filed the ESOP's application to employ Meyers,

17 Harrison & Pia, LLC as the independent appraiser and financial advisors to the ESOP Trustee.

18 The Court Subsequently entered an order granting the application.

19     The Round Table Owners Association moved the Court to an appoint an Official

20 Franchisees' Committee, which the Court denied.

21     3.    Leases

22     The Bankruptcy Code establishes an arbitrary deadline for the assumption or rejection of

23 leases. Through an Order entered on April 14, 2011, the Court deferred that deadline to the

24 furthest extent legally permissible, which is September 7, 2011. As discussed with respect to the

25 business reorganization above, Round Table engaged in extensive dialog with the landlords early

26 in the case, renegotiating leases where practicable, rejecting leases where a renegotiation was not

27 possible. Round Table determined to retain and assume all of the leases under which it currently

28

10    DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

operates Stores, and obtained an Order assuming those leases on September 6, 2011, immediately prior to the deadline.

The major exception is the lease for Round Table's corporate headquarters, which represents a very major long-term commitment. Round Table obtained, through the landlord's consent, an extension of the September 7, 2011 deadline and intends to engage in substantive dialog promptly so as to reach a conclusion respecting that lease. Round Table is engaged in negotiations with the landlord.

4. <u>Plan Process</u>

On April 25, 2011, Round Table filed its Initial Plan of Reorganization with the Court (the "Initial Plan"). The accompanying Explanatory Statement expressly stated that Round Table sought to present its thinking with clarity, and encouraged dialog with the key parties in interest to adjust the Initial Plan into a document that would enjoy broad support. Thereafter, and within the "exclusivity period" within which only the debtor may prosecute confirmation of a Plan of Reorganization, Round Table filed its Plan of Reorganization dated June 9, 2011 (the "June 9[th] Plan").

In July 2010, Round Table, the Creditors' Committee, the ESOP Trustee and the Secured Lenders agreed to try to mediate the disagreements among them relating to the June 9th Plan and the plan process. Thereafter, Round Table engaged in direct discussions with the Secured Lenders regarding the terms of a consensual plan of reorganization. Following a final mediation session on August 30, 2011, Round Table, and the Secured Lenders agreed to the principal business terms of a consensual plan of reorganization, which are reflected in the Joint Plan.

## IV. **ROUND TABLE'S CONSTITUENCIES**

In evaluating its reorganization and the available alternatives, Round Table has been mindful of the motivations and entitlements of its key constituencies, described below.

**A.     The Secured Lenders**

The Secured Lenders hold a claim for approximately $37.4 million, secured by a duly

11         DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

perfected and enforceable lien encumbering all of Round Table's assets.

**B.     The Unsecured Creditors**

Round Table estimates that general unsecured claims will aggregate approximately $7,238,000.     The unsecured creditors in this case fall into five distinct categories, as presented in the following table:

| | | |
|---|---|---:|
| Lease Rejection Claims | $ | 1,316,000 |
| Trade / Other Unsecured | $ | 1,943,000 |
| Claims of Current Management | $ | 1,250,000 |
| Claims of Former Management | $ | 1,460,000 |
| ESOP (less priority portion) | $ | 1,269,000 |
| Total General Unsecured | $ | 7,238,000 |

1.     Lease Rejection Damages

Since the filing date, Round Table has closed 22 unprofitable stores and rejected the associated leases; it also rejected 2 unexpired leases related to previously closed stores.  Round Table estimates aggregate lease rejection claims at $1,316,000, giving effect to certain agreements Round Table negotiated to reduce such claims.

2.     Trade Debt

Round Table acknowledges $1,943,000 in trade debt and other general unsecured claims. The largest component of this category is approximately $638,000 in ordinary trade debt followed by $600,000 in outstanding obligations associated with promissory notes issued by Round Table to purchase stores from franchisees.  Another significant component is approximately $361,000 owed in connection with a prior settlement of certain class action litigation.

3.     Management / Long Term Incentive Plan Debts

Round Table acknowledges management-related claims aggregating approximately $2,710,000, primarily derived from a failure to pay long term incentive plan obligations.  Of that amount, $1,460,000 represents claims held by former management, no longer employed by Round Table.

12     DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

1        Unlike many companies, as a practical matter Round Table is unable to offer senior

2  managers stock as a significant portion of their compensation because it is a Subchapter S

3  corporation wholly owned by an Employee Stock Ownership Trust.  Instead, Round Table has

4  been principally reliant on monetary compensation to incentivize and reward management.

5  Historically, Round Table paid below-market fixed compensation and used performance bonuses

6  to render its managers' compensation competitive with the marketplace.

7        In response to the Great Recession, Round Table did not pay bonuses or other

8  discretionary compensation.  In addition, Round Table deferred payment of almost $2 million in

9  senior management compensation, compensation which had been contingent on meeting certain

10  performance targets for the period from 2005 through 2007 – which were met – but were now

11  deferred by Round Table notwithstanding the fact that they were otherwise due and payable in

12  2008.  Although funding was available to pay that compensation at the time, Round Table deferred

13  management's compensation because it recognized that the cash would be useful to the company

14  in weathering the approaching storm.

15        Round Table recognizes or estimates other monetary obligations owed to management.

16  The next largest obligation consists of severance and related obligations owed to James Fletcher,

17  Round Table's former Chief Executive Officer, who was involuntarily severed shortly before the

18  filing of this case.  For purposes of estimation, Round Table has assumed that his severance claim

19  will be limited to one year's compensation pursuant to Section 502(b)(7) in the amount of

20  approximately $500,000 in salary and benefits.

21  **C.     ESOP**

22        Round Table is entirely owned by its sole shareholder, the Round Table Restated

23  Employee Stock Ownership Joint Plan & Trust (the "ESOP").  The ESOP is subject to a separate

24  legal regime ("ERISA").

25        Certain aspects of the ERISA regime are mandatory, other aspects are voluntary.  ERISA

26  does not guarantee retirement plan participants any particular dollar amount of benefits.  In

27  principle, a company may be required to make two types of payments to an ESOP.  The company

28

  DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

may make an employer contribution to the plan, ordinarily measured as a percentage of wages (or of a subset of wages). Certain employer contributions are required under the Internal Revenue Code of 1986, as amended (the "Code"), and/or ERISA. One form of such required contributions is the "safe harbor contributions" that an employer may make to a trust maintained pursuant to an ERISA plan in order for an employer to satisfy certain non-discrimination requirements under the Code for disparity in contributions by or for highly compensated employees versus non-highly compensated employees. Through year-end 2010, Round Table's mandatory employer contribution level for safe harbor contributions was 3% of designated types of wages for certain designated employees. Commencing effective January 1, 2011, Round Table was not subject to any mandatory employer contribution.

For a variety of reasons, certain safe harbor contribution amounts that were due to be paid for 2009 and 2010 in 2010 and 2011 were not paid. The ESOP Trustee has filed a Proof of Claim, Claim No. 237, of which $256,000 is entitled to priority status under the Bankruptcy Code and $1,269,463.82 is a general unsecured claim (collectively, the "ESOP Obligation").

Round Table believes that monetary safe harbor contributions owed to the ESOP that were incurred prior to the commencement of the bankruptcy case constitute general unsecured claims against its estate and are not subject to avoidance or subordination. See, *In re Merrimac Paper Co.,* Inc., 420 F.3d 53 (1st Cir. 2005) (categorically rejecting subordination of stock redemption note given by debtor pursuant to an ESOP Joint Plan). The general unsecured claim filed by the ESOP, less the priority claim portion, is approximately $1,269,463.82 (the "ERISA Unsecured Claim").

In order to rectify compliance issues with respect to the ESOP, Round Table sought to (1) secure agreement with the Secretary of the U.S. Department of Labor that the rights of all affected ESOP participants and beneficiaries to any deferred ESOP distributions will be protected under a Voluntary Fiduciary Correction Program filing submitted by the Debtor pre-petition and as thereafter supplemented in an effort to secure a no-action letter and (2) to secure agreement with the Internal Revenue Service that the ESOP's qualified status under Section 401(a) and 501(a) of

DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

the Internal Revenue Code has been maintained through the corrective actions taken pursuant to the Debtor (collectively, the "VCP / VCFP Process"). Round Table believes that the business reorganization contemplated by the Joint Plan of Reorganization will assist Round Table in accomplishing these objectives.

In addition, the ESOP holds all of the capital stock in Round Table, stock which Round Table believes should have material value as a result of the business reorganization described above.

ERISA imposes on Round Table as the plan sponsor of the ESOP a statutory obligation to enable the ESOP participants to "diversify" or to provide liquidity for certain portions of the Round Table stock allocated to their Stock Accounts (the "diversification obligation"). The ESOP's principal asset is illiquid stock in Round Table. Under certain circumstances, individual ESOP participants become entitled to diversify a portion of their beneficial equity interest into a more liquid vehicle of investment; e.g., cash or marketable securities. Round Table also has a continuing obligation, within certain parameters, to provide cash to the ESOP participants who have this diversification right, thereby providing liquidity to those ESOP participants and beneficiaries entitled to diversify their benefits.

ERISA further imposes certain requirements on the ESOP to provide distributions to ESOP participants and beneficiaries. ERISA specifies that these distributions may occur in the form of cash payments from the ESOP or in stock distributions that Round Table is required to repurchase. Round Table has made filings with both the Internal Revenue Service and the U.S. Department of Labor that contemplate the future resolution of these ESOP contribution, distribution and diversification obligations in a manner that is consistent with ERISA and the Internal Revenue Code. Round Table believes that under the Joint Plan it will have the resources necessary to make the minimum contributions or distributions to the ESOP participants and beneficiaries that are required under otherwise applicable non-bankruptcy law. The Secured Lenders have agreed to permit these ongoing contributions and distributions to be made, to the extent not inconsistent with the Amended Credit Agreement.

15      DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

Round Table believes that confirmation of the Joint Plan will enable it to return to compliance with ERISA and the Internal Revenue Code respecting the administration of the ESOP.

## V.  PLAN OF REORGANIZATION

### A.    Summary

Once Round Table concluded that a Chapter 11 filing was necessary, it utilized the case to maximize its value, closing unprofitable stores, transferring sales to nearby Round Table restaurants, reducing selling, general and administrative expenses and negotiating favorable lease modifications.  The goal of those efforts has been to increase Round Table's operating profitability by having fewer, more profitable stores.

Round Table believes that its current and future profitability makes it possible for it to propose a self-funded Joint Plan that will repay unsecured creditors in full, provide appropriate debt service and principal repayment to the Lenders and afford Round Table a reasonable opportunity to sell or refinance, thereby potentially realizing material value for the participants and beneficiaries of its ESOP.  That is the approach contemplated by the Joint Plan.

Set forth below is a summary of certain of the material provisions of the Joint Plan.  This summary is subject in all respects to the actual terms of the Joint Plan.  To the extent that there is any discrepancy between this summary and the actual terms of the Joint Plan, the terms of the Joint Plan shall control.

### B.    Payment of Administrative Claims

In order to confirm a plan of reorganization, all administrative expenses must be paid in cash, in full, not later than the Effective Date.

In this case, administrative claims fall in two distinct categories.  The largest group of administrative expenses are the fees and costs of professionals (generally, law firms and financial advisors) employed by the bankruptcy estate; e.g., Round Table, the Creditors' Committee and the ESOP Trustee.  Since July of 2011, these fees have been paid at the rate of 80% on an interim basis, subject to subsequent review and potential allowance of these amounts and the remaining

DISCLOSURE STATEMENT TO ACCOMPANY FIRST AMENDED JOINT PLAN DATED OCT. 26, 2011

1  20% held back from these payments.  Also included within this category is the success fee owed

2  to HMS with respect to its efforts to achieve lease modifications.

3      Second, the Office of the United States Trustee is entitled to a fee measured by

4  disbursements during the pendency of the bankruptcy case.

5      Round Table's current estimate of the foregoing administrative expenses which would be

6  payable on the Effective Date (or as soon thereafter as allowed by the Court) is as follows:

| Professional | Description | Estimate |
|---|---|---|
| McNutt Law Group | Debtor Bankruptcy Co-Counsel | $276,000 |
| St. James Law, P.C. | Debtor Bankruptcy Co-Counsel | 205,000 |
| HMS | Debtor Real Estate Advisory Services | 1,257,000 |
| Snell & Wilmer, LLP | Debtor Franchise Law Counsel | 6,500 |
| Littler Mendelson P.C. | Debtor Employment Law Counsel | 1,600 |
| Farella Braun & Martel LLP | Debtor Corporate Law, Advice to Board of Directors, Litigation Counsel | 9,000 |
| Davis Wright Tremaine LLP | Debtor ERISA / Tax Advice, Trademark Law Counsel | 5,600 |
| Johanson Berenson LLP | Debtor ERISA Law Counsel | 84,000 |
| Frank, Rimerman + Co LLP | Debtor Auditors and Tax Accountants | 26,000 |
| InfoSync Services | Debtor Out-Sourced Accounting Department | 0 |
| Cooper, White & Cooper LLP | Debtor Franchise Law Counsel | 17,000 |
| Brownstein Hyatt Farber & Shrek LLP | Creditors' Committee Counsel | 110,600 |
| Bailey, Elizondo Brinkman LLC | Creditors' Committee Financial Advisor | 22,600 |
| First Bankers Trust Services, Inc. | ESOP Trustee | 0 |
| Boylan Brown | ESOP Trustee General Counsel | 34,000 |
| Wendel Rosen Black & Dean LLP | ESOP Trustee Bankruptcy Counsel | 11,400 |
| Meyers, Harrison & Pia, LLC | ESOP Trustee Financial Advisor | 0 |
| Total | | $1,979,300 |

DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

Case: 11-41431    Doc# 1056    Filed: 10/26/11    Entered: 10/26/11 17:12:16    Page 22 of 53

Note:  The foregoing table identifies the amounts estimated by Round Table and the professionals involved.  No amounts are final unless and until approved by the Bankruptcy Court, and the Court may approve amounts materially different from the amounts sought by the professionals.  Round Table reserves all of its rights (including its right to object) respecting the amounts set forth above.

## C.    Treatment of Creditor and Equity Classes

The Joint Plan has 7 classes, of which the most significant in terms of total Claims and Interests are: the Secured Lenders' secured debt, unsecured claims, and the ESOP's Interests in RTP.  Unsecured creditors, other than holders of priority claims, are offered an election regarding their treatment (as more fully set forth below).  The classes and their treatment are summarized below.

### Class 1:        The Secured Lenders

The Secured Lenders hold claims secured by duly perfected and enforceable security interests on substantially all of Round Table's assets.  The Joint Plan includes a settlement of the Secured Lenders' claims.  In exchange for a release by Round Table and certain other parties more fully discussed below, the Secured Lenders have agreed to waive any claim they might have for unpaid default interest under the Credit Facility.  Such default interest totals nearly $500,000 as of the date hereof.  Round Table has agreed to provide such releases and has agreed that the Secured Lenders shall have an allowed claim (the "Secured Lenders' Claim") equal to:  (i) $31,495,399.70, which is the outstanding principal amount owed under the Credit Facility,  plus (ii) $112,458.33, which is the amount of unpaid fees owed to the Secured Lenders as of the Petition Date, plus (iii) $2,883,781.69, which is the amount of unpaid interest that has accrued at the non-default rate on and before August 31, 2011, plus (iv) all interest that accrues at the non-default rate under the Credit Facility (currently 10.05%) from September 1, 2011, through the Effective Date, plus (v)  unpaid costs and expenses through and including August 31, 2011, in the amount of approximately $2,000,000, payable to the Secured Lenders under the Credit Facility, plus (vi) all costs and expenses incurred by the Secured Lenders from and after September 1, 2011, through

18        DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

the Effective Date, <u>minus</u> (vii) any amounts held as of the Petition Date by the Secured Lenders as a retainer paid by Round Table, <u>minus</u> (viii) any amounts actually paid to the Secured Lenders by or on behalf of Round Table (including as a result of asset sales) from the Petition Date through the Effective Date.

<u>Joint Plan Treatment</u>:

The Joint Plan contemplates that the Secured Lenders will receive interest and principal payments at the end of each calendar quarter. The interest rate following the Effective Date will be 9%; unpaid interest until the Effective Date will accrue at 10.05%, less than the rate the Secured Lenders are entitled to receive under the loan documents.

Round Table will waive all claims against the Secured Lenders upon confirmation of the Joint Plan, specifically including claims associated with the Secured Lenders' conduct in connection with the pre-bankruptcy sale process and the administration of the Credit Facility over the years.

Following the Effective Date, principal will be paid down quarterly, at the annual rate of 9% commencing in 2012. The Credit Facility has been modified somewhat, in order to accommodate the Joint Plan provisions and the parties' current circumstances. Round Table and the Secured Lenders contemplate filing the Amended Credit Facility in a Plan Supplement no Later than November 21, 2011.

Following the Effective Date, the Secured Lenders may cause a designee to attend meetings of the Board of Directors as an observer. The initial such designee will be Stan Springel of Alvarez & Marsal, the Secured Lenders' financial advisor.

The entire outstanding balance of the Secured Lenders' Claim shall be fully due and payable on July 31, 2013.

*Lender-Initiated Sale Procedure:* An essential element of the treatment of the Secured Lenders is the remedy available to them if (a) Round Table breaches the Amended Credit Documents, or (b) the Class 1 obligation matures and is not timely paid. In either event, the Secured Lenders may initiate a "Lender-Initiated Sale Procedure," which is effectively a Court-

DISCLOSURE STATEMENT TO ACCOMPANY FIRST AMENDED JOINT PLAN

DATED OCT. 26, 2011

mandated foreclosure.

Specifically, the bankruptcy case will be re-opened and the Bankruptcy Court will supervise an auction sale of Round Table's assets. The Secured Lenders may credit bid their Class 1 debt; any other bidder must bid all cash and close the sale immediately after the auction. If the Lender-Initiated Sale Procedure is initiated, Round Table does not anticipate that there will be competitive bidding, and thinks it most likely that the Secured Lenders' credit bid will be the high bid, and quite probably the only bid, at the auction. There are various provisions designed to prevent efforts to challenge or block the Lender-Initiated Sale Procedure which Round Table anticipates would prove effective.

Round Table does not presently anticipate circumstances that would lead it to default under the Amended Credit Documents and thereby trigger the Lender-Initiated Sale Procedure. Similarly, Round Table expects to sell substantially all of its assets or refinance all amounts outstanding under the Amended Credit Documents prior to the maturity of the Class 1 Claim. Should the unexpected occur and the Secured Lenders trigger the Lender-Initiated Sale Procedure, however, it is unlikely that creditors or equity holders will enjoy any further recovery, except to the limited extent contemplated by the "backstop" for certain unsecured creditors, described below.

It is not clear that the foregoing treatment could be imposed on the Secured Lenders non-consensually, but under the Joint Plan, the Secured Lenders have agreed to accept this treatment.

**Class 2:**      **Priority Claims**

As of the filing date, Round Table had priority claim obligations to various taxing authorities and its employees. Through the First Day Orders, the Court approved the payment of all tax priority and all employee priority claims, so those have already been paid in full and are no longer at issue.

The only remaining extant priority claim is the employee benefit claim of the ESOP respecting Joint Plan contributions accrued during the 180 days prior to the filing date. The claim filed by the ESOP Trustee is in the amount of $256,000.

DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

Joint Plan Treatment:

Round Table proposes to pay in full on the Effective Date the allowed amount of any priority claim. As contemplated by ERISA, the ESOT's priority claim will also receive interest, measured at the applicable ERISA rate. The Debtors do not believe that any interest will be due if the claim is paid on or before December 31, 2011. The amount of the ESOT' priority claim is reflected in Effective Date payments on Schedule A, without interest. Although no interest is shown on Schedule A, it is possible that Round Table will need to pay some amount of interest on the ESOT's priority claim.

**Class 3:          General Unsecured Claims**

Under the Joint Plan, all general unsecured creditors will receive payment in full, in quarterly installments over four years, with simple fixed interest at the rate of 6% from February 9, 2011 (Class 3B). A limited number of Creditors may obtain the alternative of receiving 40% of the amount of their claims on the Effective Date in full satisfaction of their Unsecured Claims (Class 3A).

Joint Plan Treatment:

*Class 3A:*          $866,000 (the "3A Fund") has been set aside to fund distributions to general unsecured creditors who are willing to take immediate payment of 40% of their Allowed claims in full and final satisfaction.

*Class 3B:*          Under the Joint Plan, Round Table will repay the full face amount of all allowed general unsecured claims (other than those treated under Class 3A) in sixteen equal quarterly installments commencing on March 31, 2012 and continuing through and including December 31, 2015. In addition, Round Table will accrue simple fixed interest on such claims at the rate of 6%, starting from the Petition Date, all of which interest shall be paid with the final quarterly payment. In the event that any portion of the $866,000 allocated to Class 3A distributions is unused, it shall be dedicated to funding a distribution to Class 3B creditors.

*Election:*          The election for Class 3A treatment must be made on the Ballot. Holders of

21          DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

Allowed claims of $5,000 or less are assumed to prefer the Class 3A cash-out, but can instead elect to receive payment in full with interest (Class 3B treatment). All other creditors must affirmatively elect to receive treatment under Class 3A or will be assumed to prefer Class 3B. To the extent that the 3A Fund is insufficient to satisfy all electing creditors, Round Table shall select the creditors who will be afforded that treatment, with the objective of expending as close to the full amount of the 3A Fund as possible. To the extent that the 3A Fund exceeds the amount necessary to satisfy all electing creditors, such excess will be added to the funds distributed to Class 3B creditors in the initial distribution.

*Backstopped Claims:* Under the Plan, the Secured Lenders have agreed to "backstop" a recovery for certain creditors subject to certain restrictions and limitations. The Creditors entitled to this "backstop" are generally holders of Allowed Class 3B Claims other than (i) the ESOP Trustee, the ESOP or persons who were members of management after January 1, 2011 (or transferees of the Claims of such Persons) and (ii) Creditors who have sued, or have threatened in writing to sue, the Secured Lenders. Under this "backstop," if Creditors in Class 3A and Class 3B (including, without limitation, Creditors holding Backstopped Claims) receive less than $1.8 million in the aggregate under the Joint Plan, the Secured Lenders will cause the holders of Backstopped Claims to receive from funds that would otherwise be paid to holders of Allowed Class 1 Claims, the difference between $1.8 million and the actual aggregate amount distributed to holders of Class 3A Claims and holders of Class 3B Claims under the Joint Plan. Once $1.8 million or more in the aggregate has been distributed on account of Class 3A and Class 3B Claims under the Joint Plan, the "backstop" will terminate, and the Secured Lenders will have no further obligation thereunder..

***PLEASE NOTE: The Creditors' Committee has indicated that the "backstop" set forth in the Joint Plan and described in the preceding paragraph is not consistent with its understanding of the agreement in principle it reached with the Debtors and the Secured Lenders regarding the terms of the Joint Plan. As a result, the Creditors' Committee has indicated that it might object to the Joint Plan. The Debtors and the Secured Creditors believe***

22    DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

1  *that the Joint Plan is fully consistent with the agreement in principal they reached with the*

2  *Creditors' Committee. Certain other Persons have indicated that they might object to the Joint*

3  *Plan unless the "backstop" provisions of the Joint Plan are modified or removed in their*

4  *entirety. Specifically, the ESOP Trustee, in its capacity as an unsecured creditor, has indicated*

5  *that it objects to the ESOP participants being excluded from the benefits accorded to other*

6  *unsecured creditors and has insisted that the Class 3B Claims of the ESOP Trustee and the*

7  *ESOP not be excluded from the Backstopped Claims. Additionally, the Court might determine*

8  *that it cannot confirm the Joint Plan with the "backstop" provisions because, for example,*

9  *those provisions benefit some but not all Unsecured Creditors.*

10  *In order to maximize the prospects for Confirmation of the Joint Plan and to secure as*

11  *broad consent as possible for the Joint Plan, the Secured Lenders have reserved the right under*

12  *the Joint Plan to modify the "backstop" or withdraw and/or terminate the "backstop," without*

13  *recourse or liability to any holder of a Backstopped Claim or any other Person. The Secured*

14  *Lenders can exercise their right of modification or withdrawal and/or termination at any time*

15  *before Confirmation. In particular, the Secured Lenders can exercise their right of withdrawal*

16  *and/or termination if (i) the Creditors' Committee files any objection to the Joint Plan or raises*

17  *any objection to the Joint Plan at the hearing to consider confirmation of the Plan, (ii) 50% or*

18  *more of the holders of Backstopped Claims voting on the Plan vote to reject the Plan or holders*

19  *holding 33% or more in amount of the Backstopped Claims voting on the Plan vote to reject the*

20  *Plan, (iii) any Person files or threatens to file an objection to the Plan based in whole or in part*

21  *on the "backstop" or (iv) the Court determines that the Joint Plan cannot be confirmed as a*

22  *result, whether in whole or in part, of the "backstop." If the Lenders withdraw or terminate the*

23  *"backstop," the "backstop" shall be null and void, and no holder of a Backstopped Claim or*

24  *any other Person shall have any rights with respect thereto.*

25  *In voting on the Joint Plan, Creditors should consider the possibility that the "backstop"*

26  *might be withdrawn or terminated by the Secured Lenders.*

27  *ERISA Unsecured Claims:*    For a variety of reasons, it is assumed that the ESOP Trustee

28

Case: 11-41431    Doc# 1056    Filed: 10/26/11    Entered: 10/26/11 17:12:16    Page 28
of 53

will not elect 3A treatment with respect to approximately $1.3 million in general unsecured claims held by the ESOT ("ERISA Unsecured Claims"). The Joint Plan recognizes that the requirements of the Internal Revenue Service and the Department of Labor with respect to the payment of the ERISA Unsecured Claims may differ from the requirements of the Bankruptcy Code and the Plan respecting general unsecured claims. Under the Joint Plan, Round Table shall, to the extent permitted under the Amended Credit Agreement, fund to the ESOT the minimum amounts required under ERISA. To the extent that funding of amounts required under ERISA, but in excess of the ESOT's pro rata distribution as a holder of a Class 3B Claim, can permissibly be deferred, it will be deferred until *after* all other holders of Class 3B Claims have been paid in full. Following the Unsecured Creditor Claims Pay-Off Date, Round Table shall fund such additional payments or provide any additional performance necessary to satisfy the requirements of the Internal Revenue Service and the Department of Labor and applicable ERISA and tax law generally.

**Class 4:        ESOP / Equity**

The ESOP trust (the "ESOT") holds all of Round Table's stock. The Joint Plan provides that the ESOP will keep the stock, subject to the obligations established by the Joint Plan. Until December 31, 2010, Round Table was obligated to make specified "safe harbor" "employer contributions" to the ESOT measured by eligible payroll; most recently, 3%. The funding of mandatory employer contribution was terminated for 2011 and thereafter, and such termination is ratified by the Joint Plan. Under certain circumstances, the Joint Plan does provide permission to fund mandatory stock repurchases and other required provisions of liquidity to the ESOT, provided that the ESOT does not otherwise have access to sufficient liquidity; i.e., through distributions on the priority and ERISA Unsecured Claims, and only to the minimum extent required by otherwise applicable non-bankruptcy law. As soon as the Class 3B unsecured creditors have been paid in full, Round Table will dedicate its cash and efforts to returning the ESOP to full compliance with ERISA and the Internal Revenue Code and to satisfying any unperformed obligations to the ESOP.   As part of this process, Round Table will seek "compliance letters" and/or "no action letters" from the Internal Revenue Service and the Department of Labor

DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

pursuant to the VCP / VCFP Process.

**D.     Executory Contracts**

The Bankruptcy Code classifies contracts as to which further performance is due from both sides as "executory".  Over the course of the bankruptcy case or under its plan of reorganization, a debtor must "assume" or "reject" all executory contracts.   In order to assume a contract, the debtor must cure all defaults and thereafter comply with the contract according to its terms.  If a contract is rejected, performance on both sides ordinarily terminates and the other party is entitled to assert a claim for damages, which will be treated as a general unsecured pre-bankruptcy claim; i.e., a Class 3 claim.  In this case, there are three important groups of executory contracts which have been or will be assumed in the Cases, including without limitation under the Joint Plan: Franchise Agreements, leases and employment contracts.

1.     <u>Franchise Agreements</u>

Round Table, through RTFC acts as franchisor to 150 independent franchisees that collectively own and operate approximately 348 stores.

RTFC routinely and predictably generates between $11 million and $13 million per year in net profits, based on franchise fee revenues of $15 million to $18 million (including from fee revenues from company stores) and operating expenses of $4 million to $5 million.  Round Table's franchise operations represent the product of 45 years of hard work and constitute a valuable asset of its estate.

The Round Table Owners Association filed a motion seeking to compel assumption or rejection of the Franchise Agreements [Docket No. 780].  In response, Round Table filed an opposition [Docket No. 813] and its Zero Cure Motion to Assume Franchise Agreements [Docket No. 826], seeking to assume all of its Franchise Agreements to the extent that (a) the franchisee did not object or assert a default in Round Table's performance, or (b) the Court rejected any such objection or asserted default.

Round Table also acts as franchisee with respect to approximately 106 company stores operated by Round Table Development Company ("RTDC") or its wholly owned subsidiary,

DISCLOSURE STATEMENT TO ACCOMPANY FIRST AMENDED JOINT PLAN DATED OCT. 26, 2011

1  Round Table Pizza Nevada, LLC.  In response to that Motion, RTDC and Round Table Pizza

2  Nevada, LLC filed statements supporting the assumption of their Franchise Agreements.  Due to

3  the requirements of the bankruptcy laws, RTDC and Round Table Pizza Nevada, LLC did not pay

4  pre-bankruptcy contributions to the Ad Fund, measured by revenues received in January 1 thru

5  February 8, 2011, in the approximate amounts of $322,000 and $16,000, respectively which were

6  first due on February 10, 2011, the day after the commencement of its bankruptcy case.  In

7  October 2011, Round Table will pay the portion of these obligations relating to operating Stores,

8  together with all applicable late fees and charges of approximately $40,000, as part of its "cure"

9  obligations as franchisee upon the assumption of the Franchise Agreement by RTDC and Round

10 Table Pizza Nevada, LLC with respect to the operating Stores.  The Ad Fund holds a Class 3B

11 Claim for the February Ad Fund contributions relating to closed Stores aggregating approximately

12 $50,000.

13     Round Table believes that RTFC as franchisor has not breached any of the Franchise

14 Agreements, and as a consequence, there is nothing it will be required to "cure" upon assumption

15 of the Franchise Agreements.  The Franchise Agreement requires franchisees who wish to assert

16 breaches to afford RTFC written notice and an opportunity to cure, and no such notice has been

17 received in at least a decade.

18     On October 14, 2011, the Court entered is order granting in its entirety the Round Table's

19 Zero Cure Motion to Assume Franchise Agreements.  The order provided for assumption of all

20 franchise agreements to which RTFC is a party.  The assumption of Round Table's franchise

21 agreements does not prevent any party from asserting breaches or defaults under the Franchise

22 Agreements in a forum outside of the bankruptcy process.  The Court also entered an order

23 denying in full the Round Table Owner's Association's motion seeking to compel assumption or

24 rejection of franchise agreements.

25     In certain cases, Round Table entered into "area development agreements" with

26 franchisees providing exclusivity rights within a specified geographical area, ordinarily in return

27 for commitments to develop those areas with additional franchised stores.  All of the area

28

26     DISCLOSURE STATEMENT TO ACCOMPANY
       FIRST AMENDED JOINT PLAN
       DATED OCT. 26, 2011

development agreements as to which RTFC is a party will be assumed, except to the extent that any individual area development agreement has been separately rejected during the course of the case or is identified as rejected on Schedule 5.2 to the Plan.

Round Table believes that it has not breached any of the area development agreements that will be assumed under the Joint Plan, and as a consequence, there is nothing it will be required to "cure" upon assumption of the area development agreements. Each area development agreement requires the counter-party or counter-parties who wish to assert breaches to provide written notice to RTFC and give RTFC an opportunity to cure. No such notice has been received with respect to any area development agreement to be assumed under the Joint Plan.

2.      Leases

Following the commencement of its bankruptcy case, Round Table rejected 24 leases and entered into lease modification agreements with numerous landlords. That process has concluded. On September 6, 2011, the Court entered its order effecting the assumption of the leases of all of Round Table's 106 operating stores [Docket No. 812]. The Joint Plan ratifies and adopts that Order.

Round Table obtained an extension of the deadline to assume or reject its lease for its corporate headquarters for up to 30 days after the Joint Plan is confirmed. Round Table is evaluating its alternatives respecting that lease and has reached no final conclusions as yet.

3.      Employment-Related Contracts

Under Round Table's employee benefit plans, employees are allowed to accrue vacation and sick leave benefits which they may thereafter use from time to time. At the outset of the case, Round Table obtained an order from the Court [Docket No. 124] authorizing it to honor employee vacation and sick leave claims, as well as salary that had accrued pre-petition, up to an aggregate of $11,750 per employee.

35 employees had entitlements to vacation and sick leave benefits in excess of the $11,750 aggregate maximum per employee ("suspended employee benefits"), and their right to access those employee benefits have been suspended during the pendency of the bankruptcy case. Under

the Joint Plan, the obligations associated with the employee benefit plans will be assumed and all employees will be entitled to make use of their employee benefits, subject to Round Table's usual policies. All claims for these benefits will be disallowed and not entitled to treatment under Class 3A or 3B.

The suspended employee benefits aggregate $340,000, which obligation would otherwise constitute a Class 3 claim. Round Table has never permitted employees to cash out benefit entitlements while employed by Round Table, and believes that it is preferable to accept ongoing responsibility for providing the employee benefits by assuming the employee benefit obligation.

In addition, 7 members of current senior management have "change in control" contracts and the Chief Executive Officer has an employment contract that will be assumed. These members are principally responsible for Round Table's future performance, and Round Table believes that they deserve assumption of their contracts. Round Table believes that a loss of senior management, as would likely result from the rejection of their contracts, would cast serious doubt on its ability successfully to operate in the future.

Rejection of these contracts would also give rise to rejection damages claims. While these rejection damage claims would likely be limited by Section 502(b)(7) of the Bankruptcy Code, Round Table estimates that they would still aggregate to at least $1.7 million. Were the employment contracts rejected, these damages claims would be entitled to treatment under Class 3A or Class 3B.

**E.      Means of Implementation**

      1.      <u>Revesting Subject to Joint Plan</u>

On the Effective Date, all property will revest in the Reorganized Debtor, free and clear of claims and liens, except as specified in the Joint Plan (which, among other things, preserves the liens of the Secured Lenders). From and after the Effective Date, the Reorganized Debtor can freely use or transfer cash and its assets, enforce its rights and exercise its powers, and otherwise conduct its business in its unfettered discretion, subject only to the requirements of the Joint Plan, the Amended and Restated Credit Facility and otherwise applicable non-bankruptcy law.

Case: 11-41431      Doc# 1056      Filed: 10/26/11      Entered: 10/26/11 17:12:16      Page 33
of 53

1    Specifically, Round Table expects promptly after the Effective Date to transfer up to 10

2    Stores to current managers or franchisees for little or no payment.  As operated by Round Table,

3    the stores are no more than marginally profitable and Round Table would close these stores if it

4    was unable to transfer them.  Round Table believes that transferring these stores to local single

5    store operators will improve the performance of these stores and consequently the chain and

6    continue payment of franchise fees and Ad Fund contributions.  This will also prevent competitors

7    from encroaching on customers previously loyal to Round Table.

8        Under the Joint Plan and subject to the Amended Credit Documents and applicable non-

9    bankruptcy law, the Reorganized Debtor may also effect a refinancing in full of then outstanding

10   amounts under the Amended Credit Documents or a sale of substantially all of its assets.

11       2.    Bankruptcy Transition and Procedure

12       Matters subject to the Court's retained jurisdiction will be initiated and prosecuted

13   following the Effective Date substantially as they were initiated and prosecuted prior to the

14   Effective Date.  Notice of post-Confirmation matters will be given to the U.S. Trustee, the Secured

15   Lenders, the ESOP Trustee, the Creditor's Committee until it is dissolved, and persons who

16   request notice in writing *after* the Confirmation Date.  The Creditors' Committee will be dissolved

17   as of the date orders are entered on all final fee applications of estate professionals.  Round Table

18   will file quarterly reports and continue to pay U.S. Trustee fees after the Confirmation Date and

19   until entry of the Final Decree.

20       The Joint Plan contemplates that Round Table will close the Cases as soon as possible after

21   the Effective Date.  However, the Joint Plan also expressly provides that any event of default

22   under the Amended Credit Agreement or any failure by Round Table to satisfy its obligations

23   under the Joint Plan with respect to Class 1 Claims or Class 3B Claims constitutes "cause" to

24   reopen the Cases under section 350(b) of the Bankruptcy Code.  Under the Joint Plan, Round

25   Table has waived its right to object to the reopening of the Cases in such circumstances.  In

26   furtherance of the foregoing, the Joint Plan provides that, upon motion by, or on behalf of, the

27   Secured Lenders to reopen the Cases made within 36 months after entry of a final decree and after

28

Case: 11-41431   Doc# 1056   Filed: 10/26/11   Entered: 10/26/11 17:12:16   Page 34
of 53

the occurrence of any event of default under the Amended Credit Agreement or failure by Round Table to satisfy its obligations to the Secured Lenders under the Joint Plan, the Court will reopen the Cases in order to, among other things, implement a Lender-Initiated Sale Process.

### 3. Internal Operations and Management

#### i. Dissolution of Round Table Pizza Nevada

Round Table Pizza Nevada LLC will be wound up and dissolved as rapidly as is practicable after the Effective Date. All assumed leases and executory contracts respecting Stores operated by Round Table Pizza Nevada, LLC will be assigned to RTDC as soon as requisite permits and licenses have been obtained. The assignment and transfer will be effective upon a notice delivered by Round Table to the Landlord or other executory contract counterparty following the Effective Date.

#### ii. Management and Incentive Compensation

Management and the Board of Directors shall continue in effect post-petition, unless and until they are changed pursuant to otherwise applicable non-bankruptcy law.

The members of the Board of Directors[2] are Peter H. Mattson; Robert A. Fox; Eric H. Bjerkholt; Jack Robertson; J. Robert McCourt; Ted S. Storey; and D. Keith Davis.

The officers who comprise senior management[3] are J. Robert McCourt, Chief Executive Officer, Chief Operating Officer and President; Ted Storey, Vice President / Business Development and Secretary; D. Keith Davis, Vice President / Finance and Chief Financial Officer; James M. Robertson, Vice President / Human Resources and Chief Privacy Officer; Tom Guilford, Vice President / Information Systems and Chief Information Officer; Tinka Gordon, Vice President / Marketing and Chief Marketing Officer and Gregg Fleury, Vice President /

---

[2]  The four outside Directors are paid $5,000 per quarter in compensation; the three members of management receive no additional compensation for serving on the Board of Directors.

[3]  Base compensation for the officers who comprise senior management is J. Robert McCourt, $440,000; Tinka Gordon, $261,000; Ted Storey, $252,000; Keith Davis, $259,000; James Robertson, $210,000; Gregg Fleury, $143,000 and Tom Guilford, $151,000.

DISCLOSURE STATEMENT TO ACCOMPANY FIRST AMENDED JOINT PLAN DATED OCT. 26, 2011

Operations.

As noted, Round Table has historically offered low base salaries and high incentive compensation to achieve market compensation packages for management. During the course of the Great Recession, base compensation has remained largely frozen, and there has been virtually no incentive compensation. Under the Joint Plan, an incentive compensation regime will be restored, subject to certain modifications and limitations.

For 2011, the Board of Directors approved three types of incentive compensation directed toward Round Table's personnel.

- ✓ Seven members of senior management would receive incentive compensation in the amount of 80% of annual base salary upon Confirmation of the Joint Plan;

- ✓ The three principal officers – the Chief Executive Officer, the Chief Financial Officer and General Counsel – would receive $20,000 each for achieving each of three objectives. Two objectives (closing 21 Stores in the first two months at an aggregate cost of less than $2.6 million, and filing the Initial Plan within the first three months) were accomplished, yielding entitlements of $40,000 each, the third, yielding an additional $20,000 each, was to confirm a plan of reorganization within 12 months, which is expected to be accomplished; and

- ✓ A non-executive annual incentive plan consisting of 30% of EBITDA (excluding one-time reorganization costs) in excess of $9,114,000 up to a cap of $617,000 in 2011.

As part of the negotiations resulting in the Joint Plan, Round Table agreed that 2011 incentive compensation for senior management would be paid at the same times and in the same proportional amounts that general unsecured Class 3B claims are paid; i.e., in 16 quarterly installments commencing March 31, 2012, with interest at the rate of 6% per annum accrued and paid in the final installment.

DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

For 2012 and thereafter, an annual incentive plan and an executive incentive plan (the "Incentive Plans") will be reinstated. The executive incentive plan will be payable only in stock or synthetic stock, until after the Class 3B unsecured creditors have been paid in full.

The annual incentive plan will receive funding only to the extent that Round Table exceeds $8.6 million EBITDA in the relevant year. By way of comparison, in the 12 months to February 28, 2011, representative level EBITDA was $8.1 million. After the $8.6 million threshold is reached, the annual incentive plan will be funded 50% with the next $500,000 in EBITDA. Once $9.1 million in pre-incentive EBITDA is attained the annual incentive plan will fund at various payout rates depending on business performance, as set by the Board of Directors. For example in 2012, the annual incentive plan would earn $386,000 for delivering pre-incentive projected EBITDA of $9,514,000. The annual incentive plan is capped at $1.5 million annually. To earn the maximum level of incentive, Round Table would need to generate $14.6 million in pre-incentive EBITDA or $13.1 million of EBITDA after incentive payments.

More broadly, the annual incentive plan for 2012 and thereafter includes both corporate and field bonuses based on the positions' historical bonus opportunity levels. Payment will be made annually after approval by the Board of Directors for the corporate bonus, and quarterly without the requirement of Board of Directors approval for the field bonus (Area Managers and below).

The Board of Directors will work with the ESOP Trustee to craft an executive incentive plan for 2012 and thereafter that will distribute stock or synthetic stock equivalents (including those defined in Section 409(p)(6)(c) of the Internal Revenue Code) annually while the Class 3B claims are unpaid, at levels competitive with comparable executive compensation in the marketplace. Executives will annually be granted and vest performance units based on historical awards, executive performance, and market data to ensure the company rewards and retains top management.

The Incentive Plans are subject to the following three principles:

32     DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

1    ✓    No payment will be made under an Incentive Plan if Round Table is in

2         default of its obligations under the Joint Plan;

3    ✓    No compensation will be paid or accrued under an Incentive Plan unless

4         and until Round Table generates at least $8.6 million in EBITDA[4] in the

5         respective calendar year; and

6    ✓    Subject to the foregoing, Round Table will review and modify the Incentive

7         Plans each year to ensure that its employee compensation remains

8         competitive.

9    4.    Post-Petition Deposits

10   Utilities must refund their post-petition deposits within 90 days after the Effective Date

11   unless, within 60 days after the Effective Date, the utility files a motion to retain the post-petition

12   deposit on the grounds that it is necessary to protect the utility's interest.

13   With respect to all post-petition deposits that are not voluntarily returned, Round Table

14   may, at its election, offset the deposit against either post-Effective Date billings or against

15   distributions on the holder's unsecured claim, or may otherwise obtain recovery of the deposit.

16   5.    Objections to Claims

17   Any Person may object to any Claim or Interest treated under the Joint Plan by filing an

18   objection with the Court and serving it upon the respondent and the Debtor not later than the 10th

19   day before the first day set for the Confirmation Hearing.  Upon the filing of an objection, the

20   respondent Claim or Interest shall be a Disputed Claim. If both the Debtor and another party

21   objects to a Claim, the Debtor's objection shall proceed and any other objections based on the

22   same ground or grounds as the Debtor's objection shall be suspended and deferred.  Any other

23   party objecting to a Claim to which the Debtor has also objected shall be permitted to prosecute its

24   objection concurrently with the Debtor's objection, so long as the basis for such objection is not

25

26   _____

27   [4]    By way of comparison, representative level EBITDA for the 12 months ending February 28, 2011 was
     only $8.1 million.

28

33    DISCLOSURE STATEMENT TO ACCOMPANY
     FIRST AMENDED JOINT PLAN
     DATED OCT. 26, 2011

the same ground or grounds on which the Debtors' objection was based. Upon the entry of an order disallowing a Claim in its entirety, all other objections relating to that Claim shall be dismissed. The Reorganized Debtor may object to any Claim or interest at any time.

Any amendment to an otherwise timely filed Proof of Claim in Class 1B, Class 3A or Class 3B must be filed on or before the Effective Date.

6.     <u>Unitary Debtor and Co-Obligor Claims</u>

The Joint Plan treats all unsecured creditors alike, regardless of the entity that owes the debt, and regardless of whether other entities have guaranteed the debt. Every creditor holding a Class 3B claim will receive payment in full with interest in 16 installments, and the existence of guarantees or parallel claims against other affiliated Debtors or other Persons will not increase the amount of the payments or the rate of payment. Round Table believes that this treatment is consistent with economic reality and with creditor expectations, and that the alternative would yield arbitrary and unreasonable results, at the cost of unnecessary complexity and administrative expense.[5] Provided that the Joint Plan goes into effect, the treatment of claims will be on a basis equivalent to substantive consolidation, although the Reorganized Debtors will continue to be separate legal entities with separate accounting.

Under the Plan, all unsecured creditors (unless they elect Class 3A treatment) are paid in full with interest in 16 quarterly installments regardless of the Debtor that was primarily liable on

---

[5]     Without taking into account guarantees, the following summarizes the Claims against and percent of annual operating profits (or losses) of the four Round Table entities if treated as stand-alone Debtors (without taking into account the secured debt and administrative claims, which are owed by all of the entities):

| ENTITY | UNSECURED DEBT (INCLUDING EMPLOYEE BENEFIT CLAIMS) | PERCENT OF ANNUAL OPERATING PROFIT OR LOSS |
|---|---|---|
| RTP | $4.3 million | (42%) |
| RTFC | $0.1 million | 132% |
| RTDC | $3.0 million | 11% |
| RTP Nevada, LLC | $0.1 million | (1%) |
| **Total** | **$7.5 million** | **100%** |

34     DISCLOSURE STATEMENT TO ACCOMPANY FIRST AMENDED JOINT PLAN DATED OCT. 26, 2011

the Claim. As a consequence, there is no need for separate treatment based on the identity of the Debtor that was primarily liable or the existence of guarantors.

The Joint Plan includes "Co-Obligor Claims" provisions, which essentially provide that every claim which could have been asserted against any Round Table entity (a "Related Claim") be asserted as a single claim against Round Table. The merits of the claim will be determined by the disposition of the Related Claim, avoiding unnecessary and duplicative litigation.

If the Related Claim is Allowed, the creditor may not assert a comparable claim (a "Co-Obligor Claim") against any other Person (a "Co-Obligor", including a different Round Table entity, officers, directors, guarantors, etc.) for 55 months from the Effective Date. Any applicable statutes of limitation will be stayed during this period. If, as anticipated, the Related Claim is paid in full under the Joint Plan prior to that date, the Co-Obligor Claim will be dismissed (since it has been paid in full).

If the Related Claim is discharged or disallowed, the claimant will not be permitted to pursue the Co-Obligor Claim, thereby preventing multiple "bites at the apple" and disruption to the business through the pursuit of claims against managers or tertiary parties. These provisions assure the claimant of a full and fair "bite at the apple" against Round Table; additional "bites" are not necessary.

The premise of all of these provisions is that creditors are only entitled to be paid in full once, and the Joint Plan provides an appropriate and efficient means of funding that payment.

7.    Discharge

The Joint Plan provides for a broad discharge of all claims that are not timely asserted in the bankruptcy case, or which are asserted and disallowed by the Bankruptcy Court. The Joint Plan prohibits efforts to pursue collection on discharged claims.

8.    Releases

The Joint Plan includes a broad release by the Debtors and their Estates of the Secured Lenders (and certain related Persons as set forth in the Joint Plan). This release extends to any and all claims, causes of action and other liabilities or obligations in any way related to Round Table,

Case: 11-41431    Doc# 1056    Filed: 10/26/11    Entered: 10/26/11 17:12:16    Page 40 of 53

the Cases, the events and circumstances giving rise to the Cases, the Credit Facility, the Joint Plan or this Disclosure Statement (defined collectively in the Plan as the "Released Matters").

The Joint Plan also includes: separate reciprocal releases between the Secured Lenders, on the one hand, and, the Round Table's officers and directors and professional advisors, members of the Creditors' Committee (in their capacity as members of the Creditors' Committee) and the Creditors' Committee professional advisors, and the ESOP Trustee and its professional advisors (collectively defined in the Joint Plan as the "Released Persons"). Finally, the Joint Plan provides for a release of the Secured Lenders by each holder of a Backstopped Claim. The ESOP Trustee has requested that its reciprocal release with the Secured Lenders be modified to carve-out any liabilities arising under ERISA. As of the date of this Disclosure Statement, the Secured Lenders have not agreed to this modification. The ESOP Trustee and the Secured Lenders are continuing to discuss this matter.

These releases do not extend to any obligation of any Person under the Joint Plan.

## VI. ALTERNATIVES TO THE JOINT PLAN

### A. Going Concern Sale

Round Table engaged in an aggressive sales process from the summer of 2010 through February 8, 2011, contacting all likely buyers. Round Table believes that an effort to sell the company now would result in over-exposure to the market, and that potential buyers are highly likely to remember and be guided by their prior impressions of the company, suggesting that their bids will not materially increase. Round Table also believes that purchasers value companies based on predictable and established operating results, ordinarily looking to the preceding 12 months of operations. As a consequence, it will not be until April of 2012 that buyers are likely to give full effect to the business reorganization and resulting increase in the value of the company achieved in the first months of the Chapter 11 case.

Finally, Round Table believes that credit markets remain limited, such that strategic buyers would experience difficulties obtaining financing to participate in an auction, and that there is a stigma to bankruptcy, suggesting that a current marketing effort would encourage opportunistic

DISCLOSURE STATEMENT TO ACCOMPANY FIRST AMENDED JOINT PLAN DATED OCT. 26, 2011

1  bidders.

2         The Secured Lenders weigh these concerns less heavily.

3         The Joint Plan allows Round Table to control when and how it is marketed for sale or for

4  refinance, but affords the Secured Lenders with a certain outside deadline for retiring their debt;

5  July 31, 2013.

6  **B.     Liquidation**

7         Round Table believes that a true liquidation would be unreasonable and ineffective. Round

8  Table does not own any real estate; all of its company operated restaurants are leased.  The

9  liquidation value of company store assets is probably around $4.5 million[6] – 40% of that current

10 cash on hand.  Cash on hand at the parent company, currently about $4.8 million, would also be

11 available in a liquidation.

12        The amount that might be recovered from Round Table's franchise business and intangible

13 assets (including intellectual property assets) in a chapter 7 liquidation is, at best, highly uncertain.

14 – and the value of its franchise business is unclear, but likely to be severely deflated by closing the

15 company stores, which represent 25% of the system.  Round Table's goodwill, which reflects the

16 imputed value of its franchise operations and intangible assets (including intellectual property),

17 was valued at approximately $21 million dollars in its 2009 audited financial statements.  A

18 portion of that value would be attributed to company stores, which represent 25% of the overall

19 system.  Even if a chapter 7 trustee were able to recover that much from the Debtors' franchise

20 _____

| [6]  TANGIBLE ASSET DESCRIPTION | MARKET VALUE | PERCENT REALIZABLE | LIQUIDATION VALUE |
|---|---|---|---|
| Cash, Deposits, Amounts in Escrow | $1.8 | 100% | $1.8 |
| Accounts and Notes Receivable | 0.4 | 50% | 0.2 |
| Office and Restaurant Equipment | 4.5 | 50% | 2.2 |
| Owned Building on a Ground Lease | 0.4 | 50% | 0.2 |
| Restaurant Inventory | 0.6 | 10% | 0.1 |
| **Total** | **$7.7** | **69%** | **$4.5** |

37    DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

1  operations and intangible assets in a chapter 7 liquidation, a dubious proposition at best, the

2  proceeds would be insufficient to pay the Secured Lenders' claims in full.  In fact, the shortfall

3  would likely be in the millions of dollars.

4       Moreover, during its prepetition sales efforts, the highest offers Round Table received for

5  its entire business (as a going-concern) were conditioned on the Secured Lenders providing

6  financing.  Offers that were not conditioned on such financing were less than $40 million, an

7  amount that now would be insufficient to pay accrued Administrative Claims and the Claims of

8  the Secured Lenders in full, thus resulting in no recovery to holders of Unsecured Claims.  Round

9  Table believes that a chapter 7 liquidation would result in substantially less than the offers it

10 received during the pre-petition sales process for a number of reasons, including:  (i) it is highly

11 unlikely that the business would be sold as a going concern; (ii) a cessation of business operations

12 would put at risk important contractual relationships with vendors, franchisees and other third

13 parties, thus significantly depressing the value of Round Table's franchise business and other

14 intangible assets; (iii) a cessation of business operations would also result in significantly greater

15 claims, some of which would likely have administrative priority treatment, from terminated

16 employees, contract parties and others; (iv) a closing of company stores would severely tarnish the

17 "Round Table" brand and thus negatively impact the value of its franchise business and other

18 intangible assets; and (v) the stigma associated with a chapter 7 liquidation (as compared to a

19 going-concern sale) would likely drive values down.

20      In a chapter 7 liquidation, the chapter 7 trustee would be able to prosecute so-called

21 "avoidance actions," such as fraudulent transfer and preference actions.  Round Table does not

22 believe that these actions would likely result in significant recoveries for the Estates.  As a general

23 rule, prior to the Petition Date, Round Table paid its vendors and other creditors in accordance

24 with historic and customary payment terms.  In addition, Round Table has not engaged in any

25 transfer or transaction within the last several years that is likely to (i) be susceptible to avoidance

26 as a fraudulent transfer and (ii) result in a meaningful recovery for the Estates.  Finally, any

27 recoveries that might be realized from the prosecution of avoidance actions would first be applied

28

38       DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

Case: 11-41431   Doc# 1056   Filed: 10/26/11   Entered: 10/26/11 17:12:16   Page 43
of 53

1   to Administrative Claims, including the expenses of bringing such actions. Round Table believes

2   that it is highly unlikely that there would be any proceeds remaining from the prosecution of

3   avoidance actions after the payment of such Claims. (The current Joint Plan does not contemplate

4   pursuing avoidance actions because unsecured creditors are paid in full under the Joint Plan, and

5   an insufficient payment to unsecured creditors is ordinarily an element of avoidance actions.)

6         Thus, Round Table believes that Creditors holding Unsecured Claims are highly unlikely

7   to receive any recovery in a chapter 7 liquidation. Round Table further believes that any

8   theoretical recovery that they might realize in a chapter 7 liquidation would be far less than what

9   they would receive under the Joint Plan.

10 **C.**     **Non-Consensual Plan**

11         The other leading alternative to the Joint Plan would be a non-consensual Plan, as respects

12   the treatment of the Secured Lenders, consistent with Round Table's prior Plans discussed above.

13   The most substantial benefit associated with a successful non-consensual Plan would likely be a

14   deferred maturity date for the Secured Lenders' Claim; say, 3 years instead of 18 months;

15   rendering it more likely that Round Table could refinance its senior secured debt.

16         A non-consensual Plan might provide additional benefits in terms of a reduction in the

17   interest or amortization rates, although those reductions are likely to be relatively limited in scope.

18   Also, to the extent that Round Table determines that it has colorable claims against the Secured

19   Lenders relating to the pre-petition sale process or the Credit Facility, it would be able to preserve

20   these claims and causes of action rather than releasing them as contemplated by the Joint Plan.

21   However, Round Table believes that: (i) the costs of litigating such claims and causes of action

22   would be substantial; (ii) the outcome of any such litigation would be at best uncertain; (iii) the

23   prosecution of such litigation could have a negative impact on Round Table's business due to such

24   costs and the inherent distraction it would cause for management; and (iv) even if such litigation

25   were successful, actual calculable damages, if any, would likely be limited in scope and would not

26   be realized until years in the future. As discussed above, the Secured Lenders have adamantly

27   denied that they engaged in any conduct that would give rise to any colorable claim or cause of

28

39   DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

Case: 11-41431   Doc# 1056   Filed: 10/26/11   Entered: 10/26/11 17:12:16   Page 44
of 53

action and have stated that they would defend themselves vigorously if any such claim or cause of action were asserted. For the foregoing and other reasons, Round Table believes that the Joint Plan, including, without limitation, the releases of the Secured Lenders and the forfeiture of default interest by the Secured Lenders, represents a reasonable, fair and appropriate settlement of any claims and causes of action that Round Table might have or assert against the Secured Lenders and is in the best interest of the Estates and all Creditors, Interest holders and other interested Persons.

In addition, the expense and delay associated with prosecuting a non-consensual plan of reorganization at this juncture – as opposed to April, when the Initial Plan was first proposed – would likely prove prohibitive. A contested non-consensual plan has been estimated as likely to add 4-6 months to the Confirmation process, with the estate incurring aggregate professional fees on the order of $1 million per month during the period of active litigation. This cost would likely dwarf the benefits associated with success, and would render confirmation of any non-consensual plan doubtful, since it seems unlikely that Round Table would be able to fund payment in full of the professional fees on the Effective Date of the Plan, as it is legally required to do. In addition, the Secured Lenders and potentially other Persons would likely object vigorously to any non-consensual plan, and there can be no certainty that the Debtors would prevail in any such dispute.

Finally, the Court has indicated that it is likely to allow a competing plan process if the Debtors filed a plan that seeks to cramdown the Secured Lenders. Such a process would add additional cost, expense and uncertainty to these Cases.

## VII. OTHER MATERIAL ISSUES

### A. Feasibility of the Joint Plan

The Bankruptcy Code requires that, for the Joint Plan to be confirmed, Round Table must demonstrate that consummation of the Joint Plan is not likely to be followed by the liquidation or the need for further financial reorganization. Round Table believe that it and/or the Reorganized Debtors, as applicable, will be able to timely perform all obligations described in the Joint Plan and, therefore, that the Joint Plan is feasible.

Case: 11-41431    Doc# 1056    Filed: 10/26/11    Entered: 10/26/11 17:12:16    Page 45
of 53

Round Table formulated financial projections for Fiscal Years 2012 through 2016, a summary of which is set forth in Schedule B to this Disclosure Statement (the "Projections"). The Projections are subject to numerous assumptions and qualifications. These assumptions and qualifications include, but are not limited to, ](i) Plan Effective Date payments are made in 2011; (ii) 2011 results are projected consistent with Round Table's 2011 cash budget and following 2011, it is assumed topline comparable sales are flat; (iii) the restructuring benefits are forecasted through 2016; (iv) operating expense inflation is assumed to be offset with price increases and are shown on a net basis in the projections; (v) 9% interest on the Class 1 Claim after the Plan Effective Date with 9% annual principal amortization beginning in 2012 with the outstanding balance assumed to be refinanced on July 31, 2013 on similar terms with the Class 1 Claim along with related refinancing transaction costs estimated at 5% of the then outstanding principal balance; (vi) ESOP contributions are estimated based on Round Table's forecasts of the stock price and number of share to be redeemed based many factors and assumptions; (vii) in 2012 through 2016, annual incentive compensation has been assumed at historical levels; i.e., it is indexed to performance (Round Table's practice is to pay less incentive compensation for lower performance and higher incentive compensation for higher performance; (viii) for 2012 thru 2016 the executive incentive plan is assumed to be payable in stock or synthetic stock; (ix) capital expenditures in 2012 and beyond return to historical levels (calculated on a per store average basis, this aggregates approximately $1.0 million); (x) $2,165,000 of unsecured claims elect Class 3A treatment; and (xi) Class 3B and the 2011 incentive compensation for senior management are paid in 16 quarterly installments beginning in 2012 with 6% interest accrued and paid in the final installment.

The Projections should be read in conjunction with these assumptions and qualifications as well as the risk factors set forth in this Disclosure Statement, as they may affect the financial feasibility of the Joint Plan.

THE PROJECTIONS ARE PRESENTED SOLELY FOR THE PURPOSE OF PROVIDING "ADEQUATE INFORMATION" UNDER SECTION 1125 OF THE

41     DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

BANKRUPTCY CODE TO ENABLE THE HOLDERS OF CLAIMS AND INTERESTS IN VOTING CLASSES TO MAKE AN INFORMED JUDGMENT ABOUT THE JOINT PLAN AND SHOULD NOT BE USED OR RELIED UPON FOR BY ANY OTHER ENTITY OR FOR ANY OTHER PURPOSE, INCLUDING THE PURCHASE OR SALE OF CLAIMS, SECURITIES OR EQUITY INTERESTS IN ROUND TABLE, THE REORGANIZED DEBTORS OR ANY OF THEIR AFFILIATES.

MANY FACTORS COULD CAUSE THE ACTUAL RESULTS, PERFORMANCE OR ACHIEVEMENTS OF ROUND TABLE AND THE REORGANIZED DEBTORS TO BE MATERIALLY DIFFERENT FROM ANY FUTURE RESULTS, PERFORMANCE OR ACHIEVEMENTS THAT MAY BE EXPRESSED OR IMPLIED BY THE PROJECTIONS. SHOULD ONE OR MORE OF THESE RISKS OR UNCERTAINTIES MATERIALIZE, OR SHOULD ANY ASSUMPTIONS UNDERLYING THE PROJECTIONS PROVE INCORRECT, ACTUAL RESULTS COULD VARY MATERIALLY FROM THOSE SET FORTH IN THE PROJECTIONS. ROUND TABLE DOES NOT INTEND, AND DOES NOT ASSUME ANY DUTY OR OBLIGATION, TO UPDATE OR REVISE THE PROJECTIONS, WHETHER AS THE RESULT OF NEW INFORMATION, FUTURE EVENTS OR OTHERWISE, EXCEPT AS OTHERWISE REQUIRED BY LAW.

THE PROJECTIONS WERE NOT PREPARED WITH A VIEW TO COMPLYING WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS NOR IN ACCORDANCE WITH GAAP. THE DEBTORS' INDEPENDENT AUDITORS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT THERETO.

**B.      Risk Factors**

There are a large number of risk factors to be considered in weighing the prospect that

Round Table will successfully complete its payments under the Plan.

First, Round Table may default on the obligations to the Secured Lenders or may fail to satisfy those obligations by July 31, 2013. In that event, the Secured Lenders can exercise their Lender-Initiated Sale Process. Round Table believes that it is highly unlikely that there will be any further distributions to unsecured creditors following a Lender-Initiated Sale.

Second, an organization that purports to represent franchisees generally (the "Round Table Owners Association" or "RTOA") has attempted to oppose assumption of the franchise agreements and has argued that the franchise agreements must be terminated. The Court has overruled the RTOA's objections to assumption of the franchise agreements, and has ordered the assumption of all Round Table franchise agreements.

A majority of the profits enjoyed by Round Table are due to franchise revenues, and if a significant portion of the franchisees left the System, Round Table's ability to perform under the Joint Plan would be in serious doubt.

Third, the Internal Revenue Service or the Department of Labor might determine that the Joint Plan or Round Table's subsequent performance under the Joint Plan does not suitably satisfy the requirements of ERISA and commence enforcement proceedings or dispute Round Table's or the ESOT's asserted tax status. The expense of such proceedings or an adverse determination in such proceedings would call into serious doubt Round Table's ability to perform under the Joint Plan.

Fourth, Round Table's business is very closely tied to employment rates, and its profitability has historically been weakest when West Coast employment is lowest. Although unemployment has somewhat receded, it remains high and there are reasons to fear that it may not decrease rapidly, or may even increase. Were general economic conditions on the West Coast to deteriorate substantially, Round Table's ability to perform under the Joint Plan would be called into question.

**C.  Tax Consequences**

This Disclosure Statement does not purport to provide tax advice. Concerned persons

DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

Case: 11-41431    Doc# 1056    Filed: 10/26/11    Entered: 10/26/11 17:12:16    Page 48
of 53

1 should consult their own tax advisors.  The following statement is intended only to provide a

2 general discussion for the purposes of evaluating the Joint Plan.

3        1.      Tax Treatment of Creditors

4      To the extent that creditors holding claims against Round Table are cash-basis tax payers,

5 the distributions from Round Table will constitute income in the year received, as opposed to the

6 year in which it was due to be received. To the extent that creditors holding claims against Round

7 Table are accrual-basis tax payers and have written off their claims against Round Table, the

8 distributions from Round Table will constitute taxable income.  To the extent that creditors

9 holding claims against Round Table are accrual-basis tax payers and paid taxes on their claims

10 against Round Table in the year that payment was due, the distributions from Round Table will

11 likely not constitute taxable income in the year received.

12        2.      Tax Treatment of Round Table

13      Round Table is a subchapter S corporation, and so all of its taxable income or loss flow

14 through to its sole shareholder, the ESOT.  As a consequence, any tax consequences of the Plan

15 will not have any direct impact on Round Table or its ability to perform under the Plan so long as

16 its tax status is preserved based on the continuing qualification of the ESOP and the tax-exempt

17 status of the ESOT.  Should Round Table lose its current tax status, e.g., due to a determination of

18 violations of ERISA and the disqualification of the ESOP that in turn impacted the tax-exempt

19 status of the ESOT; there might be material adverse tax consequences to Round Table.

20 **D.**    **Conclusion**

21      For the reasons presented above, Round Table does not believe that any of the available

22 alternatives represent a viable, let alone a preferable, alternative to confirmation of the Joint Plan

23 for Creditors or equity holders.

24                **VIII.  CONCLUSION**

25      As a result of its current operating profitability, Round Table believes that the Joint Plan

26 will pay all unsecured Creditors in full within a few years, and preserves all equity and substantial

27 fair market value for the ESOP.  Round Table urges all Creditors to vote in favor of the Joint Plan.

28

             44    DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

DATED: October 26, 2011
ROUND TABLE PIZZA, INC.
THE ROUND TABLE FRANCHISE CORPORATION
ROUND TABLE DEVELOPMENT COMPANY, INC.
ROUND TABLE PIZZA NEVADA, LLC


By: _____ /s/ Ted Storey _____
Responsible Individual


Presented by:

McNUTT LAW GROUP, LLP
ST. JAMES LAW, P.C.


By:   /s/  Michael St. James   .
         Michael St. James
Counsel for the Debtor

45     DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

Case: 11-41431    Doc# 1056    Filed: 10/26/11    Entered: 10/26/11 17:12:16    Page 50
of 53

1          **SCHEDULES**

2

3

4          A.      Effective Date Payments

5          B.      Plan Projections

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SCHEDULE A: EFFECTIVE DATE PAYMENTS

| (in thousands) | | |
|---|---|---|
| **Administrative Claims** | | |
| Estate Professional Fees: | | |
| Debtor & Committee | $ | 764 |
| HMS (Debtor Leases) | | 1,170 |
| ESOP Trustee | | 45 |
| US Trustee | | - |
| Total Professional Fees | | 1,979 |
| Total Administrative Claims | $ | 1,979 |
| Cure RTDC Franchise Agmt | | - |
| Total Cure Claims | $ | - |
| **Priority Claims** | | |
| Employee Benefit Plan (ESOP) | $ | 256 |
| Total Priority Claims | $ | 256 |
| **Unsecured Claims** | | |
| Class 3A Claims Elect 40% | $ | 866 |
| Total Unsecured Claims | $ | 866 |
| **Total Effective Date Payments** | $ | 3,101 |

Note: The Employee Benefits (vacation) would also be reinstated on the
Effective Date.

47    DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011

# SCHEDULE B: PLAN PROJECTIONS

| | Total | 2011 | 2012 | 2013 (a) | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|---|
| RTDC Sales | $ 484,975 | $ 86,565 | $ 79,682 | $ 79,682 | $ 79,682 | $ 79,682 | 79,682 |
| RTFC Sales | 67,566 | 11,118 | 11,336 | 11,278 | 11,278 | 11,278 | 11,278 |
| Total Sales | $ 552,541 | $ 97,683 | $ 91,018 | $ 90,960 | $ 90,960 | $ 90,960 | 90,960 |
| **Adjusted EBITDA** | **$ 54,464** | **$ 9,114** | **$ 9,128** | **$ 9,115** | **$ 9,052** | **$ 9,030** | **9,025** |
| **CAPEX** | **$ 5,818** | **$ 509** | **$ 1,000** | **$ 1,030** | **$ 1,061** | **$ 1,093** | **1,126** |
| **Ending Cash Balance** | | **$ 5,252** | **$ 4,793** | **$ 4,416** | **$ 4,482** | **$ 3,432** | **4,828** |
| **Distributions:** | | | | | | | |
| **Administrative Claims** | $ 4,865 | $ 4,534 | $ 331 | $ - | $ - | $ - | - |
| **Cure Claims** | 576 | 576 | - | - | - | - | - |
| **Secured Debt** | | | | | | | |
| Interest | 13,805 | 280 | 3,252 | 2,959 | 2,729 | 2,438 | 2,147 |
| Principal | 15,560 | - | 3,365 | 2,491 | 3,234 | 3,234 | 3,234 |
| Total Secured Debt | 29,364 | 280 | 6,617 | 5,450 | 5,963 | 5,672 | 5,381 |
| **Priority Claims** | | | | | | | |
| Employee Benefit Plan (ESOP) | 256 | 256 | - | - | - | - | - |
| Total Priority Claims | 256 | 256 | - | - | - | - | - |
| **General Unsecured Claims** | | | | | | | |
| Class 3A Claims Elect 40% Pmt 12/1/11 | 866 | 866 | - | - | - | - | - |
| *Class 3A Claims Payout %* | *40%* | *40%* | *0%* | *0%* | *0%* | *0%* | *0%* |
| Class 3B Claims Elect 100% Pmt | 6,174 | - | 1,269 | 1,269 | 1,269 | 2,367 | - |
| *Class 3B Claims Payout %* | *122%* | | *25%* | *25%* | *25%* | *47%* | *0%* |
| 2011 Incentive Compensation | 1,792 | | 388 | 388 | 388 | 628 | - |
| Employee Benefits | - | Reinstated | - | - | - | - | - |
| **Grand Total Distributions** | **$ 43,894** | **$ 6,513** | **$ 8,605** | **$ 7,107** | **$ 7,621** | **$ 8,667** | **5,381** |

Note (a) Class 1 Claim is assumed to be refinanced on 7/31/13 at the similar terms.

48 DISCLOSURE STATEMENT TO ACCOMPANY
FIRST AMENDED JOINT PLAN
DATED OCT. 26, 2011