MCNUTT LAW GROUP LLP
SCOTT H. MCNUTT (CSBN 104696)
DOUGLAS C. GRAHAM (CSBN 216870)
SHANE J. MOSES (CSBN 250533)
188 The Embarcadero, Suite 800
San Francisco, California 94105
Telephone: (415) 995-8475
Facsimile: (415) 995-8487

MICHAEL ST. JAMES (CSBN 95653)
ST. JAMES LAW, P.C.
155 Montgomery Street, Ste. 1004
San Francisco CA 94104
Telephone: (415) 391-7566
Facsimile: (415) 391-7568

Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re<br><br>Round Table Pizza, Inc.,<br><br>    Debtor. | Case No. 11-41431 RLE<br><br>(Jointly Administered with Case Nos. 11-41432 RLE, 11-41433 RLE, and 11-41434 RLE)<br><br>Chapter 11<br><br>**REQUEST FOR PROTECTIVE ORDER**<br><br>Judge:  Hon. Roger Efremsky<br>Date:    TBD<br>Time:   TBD<br>Crtrm.: 1300 Clay Street<br>        Courtroom 201<br>        Oakland, California |

## I. INTRODUCTION

In the course of a mediation which the Committee solicited, the Committee entered into a binding agreement which afforded a substantially enhanced recovery to unsecured creditors in return for the Committee's commitment to support the Plan of Reorganization. Now that the enhanced Plan is being balloted and cannot be altered, the Committee has reneged, demanding that additional concessions be made, failing which it will oppose confirmation. The vehicle the Committee proposes to use is a resumption of the Rule 2004 Examination of the Debtor. *See*, DECLARATION OF SCOTT H. MCNUTT IN SUPPORT OF MOTION FOR PROTECTIVE ORDER ("McNutt Decl.), ¶ 21, Ex. F (Letter from K. Denniston demanding resumption of Rule 2004 Exam).

This conduct is entirely inappropriate. The prior Rule 2004 Examination has no connection with the examination the Committee currently proposes. Were the Committee to seek a new Rule 2004 Examination, the Court should deny the request. First, the Committee has waited more than a month to raise these issues, resulting in detrimental reliance, imposing prejudicial expense and creating the risk of delaying the confirmation process. More fundamentally, having committed to support confirmation of the Joint Plan, the Committee should not be permitted to oppose it. A protective Order prohibiting the continued Rule 2004 Examination should be entered.

## II. FACTS

**A.     The Prior Rule 2004 Examination**

From the outset, the Debtor was direct and candid about its desire to prosecute its reorganization in partnership with the Committee and repeatedly asked the Committee to join with it in formulating the terms of a consensual reorganization. As the exclusivity period drew to a close, the Committee finally agreed to meet to discuss the terms of a Plan of Reorganization. The Committee listened to the Debtor's presentation, and advised that it would break to discuss matters over lunch and would then return to present its thoughts about the Plan. It never returned from lunch,nor did it ever provide substantive input about the Plan, other than by filing an Objection.

Instead, the Committee sought a Rule 2004 Examination of Round Table with respect to the June 9th Plan of Reorganization and Disclosure Statement. *See*, Application for 2004

Examination, Docket No. 603. After a day's examination – for which the estate ultimately paid $50,000 in professional fees – the Committee deferred any further examination indefinitely.

**B.     The Mediations and the Joint Plan**

In mid-July, the Committee advocated mediation, and the Debtor, GECC and the Committee agreed to engage in mediation before Judge Lafferty, but vacillation and an inability to take a clear position characterized the Committee's approach in the mediations. *See*, McNutt Decl., ¶ 2.

Despairing of the possibility that an agreement with the Committee could be reached, or if reached, would "stick", the Debtor shifted its focus and, in August, negotiated an agreement with GECC which became the basis for the Joint Plan. *See*, McNutt Decl., ¶ 3. Inevitably, funding and financial benefits that might otherwise have been afforded to unsecured creditors were diverted to GECC in consideration for its support for the Joint Plan.

**C.     The Mediation Agreement**

Round Table and GECC concluded that the Committee's support of the Joint Plan would prove valuable. Although Round Table believed that unsecured creditors would broadly accept the Plan regardless of the Committee's position, Round Table perceived some risks of litigation if the Committee opposed confirmation. More significantly, dealing with the Committee had imposed tremendous administrative expenses on the bankruptcy estate, and Round Table expected that if the Committee agreed to support the Plan, that would significantly limit the potential for future fee accruals and make it possible to constrain the Committee's professionals to a budget.

In the hopes of obtaining the Committee's support for the Joint Plan, Round Table, GECC and the Committee agreed to attend a mediation session before Judge Lafferty on August 30, 2011. *See*, McNutt Decl., ¶ 4. Prior to the mediation, GECC confirmed its agreement (offered in the prior mediation sessions) to provide a "backstop" for the benefit of "non-insider creditors" assuring that an aggregate of $1.8 million would be distributed to unsecured creditors.

Also prior to the mediation, Round Table provided the Committee with a term sheet which specified the agreed treatment of GECC under the Joint Plan and proposed to pay unsecured

creditors in full over five years in equal quarterly installments, with interest at the rate of 3.25% paid with the final installment. *See*, McNutt Decl., ¶ 5, Ex. A.

At the outset of the mediation, Round Table advised the Committee that it would pursue confirmation of the Joint Plan with or without the Committee's consent, but that it was prepared to make some concessions in order to obtain the Committee's consent. In the course of the day, various issues were raised and rejected.

Of relevance to the Committee's current demands, the Committee requested that GECC re-affirm its agreement to a backstop. The Debtor expressed reservations about the legality of the backstop,[1] and responded that the backstop was expressly structured as a gift from GECC and thus would not be part of the Plan negotiations. *See*, McNutt Decl., ¶ 6.a. In response to the Committee's question, GECC confirmed that as part of a consensual agreement it would provide a backstop based on $1.8 million in aggregate distributions to unsecured creditors, and recited the backstop mechanics. *See*, DECLARATION OF GREGORY O. LUNT IN SUPPORT OF MOTION FOR PROTECTIVE ORDER ("Lunt Decl."), ¶¶ 4-5. The Committee did not reject the backstop or make any counterproposal for the backstop at the mediation; in addition, during the weeks following the mediation, the Committee raised no questions or concerns about the backstop with GECC or its counsel. *See*, Lunt Decl., ¶¶ 5-6; *see also*, McNutt Decl., ¶ 6. The other Additional Demand, the continuation of a post-confirmation Committee, was never raised at all. *See*, McNutt Decl., ¶ 11.

By the conclusion of the session, Round Table's final offer to the Committee was the following:

✓ The Plan treatment for unsecured creditors would be enhanced by (i) reducing the repayment period from five years to four years and (ii) increasing the interest rate from 3.25% to 6% (the "Enhanced Payment Terms"), *See*, McNutt Decl., ¶ 7, and in

---

[1] Although the Committee owes a fiduciary duty to *all* unsecured creditors, it has instead aggressively pursued the interests of the "backstopped creditors," who constitute less than half of the unsecured creditor body it purportedly represents but include *all* of the Committee members. It now threatens to oppose confirmation of a consensual Plan in order to extract additional concessions for the "backstopped creditors." Round Table believes that this is entirely improper.

220885.7                                                            4                    REQUEST FOR PROTECTIVE ORDER
Case: 11-41431    Doc# 1081    Filed: 11/11/11    Entered: 11/11/11 16:27:15    Page 4 of 10

1     return,

2     ✓     The Committee (i) would support Round Table's opposition to the Round Table Owner's Association's motion to compel rejection of franchise agreements, (ii) would support an extension of exclusivity until the confirmation hearing, and (iii) would support Confirmation of the Joint Plan (the "Support Commitment"). *See*, McNutt Decl., ¶ 8.

At the end of the day, Judge Lafferty advised that the parties were "very close" with respect to Round Table's final offer. Round Table later learned that the Committee lacked a quorum and consequently was unable to conclude an agreement at the August 30th mediation. *See*, McNutt Decl., ¶ 10. Over the ensuing days, Committee counsel requested various additional concessions, but those requests were all rejected. Counsel also proposed a resumption of the mediation, but that request was rejected as well.

On September 1, 2011, Round Table presented its final offer to the Committee at the August 30th Mediation – an exchange of the Enhanced Payment Terms for the Support Commitment – on a "take it or leave it" basis. *See*, McNutt Decl., ¶ 13. Round Table advised that it was unwilling to return to mediation or otherwise alter the proposal. If the proposal was rejected, Round Table would prosecute confirmation of the Joint Plan without the Enhanced Payment Terms. *Id.*

On September 6, 2011, the Committee, through its counsel, advised that the Committee accepted the final offer proposed by Round Table at the August 30th mediation (the "Mediation Agreement"). *See*, McNutt Decl., ¶ 14. Counsel explained that the Committee would attempt to extract additional concessions from the ESOP Trustee, but that its commitment to the Mediation Agreement was unconditional. *Id.* Notably, counsel did not identify the Committee's commitment as being conditioned upon backstop provisions or anything else. *Id.* Indeed, no mention was made of any of the Additional Demands, and there had been no discussions with GECC about the backstop following the August 30th mediation. *See*, Lunt Decl., ¶ 6.

Having reached agreement so that the Plan would be entirely consensual, Round Table requested a budget for the Committee's professional fees through the conclusion of the case. The

Committee's budget dated September 12, 2011 confirmed that it was "based on the settlement reached between the Committee and the Debtors," and anticipated that the Committee's professional fees for the balance of the case would be less than $80,000. *See*, McNutt Decl., ¶ 15, Ex. B.

**D.     The Additional Demands**

On September 20, 2011, the provisions of the Joint Plan of Reorganization governing treatment of unsecured creditor claims, specifically including the backstop provisions, were circulated in draft to the Committee. *See*, Lunt Decl., ¶ 7. On September 23, 2011, the entire Joint Plan of Reorganization was circulated in draft to the Committee; a substantially identical version was subsequently filed with the Court on September 29, 2011. *See*, McNutt Decl., ¶ 16. The Committee made no comment about either of the Additional Demands until October 11, 2011.

On October 11, 2011, more than a month after the settlement had been reached and three weeks after receiving the Plan, counsel for the Committee provided a four-page letter identifying requested revisions to the Joint Plan and Disclosure Statement, but reaffirming its support for the Plan. *See*, McNutt Decl., ¶ 17, Ex. C. Thereafter, it filed a Response to the Disclosure Statement; Docket No. 1047; identifying five specific areas of concern. *See*, McNutt Decl., ¶ 19, Ex. E. Three of the requested revisions were non-controversial or otherwise acceded to. For example, while GECC preferred to receive releases in return for the backstop, it acknowledged that it had not previously established that requirement in negotiations and hence withdrew it from the Joint Plan. *See*, Lunt Decl., ¶ 11.

After making modifications in response to the Committee, two demands asserted by the Committee (the "Additional Demands") were outstanding. *See*, McNutt Decl., ¶ 20. Neither had been raised prior to October 11th and neither formed a part of Round Table's final offer at the August 30th mediation which the Committee had expressly accepted. *Id.* Both Additional Demands were just that: additional concessions requested *after* the Mediation Agreement had been reached.

First, the Committee demanded that it remain in existence post-confirmation, apparently until all Plan performance had been completed. *See*, McNutt Decl., Ex. C, E. This demand had

not been raised prior to the October 11th letter and was entirely unacceptable to the Debtor. Avoiding the expense and disruption of further Committee proceedings had been a factor motivating the Debtor to enter into the Mediation Agreement.

Second, the Committee demanded that the backstop shift from assuring an aggregate distribution of $1.8 million to all unsecured creditors to assuring an aggregate distribution of $1.8 million to backstopped creditors. *See*, McNutt Decl., Ex. C, E. As a practical matter, modifying the backstop as requested would have assured backstopped unsecured creditors of a 90% recovery (assuming that Class 3A was fully subscribed), would have made the Class 3A election implausible, and would have represented an economic concession by GECC to the backstopped unsecured creditors greater than it had ever offered or been asked for. *See*, Lunt Decl., ¶ 11 (stating that the Backstop contained in the September 28 Plan accurately reflected the Backstop offered by GECC).

**E.    The Threatened Examination and Objection**

Through an Objection to the Disclosure Statement, filed the day before the Disclosure Statement hearing, the Committee asserted that the Plan did not conform to the "terms to which the Committee agreed." *See*, McNutt Decl., Ex. E. This was clear revisionism: neither of the two Additional Demands – preserving the Committee in existence post-confirmation and modifying and expanding the backstop mechanism – had ever been even raised at the August 30th Mediation or in connection with the Mediation Agreement. *See*, McNutt Decl., ¶¶ 6-14; *See*, Lunt Decl., ¶ 6. Round Table assumed that this was mere posturing and that the Committee would live up to its Mediation Agreement.

The Debtor complied with the Mediation Agreement by prosecuting confirmation of a Joint Plan that contained the Enhanced Payment Terms. Thus, the Committee enjoyed all of the benefits of the Mediation Agreement.

The Committee's equivocal compliance with its Support Commitment under the Mediation Agreement has now evaporated. Through a letter dated November 3, 2011, the Committee stated, in part,

1   The Committee is unanimous in its decision to oppose confirmation.
2   Given this direction, it is necessary for the Committee to resume its 2004
    examination in order to fully prepare for the confirmation hearing.

3  *See*, McNutt Decl., Ex. F.

4  The November 3, 2011 letter identified the scope of the proposed examination. *See*,

5  McNutt Decl., Ex. F. It also suggested a return to mediation. *Id.* Since the Committee

6  demonstrated its unwillingness to comply with the Mediation Agreement it previously reached, it

7  is unlikely that anyone would agree to mediate with it ever again.

### III.  ARGUMENT

**A.     "Resumption" of the Prior Rule 2004 Examination is Not Available**

In June, the Committee sought a Rule 2004 Examination respecting Round Table's June 9th Plan of Reorganization. The 13 items identified as subjects for examination in the current demand relate principally to the current Joint Plan and bear almost no relationship to the subject of the prior Rule 2004 Examination.

As a procedural matter, if the Committee wishes to examine Round Table about the Joint Plan and its anticipated objection to confirmation of the Joint Plan, it must prosecute new discovery focused to that end; it cannot simply gesture in the direction of the prior Rule 2004 Examination.

The Committee must seek new relief from the Court if it wishes to obtain discovery directed to objecting to confirmation of the Joint Plan. If it does so, the Court should deny the request.

**B.     The Committee's Efforts are Untimely**

As the Court has previously noted in the record, a successful reorganization in this case requires prompt confirmation of a Plan and an end to the accrual of professional fees; Transcript of October 6, 2011 Hearing on Franchise Motions, 51:5-52:5. The instant Joint Plan requires that the Effective Date occur before year-end, and the Court has set the confirmation schedule so as to accommodate that requirement.

1       The Committee in this case has engaged in gamesmanship, and its use of timing has been a
2 key element of its strategy.  First, the Committee did not even surface the Additional Demands for
3 three full weeks from September 20th, when it received the Plan backstop provisions, until October
4 11th, when it requested that they be dramatically enhanced.  Even so, the Committee did not then
5 repudiate the Mediation Agreement or announce its intention to violate its Support Commitments;
6 quite the contrary.  Rather, the Committee waited until *after* the Joint Plan, containing the
7 Enhanced Payment Terms, was safely out for balloting.

8       Even then, the Committee further delayed an *additional two weeks* before announcing that
9 it would object to confirmation and intended to pursue discovery.  The transparent objective –
10 emphasized by the invitation to return to mediation – is to use the pressure of time, and
11 specifically Round Table's need to confirm a Plan of Reorganization before year-end, to extort
12 concessions it knew it could obtain no other way.

13       As demonstrated by its delays, the Committee's current discovery demands are being used
14 for an improper purpose.  See, *In re Duratech Indus.,* 241 B.R. 283, 289 (E.D.N.Y. 1999) ("There
15 are, however, limits to the scope of Rule 2004 examinations.  Significantly, Rule 2004
16 examinations may not be used for the purposes of abuse or harassment . . ." citing *In re Mittco,*
17 *Inc.,* 44 B.R. 35, 36 (Bankr. E.D. Wisc. 1984) and 9 COLLIER ON BANKRUPTCY ¶2004.01[1] (15th
18 ed. 1996)).  There is no absolute right to unlimited discovery; *Wilk v American Medical Assoc*. 27
19 Fed. R. Serv. 2d (Callaghan), 802, (N.D. Ill. 1979); and the Court can use a protective order to
20 exercise discretionary control over the process.  *Turnbull v Topeka State Hosp.* 185 F.R.D. 645 (D.
21 Kan. 1999), *remanded*, 255 F.3d 1238, (10th Cir. 2001), *cert. denied*, 535 U.S. 970 (2002)
22 (holding that a court may issue a protective order, independent of Fed. R. Civ. P. 26(c), if
23 necessary to direct conduct of party or counsel.)

24       The Court should not condone the Committee's gamesmanship.  The Committee should
25 not benefit by the tactical use of delay.

26 / / /
27 / / /
28 / / /

**C.     The Committee Cannot Renege on the Mediation Agreement**

Like any other participant in the bankruptcy process, the Committee is bound by its agreements. Here, it entered into the Mediation Agreement, exchanging its Support Commitment for the Enhanced Payment Terms.

Having obtained the benefit of the Enhanced Payment Terms, the Committee now seeks to renege, breach its Support Commitment, and expose the estate to risks and substantial expenses. The Court should not condone this conduct. The Committee should be held to the commitments it makes. It should be barred from opposing confirmation of the Joint Plan. *See, In re Ion Media Networks, Inc.* 419 B.R. 585 (Bkrtcy. S.D. N.Y 2009) (rejecting for lack of standing objection to plan confirmation presented by creditor who had contractually committed to remain silent in the chapter 11 case).

DATED: November 11, 2011            Respectfully submitted,

                                                                McNUTT LAW GROUP, LLP
                                                                ST. JAMES LAW, P.C.

By:     */s/ Michael St. James*
       Michael St. James
       Attorneys for Debtor